# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| SERIES 17-03-615, a designated series of MSP RECOVERY CLAIMS, SERIES LLC; SERIES 21-12-1644, a designated series of MSP RECOVERY CLAIMS, SERIES LLC; SERIES 15-09-157, a designated series of MSP RECOVERY CLAIMS, SERIES LLC; SERIES 17-04-631, a designated series of MSP RECOVERY CLAIMS, SERIES LLC; SERIES 16-08-483, a designated series of MSP RECOVERY CLAIMS, SERIES LLC; SERIES 23-05-1945, a designated series of MSP RECOVERY CLAIMS, SERIES LLC; SERIES 15-09-355, a designated series of MSP RECOVERY CLAIMS, SERIES LLC; SERIES 16-11-509, a designated series of MSP RECOVERY CLAIMS, SERIES LLC; and SERIES 21-061592, a designated series of MSP RECOVERY CLAIMS, SERIES LLC<br><br>Plaintiff,<br><br>v.<br><br>TEVA PHARMACEUTICALS USA, INC.; TEVA NEUROSCIENCE, INC.; ADVANCED CARE SCRIPTS INC.; ASSISTRX INC.; CHRONIC DISEASE FUND d/b/a GOOD DAYS; and THE ASSISTANCE FUND,<br><br>Defendants. | CLASS ACTION COMPLAINT<br><br>JURY TRIAL REQUESTED |

## CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

NATURE OF ACTION ........................................................................................................... 3

I.     PARTIES ............................................................................................................ 6

II.    JURISDICTION AND VENUE ........................................................................ 11

III.   STANDING ...................................................................................................... 11

   A.   Assignment Agreements & Exemplars ...................................................... 12

IV.    REGULATORY BACKGROUND ................................................................... 25

   A.   Medicare Part D ........................................................................................ 25

   B.   Medicare Participation: Conditions, Certifications, and Payments under Part D ......... 27

   C.   Cost-Sharing Obligations Under Medicare Part D .................................... 31

   D.   OIG Guidance for Co-Payment Charities and Donors .............................. 33

V.     FACTUAL ALLEGATIONS ........................................................................... 35

   A.   Background ................................................................................................ 35

   B.   Defendants Intended to—and did—Cause Copaxone Claims to be Submitted to Part D Sponsors................................................................................................ 41

   C.   Teva Coordinated with ACS, AssistRx, CDF and TAF to Subsidize Medicare Co-pays for Copaxone Patients.............................................................................. 45

   D.   Defendants Knowingly and Willfully Engaged in Illegal Conduct ............ 58

   E.   The Scheme Harmed the Assignors and Class Members ........................... 62

VI.    CLASS ACTION ALLEGATIONS ................................................................. 64

VII.   TOLLING OF THE STATUTE OF LIMITATIONS........................................ 67

VIII.  CLAIMS FOR RELIEF ................................................................................... 70

DEMAND FOR JUDGEMENT ................................................................................. 130

JURY DEMAND....................................................................................................... 130

Plaintiffs, SERIES 17-03-615, a designated series of MSP RECOVERY CLAIMS, SERIES LLC ("Series 17-03-615"); SERIES 21-12-1644, a designated series MSP RECOVERY CLAIMS, SERIES LLC ("Series 21-12-1644"); SERIES 15-09-157, a designated series of MSP RECOVERY CLAIMS, SERIES LLC ("Series 15-09-157"); SERIES 17-04-631, a designated series of MSP RECOVERY CLAIMS, SERIES LLC ("Series 17-04-631"); SERIES 16-08-483, a designated series of MSP RECOVERY CLAIMS, SERIES LLC ("Series 16-08-483"); SERIES 23-05-1945, a designated series of MSP RECOVERY CLAIMS, SERIES LLC ("Series 23-05-1945");  ; SERIES 15-09-355, a designated series of MSP RECOVERY CLAIMS, SERIES LLC ("Series 15-09-355"); SERIES 16-11-509, a designated series of MSP RECOVERY CLAIMS, SERIES LLC ("Series 16-11-509") and SERIES 21-06-1592, a designated series of MSP RECOVERY CLAIMS, SERIES LLC ("Series 21-06-1592")  (collectively, "Plaintiffs"), on behalf of themselves and the Class described herein,[1] bring this action against Teva Pharmaceuticals USA, Inc., Teva Neuroscience, Inc. (collectively "Teva"), Advanced Care Scripts Inc. ("ACS"), AssistRx Inc. ("AssistRx"), Chronic Disease Fund d/b/a Good Days ("CDF"), and The Assistance Fund ("TAF") (collectively "Defendants") and allege as follows:

## **NATURE OF ACTION**

1.      This is an action against Teva, ACS, Assist Rx, CDF, and TAF to recover damages arising from the submission of tainted claims to Medicare Advantage health plans, like Plaintiffs' Assignors ("Assignors").[2] During the period from late 2006 through the present, Teva knowingly and willfully violated numerous state and federal laws by funneling hundreds of millions of dollars

---

[1] The Class Members consist of Medicare Advantage health plans—i.e., Medicare Advantage entities such as Medicare Advantage Organizations ("MAOs"), Independent Practice Associations ("IPAs"), Management Service Organizations ("MSOs"), Health Maintenance Organizations ("HMOs"), and other Medicare first tier and downstream entities—and their assignees (collectively referred to as "MA Plans" or "Medicare Advantage health plans").

[2] The Assignors are MAOs or downstream entities under a full risk contract with CMS to pay for Part D prescription drugs to its enrollees or beneficiaries, including, but not limited to, Copaxone.

through two third-party foundations—CDF and TAF—to illegally subsidize the Medicare co-pay obligations of Copaxone patients, including the Assignors' beneficiaries or enrollees (hereinafter, "Scheme" or "Co-payment Scheme" or "Co-payment Circumvention Enterprise").[3]

2.    Teva effectuated the Scheme through a specialty pharmacy—ACS—using interrelated companies AssistRx and TAF, to which Teva referred Copaxone patients who faced increasingly expensive co-pays for the drug. ACS, in turn, steered those patients to CDF and TAF. ACS then reported back to Teva how many Copaxone patients were receiving co-pay coverage from CDF and TAF. Teva used information provided by ACS to determine how much money each foundation would need to cover new and existing Copaxone patients, and Teva paid each foundation accordingly. From the outset, ACS's founder, Edward Hensley "understood that Teva was purposefully utilizing ACS and structuring its donations to CDF in a manner that essentially ensured that such donations would benefit only Copaxone patients, and not patients who had been prescribed competitor MS medications." [**Ex. 1** – Affidavit of Edward Hensley ("Hensley Aff.") ¶3]. After TAF was established, Hensley ensured that Teva "**understood that Teva would be able to use TAF as it had CDF: essentially, as a 'pass-through' donation vehicle to get Teva monies into the hands of Copaxone patients**." *Id*. ¶ 10 (emphasis added). Teva and ACS converted "free drug" Copaxone patients into Medicare paid claims by enrolling patients in health plans.

3.    Thus, for Teva, both CDF and TAF functioned not as charities for MS patients, but as pass-through vehicles for Teva giving money to Copaxone patients. Teva understood that if it did not use CDF and TAF to subsidize Medicare co-pays for Copaxone patients, Teva's revenue

---

[3] In addition to having relationships with "independent" charities like TAF and CDF, upon belief, Teva also had a relationship with Patient Access Network Foundation ("PANF") and took part in PANF's Strategic Advisory Committee beginning in 2010, until an uncertain time allowing Teva and others to share information regarding use of copayment charities and ways to keep the non-conspirators in the shadows. *See* PANF, 2010 10k, at 11, available at https://www.panfoundation.org/app/uploads/2019/12/2010panfannualreport.pdf (last visited August 16, 2024).

would suffer. Indeed, one Teva employee noted that, "[n]ot funding these patients has a direct and immediate impact on units [sold]." [a copy of this email is attached as **Ex. 20**]. Teva ensured Copaxone revenue would continue to increase by regularly paying CDF and TAF what was needed to subsidize Medicare co-pays for Copaxone patients.

4.      Defendants' Scheme circumvented the congressional design of the Part D system, which requires drug co-pays by Medicare beneficiaries, in part, to act as a market constraint against increasing prices. By insulating patients from their Medicare cost-sharing obligations, Teva was free to, and did, raise Copaxone prices to exorbitant levels. In the time between launching Copaxone in 1997 and 2017, Teva raised the price of the drug **27 times**, increasing the total price by approximately **825%**. [**Ex. 3** – 2020 Drug Pricing Investigation: Teva—*Copaxone* ("2020 Price Report")]. In fact, from December 2006—shortly after the implementation of Part D—to January 2017, Copaxone prices increased at nearly **20 times** the rate of inflation during that period.

5.      Defendants' Scheme resulted in three related, cognizable economic injuries to the Assignors and Class Members: (1) eliminating market safeguards enabled Teva to inflate and charge exorbitant prices for Copaxone; (2) the Scheme rendered Copaxone claims tainted and unpayable under federal and state law, a fact concealed by Defendants; and (3) Teva's Medicare co-pay subsidies induced patient decisions and thwarted prescription abandonment, causing increased generation and dispensing of Copaxone prescriptions. In essence, the Assignors and Class Members purchased Copaxone prescriptions at inflated prices, purchased Copaxone prescriptions that would not have otherwise been generated nor dispensed, and unknowingly purchased Copaxone prescriptions that were unpayable under federal law.

6.      The Assignors and Class Members are entitled to recover the entire amount paid for tainted Copaxone claims and/or the inflation in purchase price caused by the Scheme, in addition to treble damages, actual damages, punitive damages, attorneys' costs and fees, and/or

any other just or equitable remedy afforded by each cause of action asserted against the Defendants in this case.

## I.    PARTIES

### *Plaintiffs*

7.    Plaintiffs are companies that receive assignments to assist Government Healthcare Plans in identifying claims payments that are subject to recoupment.  Assignors provide health insurance coverage, pursuant to Medicare Part C and Part D on behalf of their enrollees. [**Ex. 2 –** Assigned Claims]. Specifically, Assignors made payments for, or otherwise became financially responsible for the cost of the illegally inflated, AKS-tainted, and excessively dispensed Copaxone as a result of the Scheme.

8.    Each and every cause of action identified in this Complaint was assigned to the named Plaintiffs.

9.    Series 17-03-615 is a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company with its principal place of business in Miami, Florida.

10.    Series 21-12-1644 is a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company with its principal place of business at 2701 S. Le Jeune Road, Coral Gables, Florida 33131.

11.    Series 17-03-615 and Series 21-12-1644  have the right to seek reimbursement for payments of Copaxone made by its assignor AvMed, Inc. ("AvMed") for which Defendants are liable due to the conduct alleged herein.

12.    Series 15-09-157 is a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company with its principal place of business in Miami, Florida.

13.     Series 15-09-157 have the right to seek reimbursement for payments of Copaxone made by its assignor ConnectiCare, Inc. ("ConnectiCare") for which Defendants are liable due to

the conduct alleged herein.

14.    Series 17-04-631 is a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company with its principal place of business in Miami, Florida.

15.    Series 17-04-631 has the right to seek reimbursement for payments of Copaxone made by its assignor Fallon Community Health Plan, Inc. ("FCHP" or "Fallon") for which Defendants are liable due to the conduct alleged herein.

16.    Series 16-08-483 is a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company with its principal place of business in Miami, Florida.

17.    Series 16-08-483 has the right to seek reimbursement for payments of Copaxone made by its assignor Emblem Health Services Company, LLC, Group Health Incorporated, and Health Insurance Plan of Greater New York ("Emblem") for which Defendants are liable due to the conduct alleged herein.

18.    Series 23-05-1945 is a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company with its principal place of business in Miami, Florida.

19.    Series 23-05-1945 has the right to seek reimbursement for payments of Copaxone made by its assignor Health Alliance Medical Plans, Inc. ("HEAL") for which Defendants are liable due to the conduct alleged herein.

20.    Series 15-09-355 is a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company with its principal place of business in Miami, Florida.

21.    Series 15-09-355 has the right to seek reimbursement for payments of Copaxone made by its assignor Network Health, Inc. ("NHPN" or "Network Health") for which Defendants are liable due to the conduct alleged herein.

22.    Series 16-11-509 is a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company with its principal place of business in Miami, Florida.

23.     Series 21-06-1592 is a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company with its principal place of business in Miami, Florida.

24.     Series 16-11-509 and Series 21-06-1592 have the right to seek reimbursement for payments of Copaxone made by its assignor SummaCare, Inc. ("SMCR" or "SummaCare") for which Defendants are liable due to the conduct alleged herein.

25.     AvMed, ConnectiCare, Fallon, Emblem, HEAL, Network Health, and SummaCare are collectively referred to as "Assignors".

**26.**     The Assignors made purchases of Copaxone from *at least* 2008 to 2022.

**27.**     Defendants' Co-Payment Circumvention Enterprise triggered payment obligations of Assignors and Class Members. These actions caused the Assignors and Class Members to pay artificially inflated prices for Copaxone. The fraudulent and anticompetitive conduct described herein directly caused damage to Assignors and the Class Members.

*** Defendants ***

*TEVA*

28.     Defendant Teva Pharmaceuticals USA, Inc., ("Teva USA") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. Teva USA is a wholly owned subsidiary of Teva Pharmaceuticals Industries Ltd. ("Teva Ltd"), an Israeli business entity whose shares are publicly traded in the United States.

29.     Defendant Teva Neuroscience, Inc. ("Teva Neuroscience"), is a Delaware corporation with its principal place of business in Overland Park, Kansas. It is a wholly owned subsidiary of Teva USA.

30.     Teva Neuroscience and Teva USA were individually and collectively involved in the Schemes alleged herein. Personnel from both entities proposed, coordinated and approved payments to CDF and TAF. In many instances, Teva USA was the source of Teva's payments to CDF and TAF. In other instances, Teva Neuroscience was the source of payments to CDF and

8

TAF. At all relevant times, Teva advertised, marketed, and sold Copaxone throughout all states and territories of the United States, including the State of Kansas.

31.    Teva Ltd approved the Teva Neuroscience and Teva USA budgets for payments to CDF and TAF. Senior Teva Neuroscience management reported to Teva USA's senior management, who in turn reported to senior management at Teva Ltd in Israel.

32.    This Court has personal jurisdiction over Teva USA because Teva USA maintains systematic and continuous contacts in Kansas, and regularly transacts business in Kansas. Teva USA purposefully availed itself of the privilege of conducting activities in Kansas, thus taking advantage of the protections and benefits of the laws of Kansas.

33.    This Court has personal jurisdiction over Teva Neuroscience because Teva Neuroscience's principal executive offices are located within the state of Kansas and therefore Teva Neuroscience is at home in the state. Teva Neuroscience maintains systematic and continuous contacts in Kansas, and regularly transacts business in Kansas. Teva Neuroscience purposefully availed itself of the privilege of conducting activities in Kansas, thus taking advantage of the protections and benefits of the laws of Kansas.

*Advanced Care Scripts*

34.    Defendant ACS is a Florida corporation with its principal place of business in Orlando, Florida. ACS is a specialty pharmacy.

35.    This Court has personal jurisdiction over ACS because ACS maintains systematic and continuous contacts in Kansas, and regularly transacts business in Kansas. ACS purposefully availed itself of the privilege of conducting activities in Kansas, thus taking advantage of the protections and benefits of the laws of Kansas.

36.    ACS entered into agreements and continuously communicated with Teva who was headquartered in the State of Kansas.

*Assist Rx*

37.     Defendant AssistRx is a Florida corporation with a principal place of business in Orlando, Florida. AssistRx provides various services in the pharmaceutical industry, including administering patient financial assistance programs.

38.     This Court has personal jurisdiction over AssistRx because AssistRx maintains systematic and continuous contacts in Kansas, and regularly transacts business in Kansas. Assist Rx purposefully availed itself of the privilege of conducting activities in Kansas, thus taking advantage of the protections and benefits of the laws of Kansas.

*Chronic Disease Fund*

39.     Defendant CDF is a Texas not for profit entity with a principal place of business in Frisco, Texas. CDF operates disease funds that receive donations from pharmaceutical manufacturers and uses a portion of those payments to subsidize drug co-payment obligations of patients, including Assignors' Enrollees.

40.     This Court has personal jurisdiction over CDF because CDF maintains systematic and continuous contacts in Kansas, and regularly transacts business in Kansas. CDF purposefully availed itself of the privilege of conducting activities in Kansas, thus taking advantage of the protections and benefits of the laws of Kansas.

*The Assistance Fund*

41.     Defendant TAF is a Florida not for profit entity with a principal place of business in Orlando, Florida. TAF operates disease funds that receive donations from pharmaceutical manufacturers and uses a portion of those payments to subsidize drug co-payment obligations of patients, including Assignors' Enrollees.

42.     The Court has personal jurisdiction over TAF because TAF maintains systematic and continuous contacts in Kansas, and regularly transacts business in Kansas. TAF purposefully

availed itself of the privilege of conducting activities in Kansas, thus taking advantage of the protections and benefits of the laws of Kansas.

## II.    JURISDICTION AND VENUE

43.    This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331. The causes of action alleged arise under federal law.

44.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d), because at least one member of the Class is a citizen of a state different from Defendants, there are at least 100 class members, and the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

45.    This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, as the state-law claims are so related to the federal claims as to form part of the same case or controversy.

46.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to this lawsuit occurred in Kansas. Venue is also proper under 28 U.S.C. § 1392(b)(3) because, considering not all Defendants are residents of this judicial district, at least one defendant is subject to the court's personal jurisdiction with respect to this action. Venue is also proper in this district under 18 U.S.C. § 1965(a) because Defendants transact their affairs in Kansas.

## III.    STANDING

47.    The Assignors pay for Copaxone as Medicare Part C (or Medicare Advantage) Plan ("MA Plan") and/or Medicare Part D sponsors.

48.    Since 2008, Assignors collectively paid more than $57 million for Copaxone.

49.    The claims paid for by Assignors involved transactions (and related events) in at least the following states: California, Connecticut, Florida, Illinois, Iowa, Maine, Massachusetts, Mississippi, Nebraska, New York, Ohio, Virginia, Washington, and Wisconsin.

**A. Assignment Agreements & Exemplars**

50.     Plaintiffs executed irrevocable assignments whereby they acquired any and all rights to recover payments made by Assignors on behalf of their Enrollees, health plan members. These assignments convey legal and beneficial ownership of the identified claims and authorize Plaintiffs to pursue and enforce all legal rights of recovery and reimbursement for health care services and benefits. Plaintiffs allege the below assignments to demonstrate standing. [4]

51.     On June 26, 2019, **AvMed**, a non-for-profit organization, irrevocably assigned to Series 17-03-615, a designated series of MSP Recovery Claims, Series LLC, all rights to recover payments made on behalf of AvMed's members or enrollees under CMS Contract ID Number H1016 (the "AvMed Assignment"). The AvMed Assignment expressly provides, in pertinent part:

> Assignor irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its designated series, successors and assigns, any and all of Assignor's right, title, ownership and interest in and to (i) all Claims existing on the date hereof, whether based in contract, tort or statutory right, and all related recovery rights arising from and related to the claims data transferred to MSP Recovery (or its affiliates or service providers, including [MSP Recovery]), and (ii) any and all causes of action, claims and demands of any nature whatsoever relating to payments for health care services provided to Assignor's members and enrollees, and legal or equitable rights (including, but not limited to, subrogation) to pursue and/or recover monies related to the Claims that Assignor had, may have had, or has asserted against any party in connection with the Claims; and (iii) all causes of action, claims, rights and demands of any nature whatsoever, legal or equitable, against primary payers, Responsible Parties and/or third parties that may be liable to Assignor arising from or relating to the Claims, including claims under consumer protection statutes and laws (aal of the items set forth in (i)-(iii), the "Assigned Claims") . . . . The assignment of the Assigned Claims set forth herein is irrevocable and absolute.

52.     The "Assigned Claims" exclude claims against "[AvMed's] network healthcare

[4] Attached hereto as **Exhibit 2**, is a non-exhaustive list of claims the representative Assignors paid for Copaxone during the relevant time period. The columns have the following meanings: "msp_client" refers to the MSP Assignor that the claim was submitted to. Abbreviated names are used therein and consistent with the Assignor abbreviated names herein. "MSP_mrd_id" is similar to a bates number and allows claim identification. Each claim transaction has a unique MSP_mrd_id. "msp_member_id_updated" is a HIPAA compliant way to identify the beneficiary. Each msp_member_id_updated is unique from all others. "msp_dos" is the date the Assignor paid for the drug, and "msp_drug_name" is the drug that the Assignor paid for.

12

Case 2:24-cv-02366-KHV-BGS   Document 1   Filed 08/16/24   Page 13 of 131

providers and current and former members" as well as "[c]laims arising from and related to the GlaxoSmithKline[] manufacturing facility in Cidra, Puerto Rico[.]" Defendants are not AvMed "network healthcare providers" or "current [or] former members" and the claims at issue in this action do not relate "GlaxoSmithKline's manufacturing facility in Cidra, Puerto Rico."

53.     The AvMed Assignment also provided for a due diligence period wherein the parties would exchange deliverables and contemplated that the parties would enter into a separate "Stand-Alone Assignment Agreement" further evidencing the assignment. Upon completion of the prescribed due diligence period, and satisfaction of all conditions precedent, the parties finalized the transaction, including the exchange of compensation and execution of the Stand-Alone Assignment Agreement. The AvMed Assignment and Stand-Alone Assignment assigned claims for dates of service up to June 26, 2019.

1.     On December 31, 2020, AvMed irrevocably assigned to Series 17-03-615 all rights to recover for health care services provided to any of AvMed's members or enrollees under CMS Contract ID Number H1016 (the "Second AvMed Assignment"). The Second AvMed Assignment assigned claims under CMS Contract ID Number H1016 for dates of service from June 27, 2019, to July 31, 2020.The Second AvMed Assignment expressly provides, in pertinent part:

> Assignor irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its designated series, successors, and assigns, any and all of Assignor's right, title, ownership, and interest in and to (i) all Quarterly Claims arising from or evidenced in the Quarterly Claims Data, whether based in contract, tort, or statutory right, and all related recovery and receivable rights arising from and related to the Quarterly Claims Data transferred to MSP Recovery, LLC; (ii) any and all causes of action, claims, and demands of any nature whatsoever relating to payments for health care services provided to individuals enrolled under Assignor's Medicare Advantage plan(s) …, and all legal or equitable rights (including, but not limited, to subrogation) to pursue and/or recover monies related to the Quarterly Claims that Assignor had, may have had, or has asserted against any party in connection with the Quarterly Claims Data; and (iii) all causes of action, claims, rights, and demands of any nature whatsoever, legal or equitable, against primary payers and/or third parties that may be liable to Assignor arising from or relating to the Quarterly Claims, including claims under consumer protection statutes and laws (all of the items set forth in (i)-(iii) …, except for Assignor's right to recovery, under any

13

theory against its network healthcare providers and current and former Members (the "Excluded Claims"). The assignment of the Assigned Claims is irrevocable and absolute. The assignment of the Quarterly Assigned Claims is irrevocable and absolute.

2.    On December 28, 2021, AvMed irrevocably assigned to Series 21-12-1644 all rights to recover for health care services provided to any of AvMed's members or enrollees under CMS Contract ID Number H1016 (the "Third AvMed Assignment"). The Third AvMed Assignment assigned claims under CMS Contract ID Number H1016 for dates of service from August 1, 2020, through June 30, 2021. The Third AvMed Assignment expressly provides, in pertinent part:

> Assignor irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its designated series, successors, and assigns, any and all of Assignor's right, title, ownership, and interest in and to all Claims arising from or evidenced in the Claims Data transferred to MSP Recovery, LLC commencing with and encompassing dates of service from August 1, 2020 through and including June 30, 2021 (the "Assigned Claims"), except for Assignor's right to recover, under any theory, against its network healthcare providers and current and former Members (the "Excluded Claims"). The assignment of the Assigned Claims is irrevocable and absolute.

3.    Consideration was given between the parties in executing these agreements.

4.    AvMed paid for Copaxone with NDC 68546031730 for patient G.R. in Florida on 2-11-2015, 3-30-2015, 4-24-2015, 5-20-2015, 6-16-2015, 7-10-2015, 8-17-2015, 9-14-2015, 10-22-2015, 11-16-2015, 12-10-2015 amongst others. All of these payments were made directly to ACS and the prescriptions were dispensed by an ACS pharmacy using NPI number 1063510097.

5.    On March 20, 2018, **ConnectiCare, Inc.** ("CONC" or "ConnectiCare") irrevocably assigned all its rights and claims to recovery against any liable entity (including Defendants) for payments made on behalf of its Enrollees pursuant to Medicare law to Series 15-09-157, a designated series of Plaintiff MSP Recovery Claims, Series LLC and to MSP Recovery, LLC, a Florida Limited Liability Company ("ConnectiCare Assignment"). Specifically, the ConnectiCare Assignment states:

Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all [claims against third parties], whether based on contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the [claims] and all rights and claims against primary payers and/or . . . third parties that may be liable to Assignor arising from or relating to the [claims], including claims under consumer protection statutes and laws, and all information relating thereto, as may be applicable.

The transfer, grant, right, or assignment of any and all of Assignor's right, title, ownership, interest and entitlements in and to the Assigned Medicare Recovery Claims shall remain the confidential and exclusive property of Assignee or its assigns. This assignment is irrevocable and absolute.
ConnectiCare Assignment at 2.

6.      Under the ConnectiCare Assignment, "Claims" is defined to include:

[L]egal and equitable rights to seek reimbursement and/or recover payments … for Health Care Services provided to Seller's Medicare … enrollees arising under state and/or federal laws, including common law subrogation theories, that provide for the reimbursement of payments made by the Seller for such Medicare services, [including] all outstanding liens, potential liens, lien rights and subrogation recovery rights, legal or equitable, in favor of Seller, including in any litigation such as but not limited to mass tort actions, class actions, [etc.]….

7.      On April 4, 2018, MSP Recovery, LLC assigned the rights it acquired in the ConnectiCare Assignment to Series 15-09-157, a designated series of MSP Recovery Claims, Series LLC ("MSPRC Assignment"). The MSPRC Assignment from MSP Recovery, LLC to Series 15-09-157, which was ratified and approved by ConnectiCare, Inc., states:

MSP Recovery, LLC ("Assignor"), for and in consideration of the sum of . . . and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, hereby irrevocably assigns, sells, transfers, conveys, sets over and delivers to **Series 15-09-157, a designated series of MSP Recovery Claims, Series LLC** . . . ("Assignee"), and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all assigned Subject Medicare Recovery Claims, . . . as such terms may be defined in the March 20, 2018 Assignment Agreement[.]

8.      Consideration was given between the parties in executing these agreements.

9.      CONC paid for Copaxone with NDC 68546031730 for patient C.K.. in Connecticut

15

on the following dates: 8-113-2012, 9-10-2012, 10-15-2012, 12-4-2012, 1-11-2013, 02-19-2013, 03-26-2013. 04-23-2013, 06-03-2013. 07-05-2013, 09-10-2013. 10-28-2013, 11-25-2013. 02-26-2014, 04-07-2014. 06-16-2014, 07-21-2014. 08-27-2014. 09-26-2014. 11-19-2014. 12-30-2014, 07-21-2015. 08-27-2015. 11-20-2015. All of these payments were made directly to ACS and the prescriptions were dispensed by an ACS pharmacy using NPI number 1063510097.

10.    On March 20, 2018, **Emblem**, a not-for-profit organization, irrevocably assigned all rights and claims to recovery against any liable entity (including Defendants) for payments made on behalf of its Enrollees to Series 16-08-483, a designated series of MSP Recovery Claims, Series LLC and to MSP Recovery, LLC ("Emblem Assignment"). The Emblem Assignment expressly provides, in pertinent part:

> Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all Assigned Medicare Recovery Claims, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the Assigned Medicare Recovery Claims and all rights and claims against primary payers and/or, subject to the definition of Assigned Medicare Recovery Claims, third parties that may be liable to Assignor arising from or relating to the Assigned Medicare Recovery Claims, including claims under consumer protection statutes and laws, and all information relating thereto, as may be applicable…

> The transfer, grant, right, or assignment of any and all of Assignor's right, title, ownership, interest and entitlements in and to the Assigned Medicare Recovery Claims shall remain the confidential and exclusive property of Assignee or its assigns. This assignment is irrevocable and absolute.

> [Emblem] has certain legal and equitable rights to seek reimbursement and/or recover payments from primary payers and any other party or entity that may be responsible to [Emblem] directly or through rights conferred on the [Emblem] pursuant to state and/or law pertaining to beneficiaries, for Health Care Services paid to [Emblem]'s Medicare (as defined above) enrollees arising under state and/or federal laws, including common law subrogation theories, that provide for the reimbursement of made by the [Emblem] for such Medicare services, whether under Parts A. B and D of the Medicare Act, including pursuant to a Medicare Advantage Plan, including the right to recover claims Medicare Health Care Services that are billed on a fee for service basis and all outstanding liens, potential liens, lien rights and subrogation recovery rights, legal equitable, in favor of

16

[Emblem], including in any litigation, such as bill not limited to mass tort actions, class actions and multi-district litigation for which a primary payer has demonstrated responsibility, all of the foregoing defined as (the "**Medicare Recovery Claims**;").

11.    The "Medicare Recovery Claims" assigned to Series 16-08-483 includes Emblem's "legal and equitable rights to seek reimbursement and/or recover payments from primary payers . . . responsible to [Emblem] directly or through rights conferred on [Emblem] pursuant to state and/or federal law pertaining to beneficiaries, for Health Care Services provided to [Emblem's] Medicare (as defined above) enrollees arising under state and/or federal laws, including common law subrogation theories, that provide for the reimbursement of payments made by [Emblem] . . . pursuant to a Medicare Advantage Plan[.]" *Id.* at p. 1.

12.    The "Assigned Medicare Recovery Claims" included the above-referenced Medicare Recovery Claims but excluded "Medicare Recovery Claims that [could] be asserted against Assignor's members, enrollees and/or contracted providers" and Medicare Recovery Claims that as of March 20, 2018 (the Effective Date of the agreement) had been assigned to and/or were being pursued "by other recovery vendors" for services rendered within a defined six-year time period. *Id.* These excluded claims are defined in the Emblem Assignment as "Assignor Retained Claims." *Id.* None of these Retained Claims are implicated here.

13.    On April 4, 2018, MSP Recovery, LLC assigned the rights it had acquired in the Emblem Assignment to Series 16-08-483, a designated series of MSP Recovery Claims, Series LLC ("MSPRC Assignment"). The MSPRC Assignment from MSP Recovery, LLC to Series 16-08-483, which was ratified and approved by Emblem, states:

MSP Recovery, LLC ("Assignor"), for and in consideration of the sum of … and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, hereby irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee, **Series 16-08-483, a designated series of MSP Recovery Claims, Series LLC,** a Delaware Series Limited Liability Company, and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the "Assigned Claims", "Claims", "Assigned Assets" "Assigned

17

Medicare Recovery Claims" and "Assigned Documents" (and all proceeds and products thereof) as such terms may be defined in the March 20, 2018 Assignment Agreement[.]

14.     Consideration was given between the parties in executing this assignment.

15.     Emblem paid for Copaxone with NDC 68546031730 for patient M.C. in New York on 1-12-2012, 2-8-2012, 3-7-2012, 4-11-2012, 5-8, 2012, 6-6-2012, 7-9-2012, 8-6-2012, 8-29-2012, 10-5-2012, 11-8-2012, 12-5-2012 . All of these payments were made directly to ACS and the prescriptions were dispensed by an ACS pharmacy using NPI number 1063510097.

16.     On June 19, 2017, **Fallon Community Health** ("FCHP"), a not-for-profit organization, irrevocably assigned all its rights and claims to recovery against any liable entity (including Defendants) for payments made on behalf of its enrollees pursuant to Medicare law to MSP Recovery, LLC ("FCHP Assignment"). Specifically, the FCHP Assignment states:

> [FCHP] hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of [FCHP's] right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for [FCHP] that [FCHP] had, may have had, or has asserted against any party in connection with Claims and all rights and claims against primary payers and/or third parties that may be liable to [FCHP] arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims."

> [FCHP] has certain legal rights to recover payments for the provision of health care services arising from contractual agreements, such as participation and network agreements with applicable capitation and risk sharing arrangements, and state and federal laws that provide for the reimbursement of conditional payments made by the [FCHP], including the right to recover claims for health care services that are billed on a fee for service basis (the "**General Claims**");

> MSP Recovery is in the business of identifying and analyzing Parts A, B and D of [FCHP]'s Medicare, Medicare Advantage and/or Medicaid claims (the "**Medicare/Medicaid Claims**, and together with the **General Claims**, the "**Claims**") and pursuing the recovery of Claims;

17.     On June 20, 2017, MSP Recovery, LLC irrevocably assigned all rights acquired under the FCHP Assignment to Series 17-04-631, LLC, a designated series of MSP Recovery

Claims, Series LLC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated June 19, 2017, by and among [FCHP] and MSP Recovery, LLC . . .

18.     Consideration was given between the parties in executing these agreements.

19.     FCHP paid for Copaxone with NDC 68546031730 for patient K.B. in Massachusetts on 12-31-2013, 05-20-2014, 08-27-2015.7-5-2013. 8-1-2013, 8-27-2013, 9-26-2013, 10-29-2013, 11-25-2013, 12-19-2013. All of these payments were made directly to ACS and the prescriptions were dispensed by an ACS pharmacy using NPI number 1063510097,

20.     On March 19, 2019, **Health Alliance Medical Plans, Inc**. ("HEAL**")** irrevocably assigned all its rights and claims to recovery against any liable entity (including Defendants) for payments made on behalf of its enrollees pursuant to Medicare law to MSP Recovery, LLC ("HEAL Assignment"). Specifically, the HEAL Assignment states:

> [HEAL] assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of [HEAL's] right, title, ownership and interest in and to (i) all Claims existing on the date hereof, whether based in contract, tort, statutory right, and all related recovery rights arising from the health care claims data transferred to MSP Recovery, and (ii) any and all causes of action and legal or equitable rights (including, but not limited to, subrogation) to pursue and/or recover monies related to the Claims that [HEAL] had, may have had, or has asserted against any party in connection with the Claims and (iii) all causes of action and rights and claims, legal or equitable, against primary payers, Responsible Parties and/or third parties that may be liable to [HEAL] arising from or relating to the Claims, including claims under consumer protection statutes and laws (all of the Claims and rights set forth in (i)-(iii), the "Assigned Claims").

> [HEAL] has or may in the future have certain legal and equitable rights to seek reimbursement, recover payments and/or seek damages from primary payers and any Other party or entity that may be responsible to [HEAL], including "Responsible Parties,'" whose failure, directly or through rights conferred on the [HEAL] pursuant to state and/or federal law pertaining to beneficiaries, for health care services provided to any of its members or enrollees for the provision of health care services arising either from (i) contractual agreements, which may include but not be limited to agreements with the Centers for Medicare & Medicare Services ("CMS"), along with such other participation and network agreements in place

containing applicable capitation and risk sharing arrangements, and/or (ii) state and/or federal laws that provide for the reimbursement of conditional payments made by the [HEAL], whether under Parts A, B and D of the Medicare Act, including pursuant to a Medicare Advantage Plan or otherwise, including the right to recover claims for health care services that are billed on a fee for service basis and all outstanding liens, potential liens, lien rights and subrogation recovery rights in favor Of [HEAL] against recoveries by enrollees, including in any litigation, such as but not limited to mass tort actions, class actions and multi-district litigation for which a primary payer has demonstrated responsibility, all of the forgoing defined as the "Claims".

21.    On April 10, 2019, MSP Recovery, LLC irrevocably assigned all rights acquired under the HEAL Assignment to Series 17-03-583, a designated series of MSP Recovery Claims, Series LLC:

> The Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively, the "Assigned Claims") as such terms are defined in the Recovery Agreement.

22.    Further, on October 22, 2020, Series 17-03-583 entered into an assignment agreement with Series 44-20-583, a designated series of Series 44, whereby it irrevocably assigned all rights it acquired through its assignment agreement with MSP Recovery, LLC. This third assignment agreement was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties, and was entered into under Florida law:

> [Series 17-03-583] . . . hereby irrevocably assigns, transfers, conveys, sets over, and delivers to [Series 44-20-583] and its successors and assigns, (i) any and all of Assignor's right, title, ownership, and interest in and to that Agreement, as well as (ii) the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively the "Assigned Claims") as such terms are defined in the Agreement.

> This Assignment includes all the Assigned Claims irrespective of when the claims were vested in HEAL, inclusive of any and all claim(s), causes of actions, proceeds, products, and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to HEAL arising from or relating to the Claims and all information relating thereto.

23.     And on May 31, 2023, Series 44-20-583 irrevocably assigned all rights acquired under the Series 44 Assignment to Series 23-05-1945, a designated series of Plaintiff MSP Recovery Claims, Series, LLC:

> Assignor . . . hereby irrevocably assigns, transfers, conveys, sets over, and delivers to Assignee and its successors and assigns, (i) any and all of Assignor's right, title, ownership, and interest in and to that Agreement, as well as (ii) the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively the "Assigned Claims") as such terms are defined in the Agreement.

This Assignment includes all the Assigned Claims irrespective of when the claims were vested in HAMP, inclusive of any and all claim(s), causes of actions, proceeds, products, and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to HAMP arising from or relating to the Claims and all information relating thereto. The transfer, grant, right, or assignment of any and all right, title, ownership, interest, and entitlements in and to the Assigned Claims shall remain the exclusive property of Assignee or its successors and assigns. The intent of the parties is to transfer any and all rights, title, and interest that Assignor obtained from the Agreement.

24.     Consideration was given between each party in executing these assignments.

25.     HEAL paid for Copaxone with NDC 68546031730 for patient T.L. in Illinois on 1-11-2013 and 2-1-2013. All of these payments were made directly to ACS and the prescriptions were dispensed by an ACS pharmacy using NPI number 1063510097

26.     On August 9, 2017, **Network Health, Inc.** ("NHPN") irrevocably assigned all its rights and claims to recovery against any liable entity (including Defendants) for payments made

on behalf of its Enrollees pursuant to Medicare law to MSP Recovery, LLC ("NHPN Assignment"). Specifically, the NHPN Assignment states:

> [NHPN] hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of [NHPN's] right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for [NHPN] that [NHPN] had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to [NHPN] arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims."
> NHPN Assignment at 4.1.

27.     Under the NHPN Assignment, "Claims" includes all rights based in a "contractual, statutory, equitable, or legal basis, whether state or federal." Further, "Claims" is defined as:

> "[L]egal and equitable rights … in connection with Assignor's payment, liability, or other obligation arising from the provision of Health Care Services to its Members, … including the right to all receivables, proceeds, and products thereof. Assignor's reimbursement and recovery rights include all rights arising under any legal or equitable theories, including but not limited to, contract, tort, state law, federal law, common law, other statutory rights, or otherwise provide for (a) the reimbursement … [of any] payments made by Assignor, … (c) liens, potential liens, lien rights, and subrogation recovery rights … or (e) any receivable or reimbursement rights associated with Assignor's claims payments, whether known or unknown, or arising in the future. Assignor's reimbursement and recovery rights include any and all causes of action, claims, and demands of any nature whatsoever related to payments for Health Care Services … to pursue and/or recover monies related to claims payments, and rights to initiate and pursue litigations…. All of the rights described herein are referred to collectively as the 'Claims.'"

28.     The conveyance of "[NHPN's] right, title, ownership, interest, and entitlements in and to the Assigned Claims shall remain the confidential and exclusive property of MSP Recovery or its assigns."

29.     On August 10, 2017, MSP Recovery, LLC irrevocably assigned all rights acquired under the NHPN Assignment to Series 15-09-355, LLC, a designated series of Plaintiff MSP Recovery Claims, Series LLC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to

22

> Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated August 9, 2017, by and among [NHPN] and [MSP Recovery, LLC] . . .

30.    Consideration was given between each party in executing these assignments.

31.    NHPN paid for Copaxone with NDC 68546031730 for patient M.D. in Wisconsin on 1-23-2012, 2-22-2012, 3-19-2012, 4-17-2012, 5-10-2012, 6-11-2012, 7-6-2012, 8-13-2012, 9-12-2012, 10-11-2012, 11-12-2012, 12-10-2012 continuing through 2016. All of these payments were made directly to ACS and the prescriptions were dispensed by an ACS pharmacy using NPI number 1063510097

32.    On May 12, 2017, **SummaCare, Inc.** ("SMCR"), a Medicare Advantage Organization, irrevocably assigned to MSP Recovery, LLC all its rights to recover against any liable third party (including Defendants) for payments made on behalf of its Enrollees ("SMCR Assignment"). Specifically, the SMCR Assignment states the following:

> [SMCR] hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of [SMCR]'s right, title, ownership and interests in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for [SMCR] that [SMCR] had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to [SMCR] arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims[.]"

> Assigned Claim includes any actions, rights or lawsuits of any nature whatsoever, arising out of or in connection with the Assigned Claims, whether founded on the contractual term and/or any other cause(s) of action either in equity of in law.

33.    On June 12, 2017, MSP Recovery, LLC irrevocably assigned all rights acquired under the SMCR Assignment to Series 16-11-509, a designated series of MSPRC ("Series 16-11-509 Assignment"):

> Assignor … irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title,

ownership and interest in and to the [Assigned Claims] (and all proceeds and products thereof) as such terms are defined in the [SMCR Assignment.]

34.    SMCR consented to, acknowledged, approved, and ratified the Series 16-11-509 Assignment, which is memorialized in a letter dated September 5, 2018.

35.    Several continuing assignment/purchase agreements were executed between SMCR and Plaintiffs ("SMCR Follow-on Assignments"). Each of the SMCR Follow-on Assignments contains materially the same language regarding what is being conveyed. The SMCR Follow-on Assignments have the effect of extending the date range for the claims that were conveyed.

On February 23, 2018, MSP Recovery, LCC purchased SMCR's interest in all claims with dates of service through March 24, 2016. The rights under this purchase agreement were subsequently assigned to Series 16-11-509, a series entity of MSP Recovery Claims, Series LLC.

On November 03, 2018, MSP Recovery, LCC purchased SMCR's interest in all claims with dates of service between March 25, 2016, and March 24, 2019. The rights under this purchase agreement were subsequently assigned to Series 16-11-509, a series entity of MSP Recovery Claims, Series LLC.. For claims between the date of the assignment and the end of the date range, the parties agreed that SMCR would transfer the claims data and convey all related claims interest (and assignee would make additional payment) on a quarterly basis until the end of the term. This agreement was fully executed.

On July 23, 2021, MSP Recovery, LCC purchased SMCR's interest in all claims with dates of service between March 25, 2019, and March 31, 2024. The rights under this purchase agreement were subsequently assigned to Series 21-06-1592, a series entity of MSP Recovery Claims, Series LLC.. For claims between the date of the assignment and the end of the date range, the parties agreed that SMCR would transfer the claims data and convey all related claims interest (and assignee would make additional payment) on a quarterly basis until the end of the term. To date, this agreement has been faithfully executed.

36.    Consideration was given between each party in executing these assignments.

37.    SMCR paid for Copaxone with NDC 68546031730 for patient S.R. in Ohio on 5-7-2013, 6-13-2013, 7-18-2013, 9-3-2013, 10-1-2013, and 11-1-2013. All of these payments were made directly to ACS and the prescriptions were dispensed by an ACS pharmacy using NPI

number 1063510097

## IV.    REGULATORY BACKGROUND

### A.  Medicare Part D

**38.**    In 1965, Congress amended the Social Security Act to create the Medicare act under Title XVIII of the U.S. Code. The Medicare Act created a federally funded health insurance program for the nation's elderly and disabled. The Medicare Act consists of five parts—Parts A, B, C, D, and E. Parts A and B "create, describe, and regulate traditional fee-for-service, government-administered Medicare."[5] Part C outlines the Medicare Advantage program and provides that Medicare beneficiaries may elect for private insurers to deliver their Medicare benefits. 42 U.S.C. §§1395w-21-29.  Part D provides for prescription drug coverage to Medicare beneficiaries. Part E includes "Miscellaneous Provisions."

**39.**    The Assignors provide Medicare benefits under Parts C and D.

40.    Medicare Part D coverage is a voluntary prescription drug benefit program for Medicare beneficiaries established in 2003. Medicare Part D took full effect in 2006. A beneficiary may enroll in Part D if he or she lives in the service area of a Part D plan and is entitled to Medicare benefits under Part A or enrolled under Part B. Medicare Part D is based on a private-market model, wherein Medicare contracts with private entities, known as Part D "Sponsors." These Part D Sponsors administer prescription drug plans and must provide qualified prescription drug coverage.  Part D Sponsors submit a bid the year before it is to deliver Part D benefits. The bid contains a per member, per month cost estimate for providing Part D benefits to an average Medicare beneficiary in the geographic area.

41.    In offering and administering these Medicare Advantage plans, Part D Sponsors,

---

[5] *In re Avandia Mktg. Sales Practices & Prods. Liab. Litig.*, 685 F.3d 353, 357 (3rd Cir. 2012) (citing 42 U.S.C. §§ 1395(c)-1395(i)-(5); 1395(j)-1395(w)).

like the Assignors, bear risks related to the cost and utilization of healthcare services and pharmaceuticals. When Assignors assume these risks, they rely in large part on the protections afforded by state and federal law prohibiting unlawful conduct within the healthcare industry, including laws prohibiting the submission of false, fraudulent, or otherwise unlawful claims.

42.     The Assignors' Part D plans include cost provisions, requiring the beneficiary to pay a percentage of drug costs. These cost-sharing provisions are a crucial factor in managing healthcare costs. *See United States v. Teva Pharmaceuticals USA, Inc*. 560 F.Supp.3d 412, 416 (Mass. Sept. 9, 2021) ("Those partial payments ("copays") are intended to encourage physicians and beneficiaries to be efficient consumers of federally reimbursed health care products and to encourage drug manufacturers to price their products upon market forces"). Likewise, "[s]tudies have shown that if patients are required to pay even a small portion of their care, they will be better healthcare consumers, and select items or services because they are medically needed, rather than simply because they are free."[6]

43.     Part D Sponsors play a critical role in the U.S. healthcare landscape. They provide thousands of Americans with not only health insurance, but with the freedom to go into the marketplace and select the health insurance that best meets their needs. Indeed, "Congress's goal in creating the Medicare Advantage program was to harness the power of private sector competition to stimulate experimentation andinnovation."[7] With each passing year, MA Plans, including Part D plans, have provided health care for a greater percentage of the population. In 2017, 33% of Medicare-eligible individuals got their health insurance from MA Plans. In 2021, that figure rose to 42% and will likely rise further in the coming years.[8] "In 2022, more than 28

---

[6] https://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html

[7] *In re Avandia Mktg. Sales Practices & Prods. Liab. Litig.*, 685 F.3d 353, 363 (3rd Cir. 2012).

[8] Meredith Freed, *Medicare Advantage in 2021: Enrollment Update and Key Trends*, June 21, 2021, Kaiser Family Foundation. Available at: https://www.kff.org/medicare/issue-brief/medicare-advantage-in-2021-enrollment-update-and-key-trends/.

million people enrolled in a Medicare Advantage plan, accounting for nearly half or 48 percent of the eligible Medicare population, and $427 billion (or 55%) of total federal Medicare spending (net of premiums)."[9]

44.     When Medicare Advantage entities "faithfully pursue and recover from liable third parties," they "will have lower medical expenses and will therefore be able to provide additional benefits to their enrollees." *In re Avandia*, 685 F.3d at 363 (quoting *Policy and Technical Changes to Medicare Advantage and the Medicare Prescription Drug Benefit Programs*, 75 Fed. Reg. 19678, 19797 (April 15, 2010)). However, Part D Sponsors, like the Assignors, are unable to play the vital role that Congress intended when faced with schemes like the Defendants'.

45.     Hence, the AKS arose out of Congressional concern that payoffs to those who can influence healthcare decisions would result in goods and services being provided that are excessively costly, medically unnecessary, of poor quality, or potentially harmful to patients. Congress determined that the inducements at issue would "contribute significantly to the cost" of federal health care programs, absent federal penalties as a deterrent. H.R. Rep. No. 95-393, at 53 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3039, 3056. Federal laws, including the AKS, prohibit pharmaceutical manufacturers from paying the cost-sharing obligation of the patient receiving their drug. Specifically, the AKS makes it a crime to knowingly and willfully offer, pay, solicit, or receive any remuneration to induce or reward the referral or generation of business reimbursable by any federal healthcare program. *See* 42 U.S.C. § 1320a-7b(b).

**B. Medicare Participation: Conditions, Certifications, and Payments under Part D**

46.     All providers and suppliers (e.g., Teva and ACS) of medical services and items—

---

[9]   *See* Medicare Advantage in 2022: Enrollment Update and Key Trends: https://www.kff.org/medicare/issue-brief/medicare-advantage-in-2022-enrollment-update-and-key-trends/#:~:text=In%202022%2C%20more%20than%2028,spending%20(net%20of%20premiums).

*including drug manufacturers* who supply covered medications indirectly—*must enroll with Medicare* to be eligible to receive any payment for their items or services through Medicare. 42 C.F.R. § 424.505. To enroll in Medicare, all providers and suppliers must submit an enrollment application to CMS and must "attest[] that the information submitted is accurate and that the provider or supplier is aware of, and abides by, all applicable statutes, regulations, and program instructions." 42 C.F.R. § 424.510(d)(3). Medicare providers and suppliers must also certify that they "understand that payment of a claim by Medicare is condition upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b) (§ 1128B(b) of the Social Security Act) and the Physician Self-Referral Law (Stark Law), 42 U.S.C. § 1395nn (§ 1877 of the Social Security Act))."[10]

47.    The application forms used by all providers and suppliers to enroll in Medicare includes the following attestation: "I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in . . . this application. . . . I understand that payment of a claim by Medicare *is conditioned upon* the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b))."[11]  (emphasis added). The AKS was enacted to protect the "public's confidence in the government" because the government is harmed by bribery even absent any financial harm. *See United States v. Killough*, 848 F.2d 1523, 1532 (11th Cir. 1988) (citing *United States v. Miss. Valley Generating Co.*, 364 U.S. 520, 562 (1961)).

---

[10] CMS Form 855I.

[11]    Medicare    Enrollment    Application,    CMS    Form    855i,    available    at: https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/cms855i.pdf. *See also* https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/Enrollment-Applications.

Defendants are routinely held liable for abusing this trust relationship,[12] and the federal government has emphasized the necessity of "closely scrutiniz[ing]" renumerations relating to the recommendation of medical products" because it involves "exceptional position[s] of public trust[.]" Re: OIG Advisory Opinion No. 11-08, 2011 WL 4526111, at *4.

48.    Additionally, "in order for coverage to be available under Medicare Part D for applicable drugs of a manufacturer, the manufacturer must," among other things, enter "into and have in effect an agreement described in § 423.2315(b)." 42 C.F.R. § 423.2310(a). This manufacturer agreement requires that "[e]ach manufacturer . . . must comply with the requirements imposed by CMS . . . for purposes of administering the program." 42 C.F.R. § 423.2315. In other words, this agreement is a precondition for Copaxone claims to qualify for payment by Assignors. Providers and suppliers also submit claims to federal health care payors, like the Assignors, using a standard claim form—the CMS 1500—which requires the provider to certify that each claim "complies with all Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal Anti-Kickback statute."[13]

49.    When a bill is submitted to a Medicare Contractor, that bill carries an implied certification that the bill is free from material misrepresentations, including violations of the AKS and analogous state law bribery statutes referenced herein. Likewise, Part D Sponsors are required to certify compliance with the AKS and are prohibited from paying for claims that are tainted by an AKS violation or are rendered unpayable due to disqualifying conduct by the underlying provider or supplier. 42 C.F.R. § 422.504(h)(1). Every subcontract that the Medicare Advantage

---

[12] *See, e.g.*, *United States v. Adebimpe*, 819 F.3d 1212, 1219 (9th Cir. 2016) ("[A]s medical equipment suppliers, [defendants] were in positions of trust with respect to Medicare."); *United States v. Goldman*, 607 F. App'x 171, 176 (3d Cir. 2015) (holding that defendant who violated the AKS held a position of trust); *U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 389 (4th Cir. 2015) ("[False] claims make the administration of Medicare more difficult, and widespread fraud would undermine public confidence in the system.") (cleaned up).

[13] *See* https://www.cms.gov/medicare/cms-forms/cms-forms/downloads/cms1500.pdf

provider enters must also contain this certification of compliance. 42 C.F.R. § 422.504(i).

50.     Payments for prescription drugs under Medicare Part D occurs through the same general process: after a physician writes a prescription for a Part D beneficiary, the patient takes the prescription to a pharmacy or submits it to a mail order specialty pharmacy to be filled (or dispensed); when the patient submits the prescription, the mandatory co-pay is due from the patient to complete the purchase of the drug and have it filled; when the pharmacy dispenses a drug to a Part D beneficiary, the pharmacy submits a claim to the beneficiary's Part D Sponsor, which, in turn, submits an electronic record of the claim, called a Prescription Drug Event ("PDE") to CMS; after dispensing the drug, the Part D Sponsor pays the pharmacy for the drug cost, less the co-pay for which the Part D beneficiary was responsible.

51.     The PDE contains specific representations regarding each prescription drug claim, including the patient's name, service provider of the drug, prescriber of the drug, name of the drug, and quantity dispensed to the patient. The creation and submission of accurate PDE claims data (starting with the dispensing pharmacy) is necessary to administer the Part D program. Submitting the required information, which is contained in the PDE, is a condition of payment. *See* 42 C.F.R. § 423.322. CMS regulations require Part D Sponsors and related "downstream" entities that generate and submit PDE claims data to certify that such data is true, accurate, and complete. *See* 42 C.F.R. § 423.505(k). Compliance with the regulatory requirement that claims data in the PDE record submitted is "true, accurate, and complete" is an express condition for payment under the Medicare Part D Program. *Id.* Thus, for a PDE to be true, accurate, and complete and in compliance with all applicable federal health care laws, the dispensing pharmacy must first certify that the submitted claim for payment is free and clear of any material defects that would otherwise prohibit payment.

52.     Teva and ACS are subject to and must comply with these rules and regulations.

Meaning, Teva and ACS necessarily, and repeatedly certified compliance with federal health care laws throughout the duration of the Scheme in order for Copaxone to have remained eligible for payment by federal health care programs, like the Assignors. Every individual Copaxone claim submitted from ACS to the Assignors necessarily represented that the claim was free and clear of any material defects that would otherwise prohibit payment. Hence, each time ACS submitted a Copaxone claim with full knowledge of the Scheme's existence, ACS falsely certified compliance with federal healthcare laws to obtain payment from the Assignors.

53. Teva and ACS are fully aware of Congress' unequivocal instruction that "compliance with federal health care laws, including the [AKS], is a condition of payment by the Medicare program." *McNutt ex rel. U.S. v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1260 (11th Cir. 2005). Like the AKS, several state laws prohibit similar unlawful conduct involving health insurance transactions, namely: (1) Cal. Bus. & Prof. Code § 650 and Cal. Ins. Code §§ 750 and 754; (2) Conn. Gen. Stat. §§ 53a-161c and 53a-161d; (3) Fla. Stat. §§ 456.054 and 817.505; (4) 740 Ill. Comp. Stat. 92/5; (5) Mass. Gen. Laws ch. 175H, § 3; (6) Ohio Rev. Code § 3999.22; and (7) Va. Code Ann. § 32.1-315.

**C. Cost-Sharing Obligations Under Medicare Part D**

54. There are four payment stages to a Medicare Part D drug plan: (1) Annual Deductible, (2) Initial Coverage, (3) Coverage Gap, and (4) Catastrophic Coverage. In each stage, the enrollee, Plan Sponsor, and/or Medicare are required to contribute their independent and exclusive portion of the total costs in accordance with the applicable cost-sharing parameters. The

cost-sharing allocation in each stage varies.



### Medicare Part D Standard Benefit Design in 2018

Note. Some amounts rounded to nearest dollar. *The estimate of $8,140 in total drug costs corresponds to a $5,000 out-of-pocket threshold for catastrophic coverage in 2018.
Source. KFF, Based on 2018 Part D benefit parameters.

55.     In 2018, the Part D standard benefit had a $405 deductible and 25% coinsurance up to an Initial Coverage limit of $3,750 in total drug costs, followed by a Coverage Gap. During the Coverage Gap, Plans covered 15% of costs for brand-name drugs and 56% of costs for generic drugs. Once the Catastrophic Coverage stage begins, Plan Sponsors are responsible for 15% of drug costs.

56.     Under Medicare Part B and D cost-sharing parameters, there is an exclusive portion of total drug expenses that are always paid for by the Assignors and Class Members—i.e., Plan Sponsors. This portion is entirely independent of any expenses covered by Medicare. Because the Assignors and Class Members pay for a portion of beneficiaries' total prescription costs, Defendants' Scheme, which increased prices and utilization of Copaxone, necessarily resulted in

injury to the Assignors and Class Members. As such, Defendants used the Scheme to boost drug sales at inflated prices necessarily causing injury to Assignors and Class Members by drastically enlarging the total cost or amount paid by the Assignors and Class Members.

### D. OIG Guidance for Co-Payment Charities and Donors

57.    The federal government, through the Office of Inspector General ("OIG"), has provided guidance to co-payment charities about compliance with applicable laws and regulations. The OIG has made clear that such charities will violate those laws and regulations if they do not follow the specified rules and/or guidance. These rules ensure that a pharmaceutical manufacturer cannot control a co-payment charity or receive information from such a charity that would allow the manufacturer to link the amount it donates to additional profits from the sale of a particular drug.

58.    On November 22, 2005, the Office of Inspector General of the Department of Health and Human Services ("HHS OIG" or "OIG") released an advisory bulletin applicable to all patient assistance programs for Medicare Part D enrollees ("PAP") (the "2005 PAP Bulletin"). 70 Fed. Reg. 70623 (Nov. 22, 2005). "That 2005 PAP Bulletin provided guidance, in anticipation of Medicare Part D taking effect in 2006, to entities operating PAPs." *Patient Servs., Inc. v. United States*, 2019 WL 267872, at *4 (E.D. Va. Jan. 18, 2019).

59.    The OIG warned it would be a violation of the AKS and other laws for a drug manufacturer to knowingly provide subsidies to Part D beneficiaries taking its product. The OIG identified criteria for PAPs and manufacturers to avoid "potentially abusive PAP structures," and to ensure any donations from manufacturers, for Part D beneficiaries, were provided through "bona fide"[14] independent charities.

---

[14] As explained, "[the OIG] would not consider a charitable foundation . . . formed, funded or controlled by a manufacturer . . . to be a bona fide, independent charity[.]" 70 Fed. Reg. 70623-03.

60.     The OIG explained that failure to abide by its regulations will result in "increasing costs to Medicare" and "reducing beneficiaries' incentives to locate and use less expensive, equally effective drugs." Circumventing "cost-sharing subsidies" would "shield beneficiaries from the economic effects of drug pricing, thus eliminating a market safeguard against inflated prices." Failure to abide by its regulations would "have the practical effect of locking beneficiaries into the manufacturer's products, even if there are other equally effective, less costly alternatives[.]"

61.     Recognizing the potential for extraordinary profits that could be garnered through abuse, "the OIG expressed concern[] . . . manufacturers may seek improperly to maximize these profits by creating sham 'independent' charities to operate PAPs; by colluding with independent charity programs . . . ; or by manipulating . . . eligibility criteria to maximize the number of beneficiaries[.]" 70 Fed. Reg. 70623-03. "Simply put, the . . . PAP must not function as a conduit for payments by the . . . manufacturer to patients[.]"

62.     The OIG identified specific procedures for entities seeking an "Advisory Opinion" from the OIG.[15] 70 Fed. Reg. 70623-03. Accordingly, the 2005 Bulletin set forth factors that the OIG considers to be "fundamental" to a properly structured, independent, bona fide PAP, including the following "Five Requirements":

   a.  No drug manufacturer or donor exerts any direct or indirect influence or control over the PAP;

   b.  The PAP awards assistance in a truly independent manner that severs any link between the drug manufacturer donors funding and the beneficiary;

   c.  The PAP awards assistance without regard to the drug manufacturer's interests, or the beneficiary's choice of product, provider, practitioner, suppler, or Part D drug plan;

   d.  The PAP awards assistance based on a reasonable verifiable, and uniform measure of financial need applied in a consistent manner; and

---

[15] As explained by the PAP in *Patient Servs., Inc.*, 2019 WL 267872, at *8, "operating without an [A]dvisory [O]pinion is practically impossible"; therefore, to successfully operate within the Part D framework, it is essential for a PAP to convince the OIG to endorse its operations.

e. The drug manufacturer does not solicit or receive data from the PAP that would allow the manufacturer to substantiate the amount of its donations with the number of subsidized prescriptions for its products. *Id*. at 70626-27 ("Simply put, the independent charity PAP must not function as a conduit for payments by the pharmaceutical manufacturer to patients and must not impermissibly influence beneficiaries drug choices.").

63.   Since 2005, the OIG has publicly disseminated multiple Special Advisory Bulletins (including in 2006, 2011, 2014 and 2015). For instance, in 2014, the OIG issued a Supplemental Bulletin relating to "indirect remuneration" provided by drug companies. *See* 79 Fed. Reg. 31120-31123 (May 30, 204). The OIG reiterated, that "[i]f a donation is made to a PAP to induce the PAP to recommend or arrange for the purchase of the donor's federally reimbursable items," as well as if a PAP's grant of financial assistance to a patient is made "to influence the patient to purchase (or induce the patient's physician to prescribe) certain items", the "[AKS] could be violated." *Id*. The OIG further stated that independent charities were prohibited from "giv[ing] a donor any information that would enable a donor to correlate the amount or frequency of its donations with the number of aid recipients who use its products or services, or the volume of those products supported by the PAP." *Id*.

## V.    FACTUAL ALLEGATIONS

### A. Background

*Teva—Copaxone*

64.   Copaxone is a prescription medication that is used to treat relapsing forms of multiple sclerosis ("MS"), to include clinically isolated syndrome, relapsing-remitting disease, and active secondary progressive disease in adults.

65.   Teva Ltd. licensed the rights to Copaxone from the Weizmann Institute of Science in 1987. In 1996, The United States Food and Drug Administration (FDA) approved Copaxone, and it subsequently became one of the best-selling drugs in the United States.

66.   Teva first launched Copaxone in March 1997 as a 20 mg/ml injection administered

35

once per day. In 2014, Teva began offering Copaxone as a 40 mg/ml injection administered three times per week at least 48 hours apart. From 1997 to 2017, Teva raised the price of Copaxone 27 times. [**Ex. 3** – 2020 Copaxone Report, pg. 1]. During that same period, the price of an annual course of Copaxone 20 mg/ml has jumped from $9,230 to $85,368 (or $7,114 monthly). *Id*.

67.    Teva's price increases fueled significant growth in net U.S. revenue for Copaxone. In 2002, Teva reported a net U.S. revenue of $411 million. *Id*. at 2. From 2014 to 2017, Copaxone U.S. revenue leveled between $3.1 billion and $3.3 billion per year—nearly an eight-fold increase over 2002. *Id*. Teva's net U.S. revenue began to decrease only when generic Copaxone hit the market in late 2017. *Id*.

*Teva's "Shared Solutions" Program, ACS, and Assist Rx*

68.    Teva used various tools to increase Copaxone profit and utilization under its "Shared Solutions" program. According to Teva, Shared Solutions was "dedicated to getting and keeping patients on Copaxone." Among other things, Shared Solutions worked with patients to obtain insurance coverage for Copaxone and helped them identify means of covering the often substantial co-pays. Physicians who prescribed Copaxone typically submitted an enrollment form directly to Shared Solutions for each new Copaxone patient. As a result, Shared Solutions established a relationship with the vast majority of Copaxone patients. A set of talking points for its Copaxone sales team demonstrates that Shared Solutions "supports 3 separate financial assistance programs for COPAXONE patients", including "Medicare Part D assistance." [**Ex. 4** – DOJ Compl., ¶ 49]. Similarly, in a 2011 Work Plan for Teva Neuroscience, the company noted that "Copaxone Patient Assistance Programs remove prescribing barriers and drive[] adherence and compliance." *Id*. ¶ 50. In essence, Shared Solutions served as a co-pay assistance HUB for prescribing physicians and Medicare patients facing exorbitant Copaxone prices.

69.    In 2004, Edward Hensley and Jeffery Spafford founded ACS to provide "[c]o-pay

assistance access and 501(c)(3) expertise" and "refer [patients] to…a foundation 501(c)(3), if funding is available"—and later founded both TAF and Assit Rx. Plaintiffs expect that between 2004 and the date the contract was signed, there were additional communications between Teva and the entities that led to the signature of the ACS agreement. In 2006, Teva entered into a contract with ACS. [**Ex. 5** – 2006 Teva-ACS Contract]. Pursuant to the contract, Shared Solutions (i.e., Teva) referred to ACS patients who had been prescribed Copaxone and who either had or were eligible for Medicare Part D coverage. If a patient did not already have Part D coverage, ACS facilitated Medicare enrollment for the beneficiary with a plan offering coverage for Copaxone.

70.    ACS would also gather the necessary information from the patient and, on the patient's behalf, apply for co-pay assistance through CDF or TAF. Teva's 2006 contract with ACS was renewed in January 2010 and remained in place until *at least* February 2015. There is reason to believe these agreements were further extended, as there is evidence that Shared Solutions referred approximately 30,300 Copaxone patients to ACS from 2006 to 2022. [**Ex. 6** – Ian M. Dew Report, pg. 14].

71.    ACS generated substantial revenue from Teva. Teva paid ACS to facilitate foundation coverage through CDF or TAF for Medicare patients prescribed Copaxone, and from ACS dispensing Copaxone. ACS dispensed Copaxone to the vast majority of patients that ACS had arranged co-pay coverage for through CDF or TAF. In fact, "ACS dispensed a disproportionate amount of all Copaxone prescriptions for Medicare patients as a result of its schemes with Teva", [**Ex. 7** – U.S. Statement of Facts ("US SoF"), ¶ 195], and, notably, "Copaxone is [or was] ACS's biggest drug." *Id*. ¶ 194.

72.    In 2009, Hensley and Spafford founded AssistRx. In September 2010, AssistRx started running Teva's free drug program for Copaxone patients who did not have insurance. [**Ex. 4** – DOJ Compl., ¶ 52]. As part of that program, AssistRx identified Medicare-eligible patients

who were receiving free Copaxone, facilitated patients Medicare coverage, then referred them to ACS, which then would seek co-pay funding for them through CDF or TAF. *Id.* In December 2014, AssistRx entered into an agreement with Teva to perform services related to the enrollment and re-enrollment of Copaxone patients at TAF, including the use of "batch" referrals and providing Teva the number of Copaxone patients that AssistRx successfully enrolled and re-enrolled at CDF and TAF. [**Ex. 7** – US SoF, ¶ 115]. AssistRx effectively assumed ACS's role and began arranging Medicare co-pay funding for Copaxone patients referred by Shared Solutions. [**Ex. 7** – US SoF, ¶ 208 (AssistRx and TAF employee, Adam Stotts, testifying that AssistRx was "just another program transition" replicating ACS's arrangement with Teva)].

73.     Like ACS, AssistRx generated substantial revenue through its efforts in furtherance of the Schemes. For example, between 2015-2018 Teva paid AssistRx approximately $2.5 million for effectuating its Copaxone Access and Medicare Program ("CAMP"). [**Ex. 8** – AssistRx Invoices and Spreadsheets]. Over the course of its contractual relationship with AssistRx, Teva paid AssistRx approximately $6.78 million in service fees through January 2016, and $1.91 million from February 2016 through December 2017. [**Ex. 7** – US SoF, ¶ 116; *see also, Id.* ¶ 197 (noting Teva accounts for about 20% of AssistRx's $80 million in annual revenue)]. In addition to generating revenue from Teva, AssistRx was paid directly by TAF. [**Ex. 9** – TAF Financial Statements, pg. 17 (noting payments over $1.9 million and $1.3 million in 2013 and 2012, respectively, in "Management Fees")].

*Teva's Conduits: CDF and TAF*

74.     In December 2006, Teva entered into a donation agreement with CDF. [**Ex. 10** – Teva-CDF Contract].

75.     Shortly before then, in September 2006, the OIG issued a favorable Advisory Opinion to CDF. [**Ex. 11** – CDF Advisory Opinion]. The OIG relied on CDF's representation and

promises that, among other things, its "reports to donors do not [and would not] contain any information that would enable a donor to correlate the amount or frequency of its donations with the number of patients that use its products." *Id*. at 5. The Opinion also noted that "Donors are not [and would not be] assured that the amount of financial assistance their patients…receive will bear any relationship to the amount of their donations. Indeed, donors are not [and would not be] guaranteed that any of their patients…will receive any financial assistance whatsoever from [CDF]." *Id*. However, Teva and CDF, knew and intended for CDF to use Teva's money to cover Medicare copays for the vast majority of Copaxone patients Teva referred to CDF through ACS or AssistRx.

76.     On May 21, 2014, the OIG issued a Supplemental Special Advisory Bulletin and issued a letter to CDF's Executive Director, Clorinda Walley, requesting information and new certifications that would allow the OIG to "work with [CDF] to achieve a modification of [2006 CDF Opinion]." [**Ex. 12** – OIG Letter to CDF]. In response, CDF certified, among other things, that all material facts represented in its 2006 Advisory Opinion remain true and accurate. *Id*. However, CDF regularly provided patient data directly to Teva and indirectly through ACS or AssistRx. CDF knowingly and intentionally coordinated with Teva, whether directly or indirectly, to ensure Teva's money went to Copaxone patients.

77.     One way to effectuate this goal was timing the submission of applications for Copaxone co-pay assistance and opening the CDF's MS Fund. For instance, just before sending a payment (i.e., donation) to CDF, Teva would notify ACS, who then would send a "batch file" of applications for all the waiting Copaxone patients to CDF so that CDF would act on those applications as soon as the fund re-opened. [**Ex. 1** – Hensley Affidavit, ¶¶ 5-6]. In this way, Teva and ACS ensured that the vast majority, if not all, of Teva's payment to CDF covered co-pays for Copaxone patients.

78.     CDF repeated this same "batch file" strategy throughout the duration of the Schemes, maximizing Teva's ROI for its Copaxone subsidies.

79.     In 2009, Hensley and Spafford founded TAF. On January 1, 2010, Teva entered into a donation agreement with TAF. [**Ex. 13** – Teva-TAF Contract].

80.     On May 26, 2010, pursuant to TAF's request, the OIG informed Spafford that TAF received a favorable Advisory Opinion related to TAF's MS Fund. [**Ex. 14** – TAF Advisory Opinion]. Like CDF, TAF made certain certifications which the OIG relied on in awarding a favorable Advisory Opinion. *Id*. Among other things, TAF certified that it would "not provide Donors with any data that would facilitate the Donor in correlating the amount and frequency of its donations with the amount or frequency of the use of its products or services" and "Donors would not be permitted to earmark contributions for specific Specialty Medications", such as Copaxone. *Id*. Pursuant to TAF's request, on May 19, 2011, the OIG modified the 2010 Advisory Opinion. On May 21, 2014, the OIG sent a letter to TAF's Executive Director, Mark P. McGreevy, requesting new information and certifications of compliance. [**Ex. 15** – OIG Letter to TAF]. On May 5, 2016, based on TAF's certifications, the OIG issued a modified advisory opinion to TAF. [**Ex. 16** – TAF Modified Opinion].

81.     Like CDF, TAF intentionally and willfully coordinated with Teva, ACS, and AssistRx in contravention of its certifications to the OIG.

82.     Throughout the duration of the Schemes, TAF implemented the same "batch file" strategy as CDF. For example: "First, ACS told Teva how many patients were awaiting Medicare co-pay coverage at a particular time; second, TAF told Teva the average Medicare co-pay grant amount for a Copaxone patient at that time; third, Teva multiplied those two figures together and added an amount for TAF's administrative fee to determine how much to pay TAF; fourth, Teva told ACS how much and when it planned to pay TAF; fifth, ACS sent a 'batch file' of Copaxone

co-pay coverage applications to TAF as soon as TAF's MS fund opened upon receipt of Teva's payment; and finally, TAF provided co-pay grants to Copaxone patients awaiting Medicare co-pay coverage." [**Ex. 4** – DOJ Compl. ¶ 90 (further noting Denise Lynch, Teva's then Vice President of Patient Services, testified that this process "was the normal way it was done.")]. TAF coordinated the same "batch file" strategy with AssistRx as well.

83.    TAF repeated the "batch file" strategy throughout the duration of the Schemes, maximizing Teva's ROI for its Copaxone subsidies.

84.    As a result of the Schemes, between January 2010 and December 2018, TAF disbursed over $205 million in Copaxone subsidies for approximately 15,461 patients, [**Ex. 6** – Ian M. Dew Report, pg. 11]; between 2008 and August 2019, CDF disbursed over $97 million in Copaxone co-pay subsidies for approximately 12,120 patients. *Id*. at 9.

85.    As a result of the Schemes, Medicare and Part D Sponsors paid approximately $1.5 billion for Copaxone between 2008 and 2017 for patients who were (1) referred by Teva to ACS or AssistRx; and (2) enrolled for assistance at CDF or TAF by ACS or AssistRx following a Teva payment to the respective foundation. [**Ex. 7** – US SoF, ¶ 141; *see also*, **Ex. 15** – Dew revised Report, pg. 15].

**B. Defendants Intended to—and did—Cause Copaxone Claims to be Submitted to Part D Sponsors**

> *i.    Teva Used its Drug Subsidies to Boost Copaxone Sales*

86.    It is "widely understood that high co-payments are a leading cause [of prescription abandonment], and lowering co-payments significantly reduces abandonment for highly effective chronic treatments."[16] To avoid abandonment of increasingly expensive drugs, illegal programs,

---

[16] *See* Dana P. Goldman et al., *Prescription Drug Cost Sharing: Associations with Medication and Medical Utilization and Spending and Health*. 298.1 Jama 61, 61–69 (2007), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6375697/.

like Defendants' Schemes, allow pharmaceutical manufacturers to "subsidize a Part D enrollee's out-of-pocket cost for only its drugs—for a category of patients for whom medication non-adherence is common because of high cost-sharing obligations."[17]

87.    Likewise, the DOJ's medical expert, Dr. Jacob Rube opined, "(i) out-of-pocket cost is central to treatment initiation and adherence in MS patients, and (ii) due to cost, patients often select different medication, choose to eventually switch drugs, or discontinue treatment." [**Ex. 7** – US SoF, ¶ 105; *see also*, **Ex. 17** – Rube Report, ¶¶ 16-24]. Dr. Rube further opined that "cost is central to treatment initiation and adherence in MS Patients" and plays a "central role…in selection of a therapy". [*Id.* ¶ 23].

88.    In fact, Teva employees testified that "Medicare Copaxone patients told Teva they needed financial assistance to afford Copaxone." [**Ex. 7** – US SoF, ¶ 142]. AssistRx and TAF "employees also have testified that Medicare Copaxone patients would not have filled their prescriptions without co-pay assistance." [*Id.* ¶ 143].

89.    Moreover, internal discussions between Teva employees and strategic documents largely reflect the findings in Dr. Rube's report. For example:

    a.    In July 2007, Dot Parker, a Teva Senior Manager of Compliance and Adherence, circulated a PowerPoint stating "[Patients] need assistance because the 25% coinsurance and the donut hole which comes to $3,850 out of pocket is due in the first four months of their Copaxone therapy", and further calculating "ROI we expect from the 1,000 patients when we flip them [from Teva's free drug program] to copay assistance in 2008?" [**Ex. 18** – Teva 2007 ppt];

    b.    In a November 2008 e-mail, Stefan Feltens, Senior Director of Finance and Planning, noted that $21.4M of the patient assistance budget was for the Medicare program, which "especially [helps by] providing assistance in covering the infamous 'doughnut hole'", and "[d]ue to per-month cost of Copaxone…[w]e would lose most of these [Medicare] patients if we didn't provide coverage through the doughnut hole." [*see* **Ex. 38**];

---

[17] *See* HHS-OIG Advisory Opinion 22-19, available at https://oig.hhs.gov/documents/advisory-opinions/1056/AO-22-19.pdf

c.  In March 2011, Marcy Tarrants, a Teva Neuroscience Product Manager, circulated a PowerPoint which made the following observations: "As patient cost-sharing increases, patients are more likely to abandon their Copaxone prescription", "As patient cost-sharing increases, Copaxone adherence decreases. Therefore, co-pay [assistance] programs and/or contracting (rebates) that decrease patient cost-sharing will increase utilization." [*see* **Ex. 19** – Teva 2011 ppt, pg. 8];

d.  In December 2011, Larry Downey, Katie Hiett, Teva Neuroscience's Director of Finance and Planning, and Felicia Ladin, Teva USA's Vice President of Finance discussed the possibility of reducing Teva's planned 2011 fourth quarter payment to TAF from $10 million to $5 million. Hiett warned Ladin against such a cut, stating "Not funding these patients has a direct and immediate impact on units." A week later, Teva paid TAF $10 million, as planned. [*see* **Ex. 20**];

e.  In December 2012, Mike Sheehy, a Teva Marketing Director, told his boss, John Hassler, that he conferred with Lynch regarding the need for "patient assistance funding", and further reported that he had "provided Denise [Lynch] the direction to move forward because *not doing so impacts the topline with existing patients*." [*see* **Ex. 21**];

f.  Teva's 2012-2014 workplan reported that its $29 million "investment" in patient services in 2011 had "generated" $363 million in sales. [**Ex. 3** – 2020 Price Report, pg. 22]. The workplan emphasized that this expenditure reflected a significant return on investment: "ROI of 1152%". [*Id.*];

g.  In January 2015, Jennifer Clark, an Associate Director in Teva's Patient Services department, warned that, if Teva cuts its foundation payments, the company's sales forecasts would be "overstated": "They still have Medicare revenue in [the forecast] which is highly unlikely if the donations are no longer made." [*see* **Ex. 22**];

h.  In February 2015, Alejandro Castro, a Teva Financial Analyst, advised David Loughery, Teva's Vice President of Finance, that "Patient access has also mentioned that they will need between $5M and $8M in donations soon to avoid losing an estimated 1,500 Medicare Patients." [*see* **Ex. 25**]. Castro then quantified the dollar value of losing those patients, noting "a risk to Net Sales of approximately $5.8M per month associated with reducing donations." [*Id.*];

i.  In August 2015, Clark reiterated her earlier warning, this time to Ryan Sloss, a Teva finance manager: "it's clear that if the $10M gets removed, the sales will decrease as well, as there will be Medicare patients out there that won't be able to fill." [*see* **Ex. 26**]. Sloss concurred: "we either pay it and go over budget or we don't make our sales numbers." [*Id.*];

j.  As Teva began planning for 2018, strategic documents noted that eliminating its "Medicare Donation" to third-party foundations would cost Teva up to $261 million in Copaxone sales. [**Ex. 3** – 2020 Price Report, pg. 19];

       k.  In early 2018, Brendan O'Grady, Teva's Executive Vice President for North America, received a presentation on Teva's 2018 company plain, which emphasized "Patients who are unable to meet the donut hole deductible in Q1 may not fill [Copaxone prescriptions] and go off therapy, which would result in a negative impact to the brand of $210-280M." [*Id.* at 21].

90.    Tellingly, Teva executives often referred to the supposedly charitable payments to CDF and TAF as "*Copaxone* donations." For instance,

       a.  A December 2014 e-mail from a Teva Senior Vice President her subordinate to "release $25M of *Copaxone donations* to be mailed on Dec 29th". [*see* **Ex. 27**];

       b.  A January 2015 e-mail from Eyal Desheh, the CFO of Teva Ltd., approving a "*Copaxone Donation* payment." [*see* **Ex. 28**];

       c.  A February 2015 e-mail from a Teva Associate Director of Finance to Larry Downey, the President of Teva's North America Specialty Medicines unit ("NASM"), with the subject "Response requested: Approval for *Copaxone donation* payment." [*see* **Ex. 29**];

       d.  An April 2015 e-mail from Jan Jones, Teva's Director of Patient Services Support, approving a "*Copaxone Donation*." [*see* **Ex. 30**];

       e.  In January 2016, Teva executives sought approval for a $10 million "*Copaxone Donation* wire transfer" to TAF, emphasizing that "this is a common payment we make each year." [**Ex. 3** – 2020 Price Report]; and

       f.  A January 2017 e-mail from a Teva NASM VP of Finance to Koremans, President and CEO of Global Specialty Medicines at Teva Ltd., regarding "*Copaxone donations* approval." [*see* **Ex. 31**].

91.    Furthermore, in a July 2013 memorandum, a manager in Teva's Tax department reviewed Teva's payments to CDF and TAF, concluding that "[t]he payments…. are made with the expectation of financial return commensurate with the amount donated and should therefore be deducted as business expense." [**Ex. 32** – Internal Teva Memo]. Teva considered its payments to CDF and TAF not as a charitable donation, but as "advertising expenses" for tax purposes in 2012—2017. [**Ex. 7** – US SoF, ¶ 188].

92.    Likewise, Hensley was aware that Teva's payments to CDF and TAF were intended to induce sales of Copaxone. [*see* **Ex. 1** – Hensley Aff., ¶ 4, 7 ("I understood from my conversations with Ms. Lynch that she needed approval from Teva's senior management,

including potential management in Israel, to make the larger donations and that she might not obtain that approval unless she were able to demonstrate that the donations would substantially go to Copaxone patients."); *see also*, **Ex. 7** – US SoF, ¶ 139 (citing Teva admission, that "Teva believed" a "portion of the donated amounts would ultimately assist some Copaxone patients….and that the donations benefitting Copaxone patients would result in an increase in revenue associated with Copaxone sales.")].

### C. Teva Coordinated with ACS, AssistRx, CDF and TAF to Subsidize Medicare Co-pays for Copaxone Patients

> i. <u>Defendants Had a Shared Goal of Building Copaxone's Patient Base and Ensuring Teva's Payments Exclusively Benefitted Copaxone Patients</u>

93.    From the outset, Teva's goal was to use CDF—and later TAF—as a "pass-through vehicle." [**Ex. 1** – Hensley Aff., ¶ 4]. Through his dealings with Lynch and other Teva personnel, Hensley "understood that Teva was purposefully utilizing ACS [and AssistRx] and structuring its donations to CDF [and TAF] in a manner that essentially ensured that such donations would benefit only Copaxone patients, and not patients who had been prescribed competitor MS medications." *Id*. ¶ 3.

94.    Lynch explained that she was "'tired' of other pharmaceutical manufacturers 'riding on [Teva's] coattails'", *id*. ¶ 4, and, during a conversation with Hensley,

> Ms. Lynch told [Hensley] that she would not authorize donations to Patient Services, Inc. [] because PSI had 'burned' her with respect to a prior donation. When [Hensley] asked Ms. Lynch what she meant by this, [she] explained that a donation that Teva had made to PSI had not been passed through to Copaxone patients, but rather had been used to cover the co-pays of patients who had been prescribed competitor MS drugs…. Ms. Lynch told [Hensley], in sum and substance, that Teva would only authorize a donation to a charity that could provide Teva reasonable assurance that the donation would exclusively (or at least predominantly) benefit Copaxone patients.

[*Id*.; *see also*, **Ex. 33** – Email between Lynch and PSI]

95.    Pursuant to his understanding of Teva's goal, Hensley e-mailed his ACS

colleagues, instructing them to "Please let's pay special attention so we allocate the appropriate no go numbers so that the particular manufacturer funds go to their own drug as what the intent of the project originally was." [*see* **Ex. 34**].

96.     Teva's and ACS' shared purpose was memorialized in several internal documents. For instance, a presentation titled "Patient Assistance Management (PAM) Project Overview", noted "[ACS'] goal with the… (PAM) program is to Maximize the effectiveness of Teva's patient assistance dollars. We believe we can accomplish this by: Facilitating that Teva Dollars are spent on Copaxone patients", further stating "ACS has partnered with Chronic Disease Fund….to provide an integrated/efficient model for managing Teva's patient assistance Fund." [**Ex. 44** – ACS Presentation, pg. 6].

97.     Another important element of the Scheme was growing the base of Copaxone patients with Medicare Part D coverage. With this goal in mind, Teva and ACS steered patients away from Teva's free drug program and into CDF's MS fund. Teva implemented a policy of excluding Medicare patients from its free drug program because foundation-assisted patients generated revenue from Medicare payments, whereas free drug patients did not. In fact, at least as early as 2008, Teva instructed ACS not to refer Medicare patients to Teva's Copaxone free drug program if foundations were accepting patients.

98.     This practice is reflected in an email Hensley wrote in November 2007, noting "[t]he Copaxone Cares [*i.e.*, free drug] patients will transition to CDF Med D program in January." [*see* **Ex. 36**]. Similarly, in an April 2016 e-mail, a Shared Solutions manager explained that, "in the past when a new Med D patient needs assistance and at that time (usually close to the end of the calendar year) the Foundation has closed its funds[,] if we want the patient to start drug we provide free product for the remainder of the calendar year and tee them up for Foundation Assistance for the following January when funds will be available." [**Ex. 37**].

99. To that end, ACS utilized its "Medicare Part D Conversion Program" for the purpose of "flipping" Copaxone patients from free drug to CDF. In a brochure, ACS touted the program's success, noting:

> ACS provides several types of services to Teva Neuroscience for their injectable MS treatment, Copaxone. These contracted service agreements include…Management of the Chronic Disease Fund Program.
> …
> Teva identified over 2000 patients that prior to Medicare Part D coverage, were receiving Copaxone through their PAP. Under this agreement, ACS provided reimbursement verification services to these patients to secure Part D funding and to convert these patients onto ACS service from the PAP program. ACS successfully converted 100% of these patients over a 2 month period.
> …
> ACS provides specific data management and reporting services back to Teva Neuroscience. In addition to reporting, ACS is also directly linked with the Shared Solutions database to receive real time data between its organization for the patients that ACS coordinates care and services.

[**Ex. 35** – ACS Brochure].

100. Teva evaluated the impact of its program with ACS and found patients on "Medicare Copay Assistance" with ACS had a higher "compliance rate" for filling Copaxone prescriptions:



101.    In 2009, ACS founders—Hensley and Spafford—created AssistRx and TAF, and quickly integrated each into the ongoing Schemes.

102.    According to Hensley, in or around 2009, while on a phone call with Lynch, and possibly Jennifer Clark,

> Ms. Lynch asked [Hensley] several questions about the structure of TAF and how the fund would operate. In particular, Ms. Lynch asked [Hensley] to confirm that TAF would not have waitlists, as waitlists would impair Teva's ability to get the maximum number of patients covered by its donations. [Hensley's] response to Ms. Lynch and others at Teva was that TAF would provide all of the advantages that CDF did—including accepting 'batch files' of patients from [Teva's] 'hub' or preferred specialty pharmacy [i.e., ACS], not utilizing waiting lists, and accepting donations at any time during the year. In other words, [Hensley] made sure the Ms. Lynch understood that Teva effectively would be able to use TAF as it had CDF: essentially, as a 'pass-through' donation vehicle to get Teva monies into the hands of Copaxone patients.

[**Ex. 1** – Hensley Aff., ¶ 10].

103.    Shortly thereafter, in 2010, "Teva made approximately 99 percent of the payments

48

to TAF's MS fund—over $20 million in seven installments….and over 95 percent of TAF's MS fund payments went to Copaxone patients that year." [**Ex. 7** – US SoF, ¶ 179; *see also*, **Ex. 6** – Ian M. Dew Report, pg. 28-30 (showing 3,032 Copaxone patients out of 3,150, and $13.5 million in Copaxone disbursements out of $14.2 million for TAF in 2010)].

104.    TAF continued its practice of accepting batch files from ACS, no questions asked, despite knowing that ACS had purposefully and strategically structured the batch file to benefit Copaxone patients rather than to fairly reflect ACS's population of financially needy MS patients. *Id*. ¶ 12.

105.    Meanwhile, in September 2010, AssistRx began running Teva's free drug program for Copaxone patients who did not have insurance. Consistent with Teva's policy of excluding Medicare eligible patients from its free drug program, AssistRx arranged for those patients to obtain Medicare coverage, and referred them to ACS, which would then seek foundation co-pay funding for them. Teva also paid AssistRx for services related to Medicare benefits investigations.

106.    In December 2014, Teva entered into an agreement with AssistRx to perform services related to the enrollment and re-enrollment of Copaxone patients at TAF or CDF, including the use of "batch" referrals and reporting to Teva the number of Copaxone patients that AssistRx successfully enrolled and re-enrolled at TAF or CDF. [*see* **Ex. 7** – US SoF, ¶ 115]. AssistRx's new role was recognized by Maureen Boyd, TAF's VP of Operations, in an e-mail dated February 6, 2015, the day after a Teva payment to TAF, where she stated, "Once you Open the program, I am sure you will be [receiving] a file from ACS [sic] and the new team upstairs under Alia [Alli, AssistRx employee] (they are doing some of the work for TEVA that ACS was doing.)." [*see* **Ex. 39**].

107.    The following evidence demonstrates the immense magnitude of the Schemes effects on the Copaxone patient population, and resulting payments:

a.  From 2006 – 2022, Teva referred over 30,000 Copaxone patients to ACS. [*see* **Ex. 6** – Ian M Dew Report, pg. 14];

b.  From 2008 – 2019, CDF disbursed over $97 million in co-pay assistance to Copaxone patients. *Id*. at 9. From 2008 – 2018, CDF enrolled over 14,000 Copaxone patients in its co-pay grant program. *Id*. at 9-10.;

c.  From 2010 – 2018, TAF disbursed over $205 million in co-pay assistance to Copaxone patients. *Id*. at 11. From 2009 – 2019, TAF enrolled over 16,500 Copaxone patients in its co-pay grant program. *Id*.;

d.  From 2008 – 2017, CDF and TAF covered all or a portion of over 530,000 Medicare Part D claims for Copaxone. *Id.* at 24; and

e.  From 2008 – 2017, Medicare Part D (including Part D Sponsors) paid over $1.5 billion in matched Copaxone claims (i.e., claims in which Copaxone co-pays were subsidized by CDF or TAF). However, the $1.5 billion in payments relates to approximately 345,970 of the over 530,000 Copaxone claims. *Id.* at 45; *see also*, **Ex. 7** – US SoF, ¶ 141].

108.    Given that Plaintiffs allege wrongful conduct beyond the scope of the DOJ's investigation, the evidence above represents a subset of the relevant claims and paid amounts pursued by Plaintiffs in the present matter.

>    ii.    *ACS, AssistRx, TAF, and CDF Regularly Provided Teva with Copaxone Patient Data*

109.    For each year throughout the duration of the Schemes, Teva used data provided by its co-conspirators reflecting per-patient amounts and numbers of Copaxone patients CDF and TAF were assisting to determine how much Teva would pay the foundations to cover existing Copaxone patients in the next year. As Hensley explained, Teva's receipt of information from its co-conspirators "would be sufficient to enable [Lynch] to determine how much Teva should donate at the start of the year." [**Ex. 1** – Hensley Aff., ¶ 14].

110.    To do so, Teva needed three data points: (1) each fund's annual per-patient grant amount; (2) the number of Copaxone patients enrolled in each fund; and (3) each fund's administrative fee, which was generally 9%. The third data point was generally stated in the foundation's donation agreement, whereas the information related to the first and second data points were provided directly to Teva by its co-conspirators.

111.    For example, CDF conveyed per-patient grant amounts to Teva:

    a.  On October 28, 2010, CDF's President, Michael Banigan, sent an e-mail to Lynch: "We are estimating the per-patient gran amount of 3,950 next year. Math is simple. Number of patients times the grant amount divided by .91. We can chat at your convenience." [*see* **Ex. 40**];

    b.  On September 15, 2011, Banigan wrote to Lynch: "Do you have time for a call tomorrow? I have preliminary numbers for you." [*see* **Ex. 41**];

    c.  On November 7, 2012, Lynch sent Banigan an e-mail asking for the "2013 patient contribution" and Banigan responded: "Everything is the same as last year. $3750 per patient [and] $1500 for [low-income subsidy]. Admin is 9%, but in reality, we paid out 92% last year across all funds." [*Id.*]. Later that day, Walley sent Lynch an e-mail clarifying that "the 2012 per patient allocation for the MS program is $4750…. The allocations will remain the same for the 2013 calendar year." [*see* **Ex. 42**];

    d.  On December 20, 2013, Lynch asked Walley for the "per patient donation estimate for the MS fund for 2014," and Walley responded: Initial allocation is $5000." [*see* **Ex. 43**].

112.    TAF provided similar information to Teva on a quarterly basis. Hensley often provided this information to Lynch over the phone or in person, but occasionally did so in writing. [*see* **Ex. 4** – DOJ Compl., ¶81]:

    a.  On September 27, 2011, Hensley sent Lynch an e-mail that included the following: "The allocation per patient for 2012 is $4,600. To give a historical number of what it has been in the past: 2012 - $4,600[;] 2011 - $4,400[;] 2010 - $5,600." [**Ex. 45**].

113.    Whether in writing or another method, Hensley "would regularly provide either Ms. Lynch or Mr. Blanc (or both) the 'per-patient allocation' that TAF was using for its MS Fund at any given time. [Hensley] sometimes did this proactively, but usually did this in response to a specific request by Ms. Lynch." [**Ex. 1** – Hensley Aff., ¶ 13].

114.    With the per-patient grant amounts readily available directly from the foundations, Teva then obtained from ACS the number of Copaxone patients who were receiving co-pay coverage from each foundation:

    a.  On August 7, 2007, Teva sent ACS an e-mail noting that it had received a file form ACS. Included within the file was a list of 1,082 Copaxone patients who were "Approved for Assistance" with CDF. [*see* **Ex. 46**];

b. On December 23, 2008, ACS sent Teva an e-mail reporting that a total of 2,499 Copaxone patients were receiving co-pay coverage from CDF at that time. [*see* **Ex. 47**];

c. On November 30, 2009, ACS sent Teva an e-mail reporting that a total of 3,230 Copaxone patients were receiving co-pay coverage from CDF at that time. [*see* **Ex. 48**];

d. On December 14, 2010, ACS sent Teva an e-mail reporting that, at the time, a total of 2,008 Copaxone patients were receiving co-pay coverage from CDF and a total of 2,714 Copaxone patients were receiving co-pay coverage from TAF. [*see* **Ex. 49**];

e. On August 30, 2011, Teva's Barb Ross informed Jennifer Clark via e-mail that "David and Zach [of ACS] will be getting [Copaxone patient] numbers first thing in the morning, they are checking with CDF for total numbers." [**Ex. 50**]. A week later, Ross reported the patient data provided by ACS to Clark.;

f. On August 27, 2012, ACS's David Blanc e-mailed Lynch with the "current numbers", as follows "CDF 1456", "AF 4747", and "PAN 2". [**Ex. 51**]; and

g. On December 5, 2013, Blanc sent Lynch the latest numbers again. [**Ex. 52**].

115. The above examples are merely a subset of instances demonstrating Defendants' communications and sharing Copaxone patient data.

### iii. *Teva Used the Copaxone Patient Data to Determine How Much to Pay CDF and TAF and When Payments were Needed*

116. For each year, from 2006 through *at least* 2020, Teva used data reflecting per-patient grant amounts and numbers of Copaxone patients CDF and/or TAF were assisting in the next year. Clark, who in 2011 took over the process of preparing Teva's budgets for foundation payments, explained the following process,

> [Clark] would take an estimated number of Medicare patients, apply that towards what the typical average Medicare cost per patient might be for a calendar year, and then multiply that times those patients to determine what that might look like. [Clark] understood the administration fees for the foundations were typically somewhere in the nine percent range, so [Clark] would do that calculation to determine how much we would need for the upcoming year.

[**Ex. 4** – DOJ Compl., ¶ 84].

117. Clark further explained that the "Medicare patients" she referenced were Copaxone

patients. *Id*.

118.    For example, in September 2011, after her colleague, Barb Ross, informed Clark that ACS was estimating 5,572 Copaxone patients would be receiving foundation co-pay coverage by the end of that year, Clark put together the following budget spreadsheet:[18]

| | 2011 | 2012 | 2013 | 2014 | | |
|---|---|---|---|---|---|---|
| 1 | | | | | | *2013 is first year |
| 2 501c Funding per pt | | 4771 | 5004 | 5280 | | *patient picks up more than p |
| 3 Katie's portion | | 1867 | 1900 | 1900 | | |
| 4 **Govt Portion** | | | | | | |
| 5 Medicare Funding per pt. | $ 6,250 | $ 6,638 | $ 6,904 | $ 7,180 | | |
| 6 Qual-new Medicare pt. | $ 150 | $ 150 | $ 150 | $ 150 | | |
| 7 Requal-Medicare pt. | $ 125 | $ 125 | $ 125 | $ 125 | | |
| 8 Adherence rate | 88% | 88% | 88% | 88% | | |
| 9 Admin fee | 9% | 9% | 9% | 9% | | |
| 10 Additional factor for | 120% | 120% | 120% | 120% | | |
| 11 Estimated Fund Carryover | | | | | | |
| 12 COGS & Shipping & Handling - Med D Free - per month ($60+$70) | $ 190 | $ 130 | $ 130 | $ 130 | | |
| 13 Average # of Med D Free dispenses per pt | 4 | 3 | 3 | 3 | | |
| 14 | | | | | | |
| 15 | | | | | | |
| 16 Beginning of Year | | 6300 | 5988 | 5330 | | |
| 17 Additional new pts - assistance donated | | 500 | 506 | 473 | | |
| 18 Med Free Roll-over | 525 | 525 | 483 | 452 | | |
| 19 Retention - Patients at year-end (full funding & partial LIS) | 5775 | 5984 | 5715 | 5107 | Per Zach, 8/31 | |
| 20 Full LIS | 2475 | 2723 | 2995 | 2750 | Per Zach, 8/31 | |
| 21 Total Patient Count | 8775 | 9232 | 9193 | 8308 | | |
| 22 | | | | | | |
| 23 | | | | | | |
| 24 Qualification-new pts. | $ 94,500.00 | $ 184,500.00 | $ 178,020.00 | $ 166,410.00 | | |
| 25 Qualification-existing pts. | $ 78,750.00 | $ 1,098,750.00 | $ 1,046,592.00 | $ 938,212.67 | | |
| 26 TN 50% portion on assisted pts | | | | | | |
| 27 Donut Hole Funding | $ - | $ 32,442,800.00 | $ 32,494,259.87 | $ 30,639,197.37 | | |
| 28 Total Donation | $ - | $ 35,651,428.57 | $ 35,707,977.87 | $ 33,669,447.66 | | |
| 29 Admin fee | $ - | $ 3,208,628.57 | $ 3,213,718.01 | $ 3,030,250.29 | | |
| 30 Estimated Fund Carryover | $ - | $ - | $ - | $ - | | |
| 31 **TOTAL Medicare - excl** | $ 173,250.00 | $ 36,934,678.57 | $ 36,932,589.87 | $ 34,774,070.32 | $5.5 M donation made 12/31/2009 | |

119.    During the last week of December 2011 and the first week of January 2012, Teva paid CDF and TAF a total of $33,200,000 from its foundation budget. Using data received from CDF and TAF via ACS, Teva paid the foundations what it understood they needed to cover co-pays for Copaxone patients in the upcoming year.

120.    From 2006 through *at least* 2020, Teva consistently followed this practice of using data from the foundations (via ACS or AssistRx) to calculate its budgets for TAF or CDF and to

---

[18] [*see also,* **Ex. 56** – Copaxone Spreadsheets (including a full copy of the spreadsheet above and additional iterations from other years)]

pay them what they needed to cover co-pays for Copaxone patients in the following year. After Teva made these payments, it then received confirmation from the foundations (via ACS or AssistRx) that they covered the Copaxone patients who sought to renew their annual Medicare co-pay grants.

121.    Following the patient data analysis and ROI calculations, ACS and AssistRx timed the opening of the foundations' MS funds with submission of Copaxone patient "batch file" applications. Teva, in turn, made payments to the foundations in the amount matching the per-patient grant amount and total number of Copaxone patients enrolled in each fund (also factoring the 9% administration fee).

122.    Defendants repeated this method throughout the duration of the Schemes. For example:

    a.    On February 9, 2011, ACS sent Teva an e-mail showing, among other things, that there were 320 Copaxone patients awaiting Medicare co-pay assistance. At that time, the per-patient allocation in TAF's MS Fund was $4,400, and TAF's administrative fee was 9 percent. Factoring those figures results in the following calculation: 320 x $4,400 x 1.09 = $1,534,720. On February 10, 2011, Lynch e-mailed Jon Congleton, then the general manager of Teva's Neuroscience division, and asked "Are you OK with a $1.5MM Medicare contribution to AF (this is a little less than what I had though[t] when we talked on [February 8, 2011]." Congleton replied with his approval. The next day, February 11, 2011, Teva paid TAF $1.5 million. [*see* **Ex. 4** – DOJ Compl., ¶ 91];

    b.    On June 30, 2011, Teva's Barb Ross, a Medicare Specialist in Teva's Patient Services department, sent Lynch an e-mail stating: "I just spoke with David [Blanc] and Zach [Gammage] @ACS. We figure around 200. This includes the 100 they already have, in addition to the 50 I am getting ready to send over July 5th as July eligible and we estimated about another 120 for the 4 weeks in July. David thinks he can maybe count on 50 of those for funds...." At that time, the per-patient allocation in TAF's MS fund was $4,400, and TAF's administrative fee was 9 percent. Factoring those figures results in the following calculation: 200 x $4,400 x 1.09 = $959,200. Later that day, Teva paid TAF $1 million. On July 5, 2011, Blanc reported to his supervisors that, as to Teva, ACS had "[s]ecured additional funding for up to 200 patients." On July 8, 2011, TAF's Maureen Boyd sent Hensley and Spafford an e-mail reporting that, of 100 new patients TAF had approved on July 1, 2011, 94 were Copaxone patients. [*Id.* ¶ 92];

c. On January 23, 2012, Kristin Wright, a Senior Supervisor in Teva's Patient Services department, sent an e-mail to Jennifer Clark stating: "I know funds are closed and AssistRx [the TAF affiliate that handled the Copaxone free drug program and referred Medicare- eligible Copaxone patients to ACS for co-pay coverage] will keep this patient on their list for when funds open back up." Clark forwarded this e-mail to Lynch, stating: "I know we're talking to Edward [Hensley] tomorrow night, this may be a topic of discussion." Lynch replied: "I agree .. .I talked with him today and learned that we will need to make a contribution. I will talk to David [Blanc at ACS] in the morning to understand how many patients they have in queue and then we can discuss the contribution amount!" On January 24, 2012, Blanc sent Lynch an e-mail reporting that 538 Copaxone patients were "pending [paperwork]" at TAF. At that time, the per-patient allocation in TAF's MS fund was $4,600, and TAF's administrative fee was 9 percent. Factoring those figures results in the following calculation: 538 x $4,600 x 1.09 = $2,697,532. On January 30, 2012, Teva paid TAF $2.75 million. [*Id.* ¶ 93];

d. On June 25, 2012, Barb Ross sent Clark and Lynch an e-mail stating: "Holding as of 06-25-12: 215…Estimate for the rest of this month 32 + July eligible so far this month 35[.] Total to fund for to date would be 282. I called Idy [Moeller of ACS] and confirmed actual amounts.... Hope that gives you some idea of what we are needing." At that time, the per-patient allocation for TAF's MS fund was $4,600, and TAF's administrative fee was 9 percent. Factoring those figures results in the following calculation: 282 x $4,600 x 1.09 = $1,413,949. On June 27, 2012, Teva paid TAF $1.4 million. That same day, David Blanc of ACS sent his colleague, Idy Moeller, an e-mail with the subject "Copaxone TAF referral" and the following request: "Can you prepare the list of patients for referral?" [*Id.* ¶ 94];

e. On August 22, 2012, Blanc sent Lynch an e-mail stating that "we currently have 165 patients in wait." (A copy of this e-mail is attached as Exhibit 60.) At that time, TAF's average grant amount for a Copaxone patient was $3,200, and TAF's administrative fee was 9 percent. Factoring those figures results in the following calculation: 165 x $3,200 x 1.09 = $575,520. On August 24, 2012, Teva paid TAF $575,000. On August 27, 2012, Blanc sent Lynch an e-mail stating: "Below are the current numbers - the AF numbers do not include approx. 164 patients who should be approved today." [*Id.* ¶ 95];

f. On September 19, 2012, Blanc sent Lynch an e-mail stating, "At this time we have 168 and 18 that we are still attempting to reach. That same day, Lynch sent Hensley an e-mail stating: "Need to talk with you about another donation." Hensley forwarded Lynch's email to TAF executives, including Boyd, and wrote: "What number should I give her? She intends to donate at the end of September. This would be only for patients till the end of the year of course. It's a couple hundred patients, I believe." Boyd responded: "Good Morning Edward, The Allocation Amount was reduced from $4600 to $3200 effective August

2012. If it was for 200 new patients, the total ask will need to be $703,500.00 (which includes the 9% admin fee)." On September 20, 2012, Blanc sent Lynch an e-mail stating that "[t]he up to the minute number is 197." TAF's administrative fee at that time was 9 percent. Factoring those figures results in the following calculation: 197 x $3,200 x 1.09 = $687,136. On September 21, 2012, Teva paid TAF $700,000. On September 26, 2012, TAF's Maureen Boyd wrote to Hensley that TAF had "processed 202 new Copaxone patients from the ACS referral file." On September 28, 2012, Hensley asked Boyd for an update on the same e-mail chain: "Can you please update the numbers below for me this morning, please. I am mtg with Denise [Lynch] at 2 at the hotel." Boyd responded: "the final number of new patients created from September 24th, 2012: ... Copaxone = 234." [*Id*. ¶ 96];

g. On May 7, 2013, Blanc sent Lynch an e-mail stating that ACS had 176 Copaxone patients "ready for referral" and another 30 "pending contact." At that time, TAF's per-patient allocation for its MS fund was $4,300, and TAF's administrative fee was 9 percent. Factoring those figures results in the following calculation: 206 x $4,300 x 1.09 = $965,522. On May 8, 2013, Teva paid TAF $925,000. That same day, Lynch told Blanc that she was "just advised that the wire transfer was completed a few minutes ago." Blanc wrote back: "Terrific! We are ready." [*Id*. ¶ 97];

h. On August 27, 2013, Blanc sent Lynch an e-mail stating: "We are at 196 with 14 pending contact at this time." The previous day, Lynch had asked Spafford of TAF for the "Q3 patient donation," and Stafford had responded "$3,700." At that time, TAF's administrative fee was 9 percent. Factoring those figures results in the following calculation: 210 x $3,700 x 1.09 = $846,930. On August 27, 2013, Teva paid TAF $850,000. On the evening of August 27, 2013, Blanc sent an e-mail to his ACS colleagues stating: "Please prep the file for referral to TAF ASAP!!" On the morning of August 28, 2013, an ACS employee sent TAF the following question: "David sent a file over with 200+ patients, he is wondering if we can have an update[] on it today?" Later that day, TAF responded: "The file has been processed. 199 patients. 1 duplicate." [*Id*. ¶ 98];

i. On March 11, 2014, Blanc sent Lynch an e-mail stating: "this morning's count is 162 queued up; 30 in process; received 9 new this morning." At that time, TAF's per-patient allocation for its MS fund was $5,100, and TAF's administrative fee was 9 percent. Factoring those figures results in the following calculation: 201 x $5,100 x 1.09 = $1,117,359. On March 11, 2014, Teva paid TAF $1,100,000. On March 13, 2014, Blanc reported to Lynch that there had been "189 Conditional Approvals this morning." [*Id*. ¶99]; and

j. On the morning of April 22, 2014, Lynch asked her Teva colleague, Barb Ross, for "the number of patients we have ready to go at ACS, May eligible and approx. how many we are sending over a day." That

afternoon, ACS sent Ross an e-mail with the subject line "CPA numbers" and a report that ACS had "appox. 187 and 27 pending interviews." Shortly thereafter, Ross reported the following to Lynch: "Looks like we have 187 ready to go, 27 that still need financial assessments, and 40 for May eligible." At that time, TAF's per-patient allocation for its MS fund was $4,500, and TAF's administrative fee was 9 percent. Factoring those figures results in the following calculation: 254 x $4,500 x 1.09 = $1,245,870. On April 24, 2014, Teva paid TAF $1,275,000. Hours later, Blanc sent an e-mail to his ACS colleagues directing them "to prepare a file for referral to TAF for Copaxone in the morning tomorrow." [*Id*. ¶ 100].

123.    The above allegations are merely a subset of instances in which Defendants coordinated their efforts to ensure Teva was able to directly subsidize the Medicare co-pay for Copaxone patients. [*see* **Ex. 57** (showing additional internal documents, data reports, and communications similar to those above); *see also*, **Ex. 6** – Ian M. Dew Report, pg. 28 (showing list of payments from Teva to CDF and TAF)].

124.    Adam Stotts, an AssistRx/TAF employee, offered the following testimony:

Q: Were there times when Teva made payment a to CDF, ACS submitted a batch enrollment file of all or predominantly all Copaxone Medicare Part D Patients, and the funding was exhausted at the foundation?

A: Yes.

Q: Did you observe that ACS submitted batch enrollment files for Copaxone patients using TAF's web portal shortly after Teva made payments to TAF's MS fund?

A: Yes.

[*see* **Ex. 7** – US SoF, ¶ 124 (citing deposition testimony of Adam Stotts)].

125.    Additionally, TAF's Maureen Boyd, offered similar testimony:

Q: Were there times at TAF where, within minutes of receiving a Teva donation causing its MS fund to open, TAF accepted from ACS a batch filed containing dozens or hundreds of Medicare Part D Copaxone patients?

A: Yes.

Q: About how many times did you observe that happen?

A: Every time the fund opened. Every time a donation came in.

[*Id.* (citing deposition testimony of Maureen Boyd)].

126.    The mechanics of Teva's arrangements with its co-conspirators enabled it to ensure that its payments to CDF and TAF went to Copaxone patients whenever Teva made a payment to either foundation. By timing its payments to TAF and CDF with ACS's and AssistRx's submission of batch files of applications, Teva effectively subsidized the Medicare co-pay of its own drug, Copaxone.

### D. Defendants Knowingly and Willfully Engaged in Illegal Conduct

127.    Teva, AssistRx, and ACS knew that sharing patient data and using TAF and CDF as conduits to subsidize Copaxone co-pays for Medicare patients was strictly prohibited.

128.    The 2005 OIG Special Advisory Bulletin made clear that a foundation "must not function as a conduit for payments by the pharmaceutical manufacturer to patients" and that a pharmaceutical manufacturer should not "solicit or receive data form the charity that would facilitate the manufacturer in correlating the amount or frequency of its donations with the number of subsidized prescriptions for its products. 70 Fed. Reg. at 70626, 70627. The 2014 Supplemental Special Advisory Bulleting reiterated these warnings, cautioning, "[t]hese opinions do not address actions by donors to correlate their funding with support for their own product. Such actions may be indicative of a donor's intent to channel its financial support to copayments of its own products, which would implicate the [AKS]. 79 Fed. Reg. at 31123.

129.    The 2005 Guidance further stated that "for purposes of an anti-kickback analysis, we would not consider a charitable foundation [] formed, funded or controlled by a manufacturer…to be a *bona fide*, independent charity, because interposition of the entity would not sever the nexus between the patient subsidies and the manufacturer. Indeed, in most cases, the foundation would receive all of its funding from the pharmaceutical manufacturer (or its affiliates) and would provide subsidies only for the manufacturer's products." 70 Fed. Reg. at 70626, n. 3.

130.    To obtain favorable advisory opinions, CDF and TAF certified compliance with the OIG guidelines on multiple occasions. [*see* **Exs.** 11,12, 14, and 15]. However, CDF's and TAF's involvement in the Schemes unequivocally contradicts those certifications. Each of the co-conspirators was fully aware of the OIG Guidelines, TAF and CDF's favorable advisory opinions, and the related certifications.

131.    To begin with, Teva's first contract with CDF, which both Lynch and Larry Downey, the CEO of Teva Neuroscience, signed in 2006, provided that CDF "shall be [] a *bona fide*, independent charity as described by the [2005 HHS-OIG Special Advisory Bulletin.]. [**Ex. 10** – Teva-CDF Contract]. The contract also specified that CDF "has received a favorable OIG opinion...as documented in OIG Opinion 06-10." *Id*.

132.    In December 2010, after Teva began paying TAF, Hensley e-mailed Lynch with a copy of the advisory opinion TAF had obtained from the OIG. [*see* **Ex. 24**]. Earlier that year, Banigan sent Lynch a "legal analysis of the risks associated with a Medicare Only PAP" prepared by Kevin McAnaney, former Chief of the Industry Guidance Branch of HHS-OIG, whom Banigan described as "the attorney who was instrumental in writing the OIG rules." [*see* **Ex. 54**]. McAnaney's analysis stated,

> As a threshold matter, any knowing payments by a pharmaceutical manufacturer or other provider to satisfy federal health care program enrollee's cost sharing obligations would almost certainly violate the federal anti-kickback statute. In evaluating a pharmaceutical company's donation to a PAP, the critical issue is the nexus between the pharmaceutical company's payment, the Medicare patient, and the pharmaceutical.

[*Id*. at 2.]

133.    In May 2012, a Teva employee circulated a PowerPoint presentation from Sidley Austin LLP titled "Legal Considerations in Developing Patient Assistance Programs." The Presentation noted that, according to the HHS-OIG:

## OIG on PAPs

- Whether a PAP arrangement violates the AKS, requires a case-by-case analysis
  - "For PAPs, the nature, structure, sponsorship, and funding of the particular PAP are necessarily relevant to the analysis." OIG, SAB
- PAPs raise two questions
  1. Does the subsidy count towards TrOOP?
     - Under CMS regulations yes, BUT
  2. Does the subsidy implicate the AKS?
     - "Simply put, the subsidies would be squarely prohibited by the statute, because the manufacturer would be giving something of value (*i.e.*, the subsidy) to beneficiaries to use its product." OIG, SAB
- PAPs present "all of the usual risks of fraud and abuse associated with kickbacks"
  - Steering patients to particular drugs
  - Increasing costs to Medicare
  - Providing financial incentives over competing drugs
  - Reducing enrollees' incentives to locate and use less expensive, equally effective drugs

9    September 19, 2008

SIDLEY

134.    Several Teva personnel, including Dot Parker and Barbara Ross, testified that "[they] understood Teva was not permitted to direct its funding to Copaxone patients." [*see* **Ex. 7** – US SoF, ¶ 199]. Other Teva personnel, including Dalton Tomlinson, testified that they believed it would be wrong for Teva to direct its payments specifically to Copaxone patients rather than all MS patients generally. [*Id*. ¶ 201]. Additionally, Patricia Glover, Teva's former Chief Compliance Officer, testified that Teva's payments to CDF and TAF did not follow Teva's compliance policies… and that, had she known, she would have been concerned about any efforts to direct Teva's payments to its own patients. [*Id.* ¶ 200]. Glover correctly observed that Teva's role in the Scheme violated its own compliance policies, which demanded that charitable donations be kept separate from sales and marketing to avoid AKS violations. [*Id*. ¶¶ 184-187].

135.    In December 2011, three Teva employees—Lynch, Clark, and Heiett—exchanged

emails about information they would like from CDF. [**Ex. 55**]. In one of these e-mails, Lynch wrote: "Is there a way to get to total patients in the fund (what % of the fund is made up of Copaxone patients[]…*I don't believe they can provide this directly to us* but is there some way you can back in to the answer?" *Id*. (emphasis added).

136.    Similarly, Hensley,

> [U]nderstood that Teva's conduct in alerting ACS of a forthcoming Teva donation to CDF or TAF was contrary to the spirit of the OIG guidance and, in substance, caused CDF and/or TAF not to be truly 'independent' of Teva, but rather to be mere 'pass-through' vehicles. [Hensley] understood that, by not objecting to Teva's conduct, TAF was allowing Teva to use the foundation in a way that was contrary to the purpose and spirit of the OIG guidance. [Hensley] also knew that the foundations to which Teva was donation, and to which ACS was then directing Copaxone patients, were 'independent' from Teva in name only.

[**Ex. 1** – Hensley Aff., ¶ 17].

137.    Lynch also told Hensley that "she had warned Teva's senior leadership years before that Teva should 'take a reserve' to cover False Claims Act liabilities associated with Teva's donations to CDF and TAF 'in the event' that the donations came under government scrutiny." [*Id*. ¶ 14].

138.    There was also no mention by TAF when obtaining the favorable OIG opinion about their corporate siblings concerted action to shift "free" Copaxone patients onto Medicare Part D to profit off payments by the health plan. TAF had overlapping ownership with the entity that steered patients to the health plan, thus allowing Teva, TAF and other conspirators to select targets of the scheme, thus directly injuring the health plan. Indeed, without enrolling the patient into a health plan away from Copaxone's free drug program, the health plan would not have paid for Copaxone.

139.    In addition to TAF and CDF falsely certifying compliance with OIG guidelines, Teva and ACS falsely certified compliance with federal law in order to be eligible as Medicare providers and suppliers and receive funds from federal payors—including Part D Sponsors, like

the Assignors. [*see supra,* §§ IV (A)-(D), explaining mandatory certifications and compliance for Medicare participants].    As demonstrated herein, Teva's and ACS' conduct unequivocally contradicts those certifications.

140.    Each time ACS submitted a claim for payment to any Part D Sponsor, including Assignors, ACS necessarily certified that the claim was free and clear of any legal defect that would otherwise prohibit payment of that claim. [*see supra* §§ IV (A)-(D)]. Because ACS operated on both ends of the Scheme—i.e., ACS acted as the primary referral source steering patients into the MS funds *and*, as a specialty pharmacy, later dispensed Copaxone to those same patients— ACS knew exactly which patients received Teva's drug subsidies and profited from them when CDF or TAF made payments directly to ACS to cover those same patients' Medicare co-pays. Meaning, despite knowing precisely which patients' Copaxone claims were generated as a result of the Schemes, when ACS submitted the claim for payment to the Assignors and Class Members, ACS necessarily (and falsely) certified that each Copaxone claim was free and clear of and legal defect that would otherwise prohibit payment by a federal payor, including Part D Sponsors.

### E.  The Scheme Harmed the Assignors and Class Members

141.    Defendants' Schemes resulted in three related, cognizable economic: (1) Assignors and Class Members unknowingly purchased tainted Copaxone claims that were unpayable under federal law (much like an AKS violation prohibits payment by any Medicare payor); (2) the Schemes circumvented Congressionally imposed price restraints and market forces (i.e., mandatory patient cost-sharing) enabling Teva to inflate Copaxone prices to exorbitant levels, leaving Assignors and Class Members to should the cost; and (3) using Teva's Copaxone subsidies to induce patient and physician decisions[19] to utilize Copaxone, which resulted in increased total

---

[19] According to a DOJ expert report, Dr. Leemore Dafny reported that "[i]n a survey of over 6,500 physicians, 78% of physicians reported considering patient cost-sharing when prescribing." [**Ex.**

number of Copaxone claims generated, dispensed, and paid for by Assignors and Class Members.

142.    <u>First</u>: as stated above, Part D Sponsors are legally prohibited from paying for any prescription claim tainted by violations of federal and state law. As demonstrated by the allegations stated herein, every Copaxone claim generated, dispensed, and paid for that was, in any way, the product of—whether directly or indirectly—Defendants' Schemes was barred from payment by law. However, Defendants' efforts to conceal the Schemes caused Assignors and Class Members to pay for tainted claims. These claims would not have, nor could have, been paid but-for Defendants' efforts to conceal the Scheme. As a result, CDF and TAF subsidized over 530,000 Copaxone co-pays for Medicare patients from 2007 – 2017. [*see* **Ex. 6** – Ian M. Dew Report, pg. 24].

143.    <u>Second</u>: Teva was able to raise Copaxone prices to exorbitant levels as a result of Defendants' collective efforts to circumvent Congressionally imposed price restraints and market forces—namely, patient co-pays. Indeed, "Congress included co-pay requirements, in part, to encourage market forces to serve as a check on…. prices that pharmaceutical manufacturers can demand for their drugs."[20] However, Defendants used the Schemes as a way to sidestep the consequences of raising Copaxone prices beyond what most patients could afford without Teva's co-pay subsidies. Because Defendants effectively and intentionally insulated Copaxone patients

---

**23** – Dafny Report (citing Hoangmay H. Pham, G. Caleb Alexander, and Ann S. O'Malley, "*Physician Consideration of Patients' Out-of-Pocket Costs in Making Common Clinical Decisions*," Archives of Internal Medicine 167, no. 7 (2007): 663–668.)]. These findings are consistent with Dr. Rube's expert opinion.

[20] U.S. Attorney's Office for the Dist. of Mass., *Fourth Foundation Resolves Allegations It Conspired with Pharmaceutical Companies to Pay Kickbacks to Medicare Patients Taking the Companies' Drugs*," (Apr. 1, 2021), https://www.justice.gov/usao-ma/pr/fourth-foundation-resolves-allegations-it-conspired-pharmaceutical-companies-pay; *see United States v. Teva Pharmaceuticals USA, Inc*. 560 F.Supp.3d 412, 416 (Mass. Sept. 9, 2021) ("Those partial payments ("copays") are intended to encourage physicians and beneficiaries to be efficient consumers of federally reimbursed health care products and to encourage drug manufacturers to price their products upon market forces").

from price considerations, Teva was able to—and did—increase Copaxone prices to exorbitant levels. Since its launch, Teva raised the price of Copaxone **27 times**, increasing the total price by approximately **825%**. [**Ex. 3** –2020 Price Report, pg. 1]. Today, an annual course of Copaxone 20 mg/ml costs over $85,000. [*Id.*]. From December 2006 to January 2017 alone, Copaxone prices increased at nearly **20 times** the rate of inflation during that period. In effect, Assignors and Class Members bore the ever-increasing Copaxone costs.

144.    <u>Third</u>: Defendants intended to—and did—increase the amount of Copaxone claims generated, dispensed, and paid for by the Assignors by utilizing Teva's money to induce patient and/or physician medical decisions. As discussed above, Teva executives viewed payments to CDF and TAF as an "investment" and exploited the direct relationship between subsidizing Medicare co-pays for Copaxone and inducing Copaxone sales. Internal documents and discussions demonstrate that Copaxone subsidies resulted in increased sales (i.e., more Copaxone prescriptions being dispensed and paid for), and that reducing or eliminating payments to CDF or TAF would result in a direct and immediate decline in Copaxone sales. Thus, Defendants used Teva's money to induce the generations, dispensing, and payment of Copaxone that would not have been generated, dispensed, or paid but for Defendants' Scheme.

145.    Since 2008 Assignors have paid more than $ 57 million to cover the cost of Copaxone for its members. As a result of Defendants' conduct, Assignors paid for tainted Copaxone claims that they otherwise would not have and paid for Copaxone at inflated prices.

146.    The allegations above, and those stated throughout the Complaint, resulted in economic damages to the Assignors and Class Members.

## VI.    CLASS ACTION ALLEGATIONS

147.    During the relevant period, various methods of communication were used to carry out the illegal acts alleged here, including the United States mail, interstate, and foreign travel,

interstate and foreign telephone commerce, and interstate wire facilities. The activities of Defendants, as alleged in this Complaint, were within the flow of, and have substantially affected, interstate commerce.

148.   Plaintiffs bring this action on behalf of themselves and the following Class Members:

Federal RICO / State RICO / State Consumer Protection Statute Class 1:

All Medicare Advantage Organizations, and at-risk, first-tier, and downstream entities in the United States and its territories that from at least 2006, through present, pursuant to Medicare contracts offering Medicare benefits, provided services, purchased Copaxone, provided payment relating to, or possess the recovery rights for some or all of the purchase price of Copaxone resulting from CDF's and TAF's co-payment assistance, and Teva's inflation of Copaxone's AWP. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) the federal government; and (c) any judges or justices involved in this action and any members of their immediate families.

Federal RICO / State RICO / State Consumer Protection Statute Class 2:

All self-funded, insurers and related entities in the United States and its territories that from at least 2006, through present, provided services, purchased Copaxone, provided payment relating to, or possess the recovery rights for some or all of the purchase price of Eyela resulting from CDF's and TAF's co-payment assistance, and Teva's inflation of Copaxone's AWP.  This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) the federal government; and (c) any judges or justices involved in this action and any members of their immediate families, Plaintiffs bring this action under the Federal Rule of Civil Procedure 23 both individually and on behalf of a national damages class, as discussed in this Complaint, Defendants' Scheme resulted in inflated prices for, and increased quantities of, Copaxone, the costs of which were borne by the Assignors and Class Members. The damages suffered by the Assignors apply to all individual Class Members (and Plaintiffs as the rightful assignees of those organizations rights of recovery). Class action law has long recognized that, when companies engage in conduct that has uniformly harmed many claimants such as Assignors, and other Medicare insurers, class resolution is an effective tool to redress the harm Assignors and Class Members have been deprived of money as a result of their obligation to pay for dispensed Copaxone at artificially inflated quantities and prices, and because of Teva's concealment of price concessions offered to physicians purchasing and prescribing Copaxone. But for Defendants' conduct, Assignors and Class Members would have paid less for Copaxone during the relevant time.

149. The Class Members claims are properly brought and should be maintained as a nationwide class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy:

Numerosity: The Class Members are so numerous that joinder is impracticable. Plaintiffs believe the Class includes thousands of insurers that paid millions, if not hundreds of millions, for Copaxone prescriptions. There are thousands of entities (including the organizations that assigned their rights to Plaintiffs) throughout the United States that sustained damages as a result of induced purchases of Copaxone at inflated prices caused by Defendants' conduct. Thus, the numerosity element for class certification is met.

Commonality: Defendants' misconduct was directed at all Class Members. Questions of law or fact are common to all Class Members. Defendants' co-pay Scheme and racketeering activity carried out by their enterprise have a common, adverse effect on all Class Members. Thus, common questions of law or fact are prevalent throughout the class, such as whether Defendants engaged in a unfair or deceptive conduct, pattern of racketeering activity, and conspired to induce Class Members' payment for Copaxone. Each Class Member shares the same needed remedy—namely payment for unlawfully paid bills and lost money or disgorgement of Defendants' profits as a result of Defendants' co-pay Scheme and racketeering activity that caused the Assignors and Class Members to pay inflated prices and inflated quantities of Copaxone.

Typicality: Plaintiffs' claims are typical of the claims of the Class Members because their claims arise from the same course of conduct by Defendants, namely Defendants' formation of their unfair or deceptive co-pay Schemes and racketeering activity unlawfully causing Class Members to pay pharmacies (including ACS) for the over-dispensing Copaxone at inflated prices and actual payment that would otherwise not have been made but for Defendants' conduct. Plaintiffs' claims are, therefore, typical of the Class Members.

Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. Plaintiffs' interests in vindicating these claims are shared with all of the Class Members. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action litigation and have particular experience with class action consumer protection and RICO litigation in the pharmaceutical and health care industry.

150. The Classes properly brought and should be maintained as a class action under Rule 23(b) because a class action is the superior method for resolving these claims. Under Rule 23(b)(3), common issues of law and fact predominate over any questions affecting only individual members of the Class. Defendants knowingly and willfully conspired to cause Assignors and Class Members

to pay for Copaxone through the formation of their co-pay Schemes that subsequently resulted in the submission and payment of inflated prices for Copaxone by Assignors and the Class Members that otherwise would not have been paid.

151.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

152.    Plaintiffs know of no difficulty to be encountered in this action that would preclude its maintenance as a class action.

## VII.    TOLLING OF THE STATUTE OF LIMITATIONS

153.    As a preliminary matter, Plaintiffs' allegations of wrongdoing extend well beyond the timeline alleged in the DOJ complaint. Indeed, *after* the DOJ filed suit, the Congressional Committee on Oversight and Reform published a Report, noting "Documents reviewed by the Committee indicate that Teva continued payments to TAF and other third-party foundations through *at least* 2018—three years beyond the scope of the DOJ's complaint." [**Ex. 3** – 2020 Price Report, pg. 17 (emphasis added)]. In the years following the Congressional Report, the DOJ has since uncovered additional evidence—as discussed above—demonstrating that the Schemes continued beyond 2018.

### *Fraudulent Concealment Tolling*

154.    The claims asserted in this Complaint have been tolled as a matter of law as

Defendants took affirmative steps to conceal the wrongful conduct alleged here including, inter alia, Teva's use of CDF and TAF as a conduit and concealing such use under the guise of "donations" to an "independent" co-payment assistance charity.

155.    The claims asserted in this Complaint have been tolled as a matter of law as Teva arranged for individuals receiving Copaxone through their free drug program to be enrolled into Medicare health plans and implemented the Scheme to receive revenue from members of the Class. Members of the class would have no way of knowing that Teva caused the beneficiary to be enrolled in the health plan.

156.    The claims asserted in this Complaint have been tolled as a matter of law as CDF and TAF repeatedly and continuously took affirmative steps to conceal the wrongful conduct alleged herein by misleading the OIG, DOJ, health care providers, certain pharmacies, beneficiaries, insurers, and the general public, into believing it was operating a legitimate, legal, and independent 501(c)(3) charitable organization, when in reality, it was serving as an illegal conduit for Teva.

157.    The claims asserted in this Complaint have been tolled as a matter of law as each Defendant actively concealed the Schemes' existence.

### *Discovery Rule Tolling*

158.    Assignors did not know, and no reasonable way of discovering Defendants' Scheme until it became public knowledge as a result of the DOJ's Complaint(s), at the earliest, further, additional documents were put into the public after the DOJ Complaint, giving rise to additional causes against Defendants that would not have been available at the time of filing the DOJ complaint (e.g., Teva enrolling beneficiaries in health plans).

159.    Within the applicable statutes of limitation, Assignors could not have discovered through the exercise of reasonable diligence that Defendants were engaged in and concealing the

conduct alleged herein.

160.     Assignors did not discover, and did not know of, facts that would have caused a reasonable person to suspect that the Defendants were engaged in the alleged Scheme, nor would a reasonable diligent investigation have disclosed the facts.

### *Continuing Violation Doctrine*

161.     The Complaint alleges a continuing course of conduct, and Defendants' unlawful conduct has inflicted continuing and accumulating harm. As demonstrated above, Defendants have continued the unlawful copay scheme long after 2018. Plaintiffs did not know, nor could have known of Teva's illegal efforts to inflate Copaxone prices which span the entirety of Copaxone's availability. Teva has continued its practice of bribery and concealment since Copaxone was launched.

### *Equitable Tolling*

162.     Defendants were under a continuous duty to disclose to Assignors and Class Members the existence and true nature of the Co-Payment Scheme, including the subsequent obligations for payment triggered by Defendant's misconduct.

163.     The existence of Defendants' co-payment assistance scheme was a material fact, and Defendants concealed its existence and instead falsely represented that they were in compliance with federal regulations including the FCA and AKS. When Defendants made these misrepresentations and concealed their co-payment assistance scheme, they had knowledge of the facts surrounding the scheme's existence. Defendants concealed the co-payment assistance conspiracy scheme and made misrepresentations about it with the intention that Assignors and Class Members would rely on said misrepresentations and would pay for Copaxone. Defendants' concealment induced Assignors and Class Members to reasonably rely and act upon these misrepresentations and were misled into paying for Copaxone. *See Safe Env't of Am., Inc. v. Emps.*

*Ins. of Wausau*, 278 F. Supp. 2d 121, 126–27 (D. Mass. 2003).

164.    Teva was under a continuous duty to disclose the existence of any price concessions, such as credit card rebates, and other gifts, provided to physicians. The existence of the illegal Scheme was a material fact, and Defendants concealed its existence in violation of federal and state law.

165.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action and all equitable principles of tolling should apply.

## VIII.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### Violations of State Consumer Protection Laws
*Against All Defendants*

166.    Plaintiff re-allege and incorporate by reference paragraphs 1–218 of this Complaint as if fully set forth herein.

#### (1) Connecticut Unfair Trade Practices Act
#### (Conn. Gen. Stat. §§ 42-110a *et seq.*)

167.    To prevail under the Connecticut Unfair Trade Practices Act ("CUTPA"), Plaintiff must show: (1) Defendants engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce; and (2) Defendants' practices resulted in an ascertainable loss of money or property. Conn. Gen. Stat. § 42-110b.

168.    Defendants' conduct constitutes unfair acts or practices for purposes of CUTPA. First, Defendants' Scheme circumvented Congressionally imposed price restrictions and market safeguards enabling Teva to raise its prices to exorbitant levels—which Teva did—leaving the Assignors with increasingly expensive Copaxone costs. Second, Defendants used Teva's drug subsidies to induce patients and physicians to opt for Copaxone over other treatment options. Between 2006-2017 alone, Copaxone's price increased at 20 times the rate of inflation. Third:

TAF and CDF operated as Teva's conduits, rather than independent charities, to funnel Teva's illegal subsidies to patients, which largely was paid directly to the dispensing pharmacy—i.e., ACS. Fourth: due to the increasingly unaffordable Copaxone prices, Defendants, in essence, created a greater need for co-pay assistance. Teva's Shared Solutions program, with the aid of AssistRx and ACS patient services, ensured that the vast majority of patients in need would receive assistance through TAF or CDF. Fifth: Defendants circumvented mandatory certifications and/or conditions to conceal the Schemes thereby ensuring that Assignors and Class Members continue paying for tainted Copaxone claims at inflated prices. Sixth: With the assistance of ACS and AssistRx, Teva steered patients away from free Copaxone programs, so that Defendants could profit from additional Copaxone sales which were largely funded, in part, by Teva's subsidies. Seventh: Scheme undermines and offends significant public policy considerations, including, but not limited to: encouraging development and use of affordable drugs; streamlining access to affordable health care; Part D Sponsors' ability to negotiate lower drug prices, as Congress intended; preserving a fair and competitive market for prescription medications; avoiding patient-physician conflicts of interest by ensuring medical decisions are not made based on financial incentives; safeguarding responsible Medicare spending funded by taxpayer dollars; lowering healthcare costs for U.S. citizens generally; and maintaining transparency and accountability to avoid distrust between patients and healthcare entities.

169.    Defendants' conduct also constitutes deceptive acts or practices for purposes of CUTPA. First: On multiple occasions, CDF and TAF sought and obtained favorable OIG advisory opinions by omitting material facts, including their roles as Teva's conduits in the Scheme. Second: CDF and TAF publicly advertised their favorable advisory opinion, representing themselves as legitimate, independent charities to deceive the OIG, Medicare, Part D Sponsors, and individuals—which turned out to be false. Third: As stated above, for Copaxone to be eligible

for payment by a federal health care program, Teva necessarily certified compliance with numerous federal and state health care laws, including the AKS. However, as demonstrated by the allegations contained herein, those certifications were unequivocally contradicted by Teva's involvement in the Scheme. By falsely certifying compliance, Teva misled Part D Sponsors, including the Assignors, into believing that Copaxone was eligible for payment. Fourth: like Teva, ACS' participation in the Medicare program necessarily required ACS to certify compliance with numerous federal and state health care laws, including the AKS. However, as demonstrated by the allegations contained herein, those certifications were unequivocally contradicted by ACS' involvement in the Scheme. Each time ACS steered a patient into CDF's or TAF's MS fund, and subsequently submitted that patient's claim to a Part D Sponsor, like the Assignors, ACS necessarily certified that the claim was free and clear of any legal defects that would otherwise prohibit payment. ACS deceived the Assignors by certifying compliance, thereby ensuring the Assignors continued paying for tainted Copaxone claims. But for ACS knowingly omitting material facts and/or falsely certifying each claim to be free and clear of legal defects, the Assignors would not, nor could have, paid for Copaxone claims. Fifth: because AssistRx contracted to Medicare providers and suppliers (i.e., Teva and ACS), AssistRx necessarily was required to abide by the same federal and state health care laws, including the AKS. AssistRx's role in the Scheme unequivocally contradicts those requirements.

170.    These allegations, and those throughout the Complaint, constitute unfair or deceptive acts or practices for the purposes of CUTPA.

171.    The Assignors' injuries were a foreseeable risk of and/or were substantially caused by Defendants' unfair and deceptive acts or practices. First: Due to Medicare cost-sharing, the Assignors and Class Members are obligated to cover an independent and exclusive portion of total drug expenses for their beneficiaries. Because Assignors and Class Members cost-sharing is based

on an annual fixed percentage of total drug expenses, an increase in drug prices necessarily increases the total expenses to the Assignors and Class Members. Thus, as Defendants utilized the Scheme to increase price for Copaxone, the Assignors and Class Members were necessarily left with significantly higher expenses. Second: to effectuate the Scheme, the Defendants necessarily engaged in prohibited conduct thereby rendering Copaxone claims generated by the Scheme to be tainted. By concealing the Scheme and/or omitting material facts, Defendants caused Assignors to pay for tainted claims that they would not have, nor could have, but for Defendants' efforts to conceal it. Third: as demonstrated by Teva's internal documents, Defendants intended to—and did—utilize Teva's drug subsidies to induce patient and physician medical decisions. But for Teva's drug subsidies, many (if not most) of the Copaxone claims would not have been generated, dispensed, and paid for by the Assignors.

172.    As a result of the Scheme, the Assignors paid more than $57 million for Copaxone, including claims paid in the State of Connecticut. The over $57 million in Copaxone payments represents an ascertainable loss of the Assignors' money or property resulting from Defendants' unfair and deceptive acts or practices. The precise measurement of damages will be proven at trial.

173.    Defendants' conduct alleged in this Amended Complaint occurred throughout the United States, including in the trade or commerce of the State of Connecticut. For example, the following conduct occurred within the State of Connecticut: (1) the advertisement, transport, sale, and purchase of Copaxone, as well as advertising patient co-pay assistance through CDF's and TAF's MS funds; (2) Teva, ACS, AssistRx, CDF, and TAF solicited and communicated with Connecticut residents (including Assignors' beneficiaries and other patients) with the intent to steer patients into CDF's or TAF's MS funds; (3) Teva, ACS, AssistRx, CDF, and TAF solicited and communicated with Connecticut medical physicians with the intent to influence physician decisions with Teva's illicit drug subsidies; (4) The transfer and disbursement of Teva's illicit

funds through CDF and TAF, was provided on behalf of the Connecticut resident prescribed Copaxone; (5) The submission of tainted Copaxone claims for payment by Assignors and Class Members; and (6) The disbursement of funds for tainted Copaxone claims induced by Defendants' Scheme.

174.    Analysis of the Assignors' data identified Copaxone purchases in the State of Connecticut. The Assignors and Class Members were harmed in the State of Connecticut for each purchase of Copaxone within the state.

175.    Simultaneously with the filing of this Complaint, Plaintiffs served a copy on the Connecticut Attorney General and Commissioner of Consumer Protection.

176.    Plaintiffs are entitled to recover their actual damages, punitive damages, and attorney's fees and costs.

<div align="center">

**(2) Florida Deceptive & Unfair Practices Act**
**(Fla. Stat. §§ 501.201 *et seq.*)**

</div>

177.    To prevail under the Florida Deceptive & Unfair Trade Practice Act ("FDUPTA"), Plaintiff must show: (1) Defendants engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce; and (2) Defendants' practices resulted in an ascertainable loss of money or property. Fla. Stat. § 501.204(1).

178.    The Florida Deceptive & Unfair Trade Practice Act ("FDUTPA") states "in any action brough by a person who has suffered a loss as a result of a violation of this part, such person may recover actual damages, plus attorney's fees and court costs." § 501.211(2).[21]

179.    To prevail under FDUTPA, a plaintiff must show: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. Fla. Stat. § 501.204(1).

---

[21] FDUPTA defines "consumer" as "an individual; child, by and through its parent or legal guardian; business; firm; association; joint venture; partnership; estate; trust; business trust; syndicate; fiduciary; corporation; any commercial entity, however denominated; or any other group or combination." § 501.203(7).

180.    A deceptive act or practice is one that is likely to mislead consumers. An unfair practice can be any of the following: a practice that (1) offends public policy; (2) is immoral, unethical, oppressive, unscrupulous; or (3) substantially injurious to consumers.

181.    Defendants' conduct constitutes unfair acts or practices for purposes of FDUPTA. First, Defendants' Scheme circumvented Congressionally imposed price restrictions and market safeguards enabling Teva to raise its prices to exorbitant levels—which Teva did—leaving the Assignors with increasingly expensive Copaxone costs. Second, Defendants used Teva's drug subsidies to induce patients and physicians to opt for Copaxone over other treatment options. Between 2006-2017 alone, Copaxone's price increased at 20 times the rate of inflation. Third: TAF and CDF operated as Teva's conduits, rather than independent charities, to funnel Teva's illegal subsidies to patients, which largely was paid directly to the dispensing pharmacy—i.e., ACS. Fourth: due to the increasingly unaffordable Copaxone prices, Defendants, in essence, created a greater need for co-pay assistance. Teva's Shared Solutions program, with the aid of AssistRx and ACS patient services, ensured that the vast majority of patients in need would receive assistance through TAF or CDF. Fifth: Defendants circumvented mandatory certifications and/or conditions to conceal the Schemes thereby ensuring that Assignors and Class Members continue paying for tainted Copaxone claims at inflated prices. Sixth: With the assistance of ACS and AssistRx, Teva steered patients away from free Copaxone programs, so that Defendants could profit from additional Copaxone sales which were largely funded, in part, by Teva's subsidies. Seventh: Scheme undermines and offends significant public policy considerations, including, but not limited to: encouraging development and use of affordable drugs; streamlining access to affordable health care; Part D Sponsors' ability to negotiate lower drug prices, as Congress intended; preserving a fair and competitive market for prescription medications; avoiding patient-physician conflicts of interest by ensuring medical decisions are not made based on financial

incentives; safeguarding responsible Medicare spending funded by taxpayer dollars; lowering healthcare costs for U.S. citizens generally; and maintaining transparency and accountability to avoid distrust between patients and healthcare entities.

182.    Defendants' conduct also constitutes deceptive acts or practices for purposes of FDUPTA. First: On multiple occasions, CDF and TAF sought and obtained favorable OIG advisory opinions by omitting material facts, including their roles as Teva's conduits in the Scheme. Second: CDF and TAF publicly advertised their favorable advisory opinion, representing themselves as legitimate, independent charities to deceive the OIG, Medicare, Part D Sponsors, and individuals—which turned out to be false. Third: As stated above, for Copaxone to be eligible for payment by a federal health care program, Teva necessarily certified compliance with numerous federal and state health care laws, including the AKS. However, as demonstrated by the allegations contained herein, those certifications were unequivocally contradicted by Teva's involvement in the Scheme. By falsely certifying compliance, Teva misled Part D Sponsors, including the Assignors, into believing that Copaxone was eligible for payment. Fourth: like Teva, ACS' participation in the Medicare program necessarily required ACS to certify compliance with numerous federal and state health care laws, including the AKS. However, as demonstrated by the allegations contained herein, those certifications were unequivocally contradicted by ACS' involvement in the Scheme. Each time ACS steered a patient into CDF's or TAF's MS fund, and subsequently submitted that patient's claim to a Part D Sponsor, like the Assignors, ACS necessarily certified that the claim was free and clear of any legal defects that would otherwise prohibit payment. ACS deceived the Assignors by certifying compliance, thereby ensuring the Assignors continued paying for tainted Copaxone claims. But for ACS knowingly omitting material facts and/or falsely certifying each claim to be free and clear of legal defects, the Assignors would not, nor could have, paid for Copaxone claims. Fifth: because AssistRx

contracted to Medicare providers and suppliers (i.e., Teva and ACS), AssistRx necessarily was required to abide by the same federal and state health care laws, including the AKS. AssistRx's role in the Scheme unequivocally contradicts those requirements.

183.    These allegations, and those throughout the Complaint, constitute unfair or deceptive acts or practices for the purposes of FDUPTA.

184.    The Assignors' injuries were a foreseeable risk of and/or were substantially caused by Defendants' unfair and deceptive acts or practices. <u>First</u>: Due to Medicare cost-sharing, the Assignors and Class Members are obligated to cover an independent and exclusive portion of total drug expenses for their beneficiaries. Because Assignors and Class Members cost-sharing is based on an annual fixed percentage of total drug expenses, an increase in drug prices necessarily increases the total expenses to the Assignors and Class Members. Thus, as Defendants utilized the Scheme to increase price for Copaxone, the Assignors and Class Members were necessarily left with significantly higher expenses. <u>Second</u>: to effectuate the Scheme, the Defendants necessarily engaged in prohibited conduct thereby rendering Copaxone claims generated by the Scheme to be tainted. By concealing the Scheme and/or omitting material facts, Defendants caused Assignors to pay for tainted claims that they would not have, nor could have, but for Defendants' efforts to conceal it. <u>Third</u>: as demonstrated by Teva's internal documents, Defendants intended to—and did—utilize Teva's drug subsidies to induce patient and physician medical decisions. But for Teva's drug subsidies, many (if not most) of the Copaxone claims would not have been generated, dispensed, and paid for by the Assignors.

185.    As a result of the Scheme, the Assignors paid more than $57 million for Copaxone, including claims paid in the State of Florida. The over $57 million in Copaxone payments represents an ascertainable loss of the Assignors' money or property resulting from Defendants' unfair and deceptive acts or practices. The precise measurement of damages will be proven at trial.

186.    Defendants' conduct alleged in this Amended Complaint occurred throughout the United States, including in the trade or commerce of the State of Florida.[22] For example, the following conduct occurred within the State of Florida: (1) the advertisement, transport, sale, and purchase of Copaxone, as well as advertising patient co-pay assistance through CDF's and TAF's MS funds; (2) Teva, ACS, AssistRx, CDF, and TAF solicitated and communicated with Florida residents (including Assignors' beneficiaries and other patients) with the intent to steer patients into CDF's or TAF's MS funds; (3) Teva, ACS, AssistRx, CDF, and TAF solicited and communicated with Florida medical physicians with the intent to influence physician decisions with Teva's illicit drug subsidies; (4) The transfer and disbursement of Teva's illicit funds through CDF and TAF, was provided on behalf of the Florida resident prescribed Copaxone; (5) The submission of tainted Copaxone claims for payment by Assignors and Class Members; and (6) The disbursement of funds for tainted Copaxone claims induced by Defendants' Scheme.

187.    Analysis of the Assignors' data identified Copaxone purchases in the State of Florida. The Assignors and Class Members were harmed in the State of Florida for each purchase of Copaxone within the state.

188.    Accordingly, Defendants violated FDUPTA. Plaintiffs seek to recover against each Defendant the amount of their actual damages, attorneys' fees, and costs pursuant to Fla. Stat. §§ 501.211(2) and 501.2105(1).

### (3) Illinois Consumer Fraud & Deceptive Business Practices Act
#### (815 Ill. Comp. Stat. 505/1 *et seq*.)

189.    To prevail under Illinois Consumer Fraud Act ("ICFA"), Plaintiff must show: (1) (1) a deceptive or unfair act or practice committed by the defendant; (2) the defendant's intent that

---

[22] The terms "trade or commerce means the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." Fla. Stat. § 501.203(8).

the plaintiff rely on the deception; (3) the occurrence of the deception in the course of conduct involving trade or commerce; (4) actual damages to the plaintiff; and (5) caused by defendant's acts or practices.

190.     The ICFA defines deceptive acts or practices as: including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or concealment, suppression, or omission of any material fact, with the intent that others rely upon the concealment, suppression, or omission of such fact in the conduct of any trade or commerce.

191.     A practice is unfair if the practice: (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; and/or (3) causes substantial injury to the plaintiff.

192.     Defendants' conduct constitutes unfair acts or practices for purposes of ICFA. <u>First</u>, Defendants' Scheme circumvented Congressionally imposed price restrictions and market safeguards enabling Teva to raise its prices to exorbitant levels—which Teva did—leaving the Assignors with increasingly expensive Copaxone costs. <u>Second</u>, Defendants used Teva's drug subsidies to induce patients and physicians to opt for Copaxone over other treatment options. Between 2006-2017 alone, Copaxone's price increased at 20 times the rate of inflation. <u>Third</u>: TAF and CDF operated as Teva's conduits, rather than independent charities, to funnel Teva's illegal subsidies to patients, which largely was paid directly to the dispensing pharmacy—i.e., ACS. <u>Fourth</u>: due to the increasingly unaffordable Copaxone prices, Defendants, in essence, created a greater need for co-pay assistance. Teva's Shared Solutions program, with the aid of AssistRx and ACS patient services, ensured that the vast majority of patients in need would receive assistance through TAF or CDF. <u>Fifth</u>: Defendants circumvented mandatory certifications and/or conditions to conceal the Schemes thereby ensuring that Assignors and Class Members continue paying for tainted Copaxone claims at inflated prices. <u>Sixth</u>: With the assistance of ACS and AssistRx, Teva steered patients away from free Copaxone programs, so that Defendants could

79

profit from additional Copaxone sales which were largely funded, in part, by Teva's subsidies.

Seventh: Scheme undermines and offends significant public policy considerations, including, but not limited to: encouraging development and use of affordable drugs; streamlining access to affordable health care; Part D Sponsors' ability to negotiate lower drug prices, as Congress intended; preserving a fair and competitive market for prescription medications; avoiding patient-physician conflicts of interest by ensuring medical decisions are not made based on financial incentives; safeguarding responsible Medicare spending funded by taxpayer dollars; lowering healthcare costs for U.S. citizens generally; and maintaining transparency and accountability to avoid distrust between patients and healthcare entities.

193. Defendants' conduct also constitutes deceptive acts or practices for purposes of ICFA. First: On multiple occasions, CDF and TAF sought and obtained favorable OIG advisory opinions by omitting material facts, including their roles as Teva's conduits in the Scheme. Second: CDF and TAF publicly advertised their favorable advisory opinion, representing themselves as legitimate, independent charities to deceive the OIG, Medicare, Part D Sponsors, and individuals—which turned out to be false. Third: As stated above, for Copaxone to be eligible for payment by a federal health care program, Teva necessarily certified compliance with numerous federal and state health care laws, including the AKS. However, as demonstrated by the allegations contained herein, those certifications were unequivocally contradicted by Teva's involvement in the Scheme. By falsely certifying compliance, Teva misled Part D Sponsors, including the Assignors, into believing that Copaxone was eligible for payment. Fourth: like Teva, ACS' participation in the Medicare program necessarily required ACS to certify compliance with numerous federal and state health care laws, including the AKS. However, as demonstrated by the allegations contained herein, those certifications were unequivocally contradicted by ACS' involvement in the Scheme. Each time ACS steered a patient into CDF's or TAF's MS fund, and

subsequently submitted that patient's claim to a Part D Sponsor, like the Assignors, ACS necessarily certified that the claim was free and clear of any legal defects that would otherwise prohibit payment. ACS deceived the Assignors by certifying compliance, thereby ensuring the Assignors continued paying for tainted Copaxone claims. But for ACS knowingly omitting material facts and/or falsely certifying each claim to be free and clear of legal defects, the Assignors would not, nor could have, paid for Copaxone claims. Fifth: because AssistRx contracted to Medicare providers and suppliers (i.e., Teva and ACS), AssistRx necessarily was required to abide by the same federal and state health care laws, including the AKS. AssistRx's role in the Scheme unequivocally contradicts those requirements.

194.    These allegations, and those throughout the Complaint, constitute unfair or deceptive acts or practices for the purposes of ICFA.

195.    The Assignors' injuries were a foreseeable risk of and/or were substantially caused by Defendants' unfair and deceptive acts or practices. First: Due to Medicare cost-sharing, the Assignors and Class Members are obligated to cover an independent and exclusive portion of total drug expenses for their beneficiaries. Because Assignors and Class Members cost-sharing is based on an annual fixed percentage of total drug expenses, an increase in drug prices necessarily increases the total expenses to the Assignors and Class Members. Thus, as Defendants utilized the Scheme to increase price for Copaxone, the Assignors and Class Members were necessarily left with significantly higher expenses. Second: to effectuate the Scheme, the Defendants necessarily engaged in prohibited conduct thereby rendering Copaxone claims generated by the Scheme to be tainted. By concealing the Scheme and/or omitting material facts, Defendants caused Assignors to pay for tainted claims that they would not have, nor could have, but for Defendants' efforts to conceal it. Third: as demonstrated by Teva's internal documents, Defendants intended to—and did—utilize Teva's drug subsidies to induce patient and physician medical decisions. But for

Teva's drug subsidies, many (if not most) of the Copaxone claims would not have been generated, dispensed, and paid for by the Assignors.

196.    As a result of the Scheme, the Assignors paid more than $57 million for Copaxone, including claims paid in the State of Illinois. The over $57 million in Copaxone payments represents an ascertainable loss of the Assignors' money or property resulting from Defendants' unfair and deceptive acts or practices. The precise measurement of damages will be proven at trial.

197.    Defendants' conduct alleged in this Amended Complaint occurred throughout the United States, including in the trade or commerce of the State of Illinois.[23] For example, the following conduct occurred within the State of Illinois: (1) the advertisement, transport, sale, and purchase of Copaxone, as well as advertising patient co-pay assistance through CDF's and TAF's MS funds; (2) Teva, ACS, AssistRx, CDF, and TAF solicitated and communicated with Illinois residents (including Assignors' beneficiaries and other patients) with the intent to steer patients into CDF's or TAF's MS funds; (3) Teva, ACS, AssistRx, CDF, and TAF solicited and communicated with Illinois medical physicians with the intent to influence physician decisions with Teva's illicit drug subsidies; (4) The transfer and disbursement of Teva's illicit funds through CDF and TAF, was provided on behalf of the Illinois resident prescribed Copaxone; (5) The submission of tainted Copaxone claims for payment by Assignors and Class Members; and (6) The disbursement of funds for tainted Copaxone claims induced by Defendants' Scheme.

198.    Because Defendants' unfair or deceptive trade practices occurred within the trade or commerce of the State of Illinois and/or affected trade or commerce in the State of Illinois, a sufficient Consumer Nexus exists between Defendants' conduct and residents (businesses and

---

[23] The terms "trade or commerce means the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." Fla. Stat. § 501.203(8).

individuals) within the State.

199.    Analysis of the Assignors' data identified Copaxone purchases in the State of Illinois. The Assignors and Class Members were harmed in the State of Illinois for each purchase of Copaxone within the state.

200.    Simultaneously with the filing of this Complaint, Plaintiff's served a copy on the Illinois Attorney General.

201.    Plaintiffs are entitled to recover three (3) times the amount of actual damages resulting from Defendants' violation together with costs and reasonable attorney's fees.

### (4) Maine Unfair Trade Practices Act
(Me. Stat. tit. 5, §§ 205A *et seq.*)

202.    The Maine Unfair Trade Practices Act ("MGL CH. 93A") prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce. §207.

203.    An act or practice is unfair, if (1) the act causes, or is likely to cause substantial injury to consumers; (2) that is not reasonably avoidable by consumers; and (3) that is not outweighed by any countervailing benefits to consumers or competition.

204.    An act or practice is deceptive if it is a material representation, omission, act or practice that is likely to mislead consumers acting reasonably under the circumstances. *Id.*

205.    Defendants' conduct constitutes unfair acts or practices for purposes of MGL CH. 93A. First, Defendants' Scheme circumvented Congressionally imposed price restrictions and market safeguards enabling Teva to raise its prices to exorbitant levels—which Teva did—leaving the Assignors with increasingly expensive Copaxone costs. Second, Defendants used Teva's drug subsidies to induce patients and physicians to opt for Copaxone over other treatment options. Between 2006-2017 alone, Copaxone's price increased at 20 times the rate of inflation. Third: TAF and CDF operated as Teva's conduits, rather than independent charities, to funnel Teva's illegal subsidies to patients, which largely was paid directly to the dispensing pharmacy—i.e.,

ACS. Fourth: due to the increasingly unaffordable Copaxone prices, Defendants, in essence, created a greater need for co-pay assistance. Teva's Shared Solutions program, with the aid of AssistRx and ACS patient services, ensured that the vast majority of patients in need would receive assistance through TAF or CDF. Fifth: Defendants circumvented mandatory certifications and/or conditions to conceal the Schemes thereby ensuring that Assignors and Class Members continue paying for tainted Copaxone claims at inflated prices. Sixth: With the assistance of ACS and AssistRx, Teva steered patients away from free Copaxone programs, so that Defendants could profit from additional Copaxone sales which were largely funded, in part, by Teva's subsidies. Seventh: Scheme undermines and offends significant public policy considerations, including, but not limited to: encouraging development and use of affordable drugs; streamlining access to affordable health care; Part D Sponsors' ability to negotiate lower drug prices, as Congress intended; preserving a fair and competitive market for prescription medications; avoiding patient-physician conflicts of interest by ensuring medical decisions are not made based on financial incentives; safeguarding responsible Medicare spending funded by taxpayer dollars; lowering healthcare costs for U.S. citizens generally; and maintaining transparency and accountability to avoid distrust between patients and healthcare entities.

206.    Defendants' conduct also constitutes deceptive acts or practices for purposes of MGL CH. 93A. First: On multiple occasions, CDF and TAF sought and obtained favorable OIG advisory opinions by omitting material facts, including their roles as Teva's conduits in the Scheme. Second: CDF and TAF publicly advertised their favorable advisory opinion, representing themselves as legitimate, independent charities to deceive the OIG, Medicare, Part D Sponsors, and individuals—which turned out to be false. Third: As stated above, for Copaxone to be eligible for payment by a federal health care program, Teva necessarily certified compliance with numerous federal and state health care laws, including the AKS. However, as demonstrated by the

allegations contained herein, those certifications were unequivocally contradicted by Teva's involvement in the Scheme. By falsely certifying compliance, Teva misled Part D Sponsors, including the Assignors, into believing that Copaxone was eligible for payment. Fourth: like Teva, ACS' participation in the Medicare program necessarily required ACS to certify compliance with numerous federal and state health care laws, including the AKS. However, as demonstrated by the allegations contained herein, those certifications were unequivocally contradicted by ACS' involvement in the Scheme. Each time ACS steered a patient into CDF's or TAF's MS fund, and subsequently submitted that patient's claim to a Part D Sponsor, like the Assignors, ACS necessarily certified that the claim was free and clear of any legal defects that would otherwise prohibit payment. ACS deceived the Assignors by certifying compliance, thereby ensuring the Assignors continued paying for tainted Copaxone claims. But for ACS knowingly omitting material facts and/or falsely certifying each claim to be free and clear of legal defects, the Assignors would not, nor could have, paid for Copaxone claims. Fifth: because AssistRx contracted to Medicare providers and suppliers (i.e., Teva and ACS), AssistRx necessarily was required to abide by the same federal and state health care laws, including the AKS. AssistRx's role in the Scheme unequivocally contradicts those requirements.

207. These allegations, and those throughout the Complaint, constitute unfair or deceptive acts or practices for the purposes of MGL CH. 93A.

208. The Assignors' injuries were a foreseeable risk of and/or were substantially caused by Defendants' unfair and deceptive acts or practices. First: Due to Medicare cost-sharing, the Assignors and Class Members are obligated to cover an independent and exclusive portion of total drug expenses for their beneficiaries. Because Assignors and Class Members cost-sharing is based on an annual fixed percentage of total drug expenses, an increase in drug prices necessarily increases the total expenses to the Assignors and Class Members. Thus, as Defendants utilized the

Scheme to increase price for Copaxone, the Assignors and Class Members were necessarily left with significantly higher expenses. <u>Second</u>: to effectuate the Scheme, the Defendants necessarily engaged in prohibited conduct thereby rendering Copaxone claims generated by the Scheme to be tainted. By concealing the Scheme and/or omitting material facts, Defendants caused Assignors to pay for tainted claims that they would not have, nor could have, but for Defendants' efforts to conceal it. <u>Third</u>: as demonstrated by Teva's internal documents, Defendants intended to—and did—utilize Teva's drug subsidies to induce patient and physician medical decisions. But for Teva's drug subsidies, many (if not most) of the Copaxone claims would not have been generated, dispensed, and paid for by the Assignors.

209.    As a result of the Scheme, the Assignors paid more than $57 million for Copaxone, including claims paid in the State of Maine. The over $57 million in Copaxone payments represents an ascertainable loss of the Assignors' money or property resulting from Defendants' unfair and deceptive acts or practices. The precise measurement of damages will be proven at trial.

210.    Defendants' conduct alleged in this Amended Complaint occurred throughout the United States, including in the trade or commerce of the State of Maine.[24] For example, the following conduct occurred within the State of Maine: (1) the advertisement, transport, sale, and purchase of Copaxone, as well as advertising patient co-pay assistance through CDF's and TAF's MS funds; (2) Teva, ACS, AssistRx, CDF, and TAF solicited and communicated with Maine residents (including Assignors' beneficiaries and other patients) with the intent to steer patients into CDF's or TAF's MS funds; (3) Teva, ACS, AssistRx, CDF, and TAF solicited and communicated with Maine medical physicians with the intent to influence physician decisions with

---

[24] "Trade or commerce" shall include the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of the State of Maine. § 206(3).

Teva's illicit drug subsidies; (4) The transfer and disbursement of Teva's illicit funds through CDF and TAF, was provided on behalf of the Maine resident prescribed Copaxone; (5) The submission of tainted Copaxone claims for payment by Assignors and Class Members; and (6) The disbursement of funds for tainted Copaxone claims induced by Defendants' Scheme.

211.    Analysis of the Assignors' data identified Copaxone purchases in the State of Maine. The Assignors and Class Members were harmed in the State of Maine for each purchase of Copaxone within the state.

212.    Simultaneously with the filing of the Complaint, Plaintiffs served a copy on the Maine Attorney General pursuant to § 213.

213.    Plaintiffs are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant, and any other remedies that are just and proper under § 213.

### (5) Massachusetts Regulation of Business Practice & Consumer Protection Act
### (Mass. Gen. Laws Ch. 93A §§ 1 *et seq.*)

214.    To establish a violation of the Massachusetts unfair and deceptive trade practice statute, a plaintiff must show (1) the defendant engaged in an unfair method of competition or committed an unfair or deceptive act or practice; (2) a loss of money or property was suffered; and (3) defendant's unfair or deceptive act or practice caused the loss suffered. Mass. Gen. Laws. Ch. 93A §§ 9, 11.

215.    An act or practice is considered unfair if (1) the practice is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) it is immoral, unethical, oppressive, or unscrupulous; and (3) it causes substantial injury to consumers, competitors, or businesspeople.

216.    Practices may be deemed deceptive where they could reasonably be found to have caused a person to act differently from the way they would have acted; conduct is deceptive when it tends to mislead.

217.    Defendants' conduct constitutes unfair acts or practices for purposes of MUTPA. First, Defendants' Scheme circumvented Congressionally imposed price restrictions and market safeguards enabling Teva to raise its prices to exorbitant levels—which Teva did—leaving the Assignors with increasingly expensive Copaxone costs. Second, Defendants used Teva's drug subsidies to induce patients and physicians to opt for Copaxone over other treatment options. Between 2006-2017 alone, Copaxone's price increased at 20 times the rate of inflation. Third: TAF and CDF operated as Teva's conduits, rather than independent charities, to funnel Teva's illegal subsidies to patients, which largely was paid directly to the dispensing pharmacy—i.e., ACS. Fourth: due to the increasingly unaffordable Copaxone prices, Defendants, in essence, created a greater need for co-pay assistance. Teva's Shared Solutions program, with the aid of AssistRx and ACS patient services, ensured that the vast majority of patients in need would receive assistance through TAF or CDF. Fifth: Defendants circumvented mandatory certifications and/or conditions to conceal the Schemes thereby ensuring that Assignors and Class Members continue paying for tainted Copaxone claims at inflated prices. Sixth: With the assistance of ACS and AssistRx, Teva steered patients away from free Copaxone programs, so that Defendants could profit from additional Copaxone sales which were largely funded, in part, by Teva's subsidies. Seventh: Scheme undermines and offends significant public policy considerations, including, but not limited to: encouraging development and use of affordable drugs; streamlining access to affordable health care; Part D Sponsors' ability to negotiate lower drug prices, as Congress intended; preserving a fair and competitive market for prescription medications; avoiding patient-physician conflicts of interest by ensuring medical decisions are not made based on financial incentives; safeguarding responsible Medicare spending funded by taxpayer dollars; lowering healthcare costs for U.S. citizens generally; and maintaining transparency and accountability to avoid distrust between patients and healthcare entities.

218.    Defendants' conduct also constitutes deceptive acts or practices for purposes of MUTPA. First: On multiple occasions, CDF and TAF sought and obtained favorable OIG advisory opinions by omitting material facts, including their roles as Teva's conduits in the Scheme. Second: CDF and TAF publicly advertised their favorable advisory opinion, representing themselves as legitimate, independent charities to deceive the OIG, Medicare, Part D Sponsors, and individuals—which turned out to be false. Third: As stated above, for Copaxone to be eligible for payment by a federal health care program, Teva necessarily certified compliance with numerous federal and state health care laws, including the AKS. However, as demonstrated by the allegations contained herein, those certifications were unequivocally contradicted by Teva's involvement in the Scheme. By falsely certifying compliance, Teva misled Part D Sponsors, including the Assignors, into believing that Copaxone was eligible for payment. Fourth: like Teva, ACS' participation in the Medicare program necessarily required ACS to certify compliance with numerous federal and state health care laws, including the AKS. However, as demonstrated by the allegations contained herein, those certifications were unequivocally contradicted by ACS' involvement in the Scheme. Each time ACS steered a patient into CDF's or TAF's MS fund, and subsequently submitted that patient's claim to a Part D Sponsor, like the Assignors, ACS necessarily certified that the claim was free and clear of any legal defects that would otherwise prohibit payment. ACS deceived the Assignors by certifying compliance, thereby ensuring the Assignors continued paying for tainted Copaxone claims. But for ACS knowingly omitting material facts and/or falsely certifying each claim to be free and clear of legal defects, the Assignors would not, nor could have, paid for Copaxone claims. Fifth: because AssistRx contracted to Medicare providers and suppliers (i.e., Teva and ACS), AssistRx necessarily was required to abide by the same federal and state health care laws, including the AKS. AssistRx's role in the Scheme unequivocally contradicts those requirements.

219.    These allegations, and those throughout the Complaint, constitute unfair or deceptive acts or practices for the purposes of MGL Ch. 93A.

220.    The Assignors' injuries were a foreseeable risk of and/or were substantially caused by Defendants' unfair and deceptive acts or practices. <u>First</u>: Due to Medicare cost-sharing, the Assignors and Class Members are obligated to cover an independent and exclusive portion of total drug expenses for their beneficiaries. Because Assignors and Class Members cost-sharing is based on an annual fixed percentage of total drug expenses, an increase in drug prices necessarily increases the total expenses to the Assignors and Class Members. Thus, as Defendants utilized the Scheme to increase price for Copaxone, the Assignors and Class Members were necessarily left with significantly higher expenses. Second: to effectuate the Scheme, the Defendants necessarily engaged in prohibited conduct thereby rendering Copaxone claims generated by the Scheme to be tainted. By concealing the Scheme and/or omitting material facts, Defendants caused Assignors to pay for tainted claims that they would not have, nor could have, but for Defendants' efforts to conceal it. Third: as demonstrated by Teva's internal documents, Defendants intended to—and did—utilize Teva's drug subsidies to induce patient and physician medical decisions. But for Teva's drug subsidies, many (if not most) of the Copaxone claims would not have been generated, dispensed, and paid for by the Assignors.

221.    As a result of the Scheme, the Assignors paid more than $57 million for Copaxone, including claims paid in the State of Massachusetts. The over $57 million in Copaxone payments represents an ascertainable loss of the Assignors' money or property resulting from Defendants' unfair and deceptive acts or practices. The precise measurement of damages will be proven at trial.

222.    Defendants' conduct alleged in this Amended Complaint occurred throughout the United States, including in the trade or commerce of the State of Massachusetts. For example, the following conduct occurred within the State of Massachusetts: (1) the advertisement, transport,

sale, and purchase of Copaxone, as well as advertising patient co-pay assistance through CDF's and TAF's MS funds; (2) Teva, ACS, AssistRx, CDF, and TAF solicited and communicated with Massachusetts residents (including Assignors' beneficiaries and other patients) with the intent to steer patients into CDF's or TAF's MS funds; (3) Teva, ACS, AssistRx, CDF, and TAF solicited and communicated with Massachusetts medical physicians with the intent to influence physician decisions with Teva's illicit drug subsidies; (4) The transfer and disbursement of Teva's illicit funds through CDF and TAF, was provided on behalf of the Massachusetts resident prescribed Copaxone; (5) The submission of tainted Copaxone claims for payment by Assignors and Class Members; and (6) The disbursement of funds for tainted Copaxone claims induced by Defendants' Scheme.

223. Analysis of the Assignors' data identified Copaxone purchases in the State of Massachusetts. The Assignors and Class Members were harmed in the State of Massachusetts for each purchase of Copaxone within the state.

224. Plaintiffs seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff. Because Defendants' conduct was committed willfully and knowingly, Plaintiffs are entitled to recover up to three times actual damages, but no less than two times actual damages pursuant to Mass. Gen. Laws ch. 93A, §§ 9 and 11. Plaintiffs also seek punitive damages, attorneys' fees and costs, and any other just and proper relief.

### (6) New York Consumer Fraud & Deceptive Business Practices Act (N.Y. Gen. Bus. Laws §§ 349 *et seq.*)

225. To establish a violation a N.Y. Gen. Bus. Law § 349 violation, plaintiff must allege that defendant engaged in (1) a deceptive act or practice in the conduct of any business, trade or commerce or in the furnishing of any service in the State of New York that is (2) consumer-oriented, and (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.

226. Consumer-oriented conduct includes any conduct that potentially affects similarly situated consumers or that has a broader impact on consumers at large.

227. The scope of N.Y. Gen. Bus. Law § 349 includes businesses, commercial entities, and individual consumers. *See N. State Autoban, Inc., v. Progressive Ins. Grp. Co*., 953 N.Y.S.2d 96, 104 (N.Y. App. Div. 2012) ("[L]imiting the scope of § 349 to only consumers" would be "in contravention of the statute's plain language permitting recovery of any person injured by reason of any violation.").

228. A deceptive act or practice is defined as an act likely to mislead a reasonable consumer acting reasonably under the circumstances.

229. Defendants' conduct also constitutes deceptive acts or practices for purposes of NYGBL 349. First: On multiple occasions, CDF and TAF sought and obtained favorable OIG advisory opinions by omitting material facts, including their roles as Teva's conduits in the Scheme. Second: CDF and TAF publicly advertised their favorable advisory opinion, representing themselves as legitimate, independent charities to deceive the OIG, Medicare, Part D Sponsors, and individuals—which turned out to be false. Third: As stated above, for Copaxone to be eligible for payment by a federal health care program, Teva necessarily certified compliance with numerous federal and state health care laws, including the AKS. However, as demonstrated by the allegations contained herein, those certifications were unequivocally contradicted by Teva's involvement in the Scheme. By falsely certifying compliance, Teva misled Part D Sponsors, including the Assignors, into believing that Copaxone was eligible for payment. Fourth: like Teva, ACS' participation in the Medicare program necessarily required ACS to certify compliance with numerous federal and state health care laws, including the AKS. However, as demonstrated by the allegations contained herein, those certifications were unequivocally contradicted by ACS' involvement in the Scheme. Each time ACS steered a patient into CDF's or TAF's MS fund, and

subsequently submitted that patient's claim to a Part D Sponsor, like the Assignors, ACS necessarily certified that the claim was free and clear of any legal defects that would otherwise prohibit payment. ACS deceived the Assignors by certifying compliance, thereby ensuring the Assignors continued paying for tainted Copaxone claims. But for ACS knowingly omitting material facts and/or falsely certifying each claim to be free and clear of legal defects, the Assignors would not, nor could have, paid for Copaxone claims. Fifth: because AssistRx contracted to Medicare providers and suppliers (i.e., Teva and ACS), AssistRx necessarily was required to abide by the same federal and state health care laws, including the AKS. AssistRx's role in the Scheme unequivocally contradicts those requirements.

230. The Assignors' injuries were a foreseeable risk of and/or were substantially caused by Defendants' unfair and deceptive acts or practices. First: Due to Medicare cost-sharing, the Assignors and Class Members are obligated to cover an independent and exclusive portion of total drug expenses for their beneficiaries. Because Assignors and Class Members cost-sharing is based on an annual fixed percentage of total drug expenses, an increase in drug prices necessarily increases the total expenses to the Assignors and Class Members. Thus, as Defendants utilized the Scheme to increase price for Copaxone, the Assignors and Class Members were necessarily left with significantly higher expenses. Second: to effectuate the Scheme, the Defendants necessarily engaged in prohibited conduct thereby rendering Copaxone claims generated by the Scheme to be tainted. By concealing the Scheme and/or omitting material facts, Defendants caused Assignors to pay for tainted claims that they would not have, nor could have, but for Defendants' efforts to conceal it. Third: as demonstrated by Teva's internal documents, Defendants intended to—and did—utilize Teva's drug subsidies to induce patient and physician medical decisions. But for Teva's drug subsidies, many (if not most) of the Copaxone claims would not have been generated, dispensed, and paid for by the Assignors.

231.    As a result of the Scheme, the Assignors paid more than $57 million for Copaxone, including claims paid in the State of New York. The over $57 million in Copaxone payments represents an ascertainable loss of the Assignors' money or property resulting from Defendants' unfair and deceptive acts or practices. The precise measurement of damages will be proven at trial.

232.    Defendants' conduct alleged in this Amended Complaint occurred throughout the United States, including in the trade or commerce of the State of New York. For example, the following conduct occurred within the State of New York: (1) the advertisement, transport, sale, and purchase of Copaxone, as well as advertising patient co-pay assistance through CDF's and TAF's MS funds; (2) Teva, ACS, AssistRx, CDF, and TAF solicitated and communicated with New York residents (including Assignors' beneficiaries and other patients) with the intent to steer patients into CDF's or TAF's MS funds; (3) Teva, ACS, AssistRx, CDF, and TAF solicited and communicated with New York medical physicians with the intent to influence physician decisions with Teva's illicit drug subsidies; (4) The transfer and disbursement of Teva's illicit funds through CDF and TAF, was provided on behalf of the New York resident prescribed Copaxone; (5) The submission of tainted Copaxone claims for payment by Assignors and Class Members; and (6) The disbursement of funds for tainted Copaxone claims induced by Defendants' Scheme.

233.    Analysis of the Assignors' data identified Copaxone purchases in the State of New York. The Assignors and Class Members were harmed in the State of New York for each purchase of Copaxone within the state.

234.    The above conduct misled Assignors, individuals—such as beneficiaries and other patients—other MA plans, Medicare, and physicians thereby inducing purchases and prescriptions of Copaxone.

235.    Defendants' false statements, certifications, misrepresentations, or omissions tend to, and were designed to, manipulate, induce, or mislead Assignors and the public at large into

paying for tainted claims, which is precisely what occurred here.

236.    Defendants' conduct is consumer-oriented because it affected similarly situated entities and the public at large. For instance, Defendants' efforts undermined the competitive market for MS drugs, raised prices across the board for Medicare, MA plans, and patients who were unable to obtain copay assistance and therefore had to pay higher copays for Copaxone. Defendants' conduct also implicated significant public policy concerns including: Encouraging development and use of affordable alternative drugs or treatments; Streamlining access to affordable healthcare; MA Plans intended ability to negotiate lower drug prices; Preserving a fair and competitive market for prescription medications; Avoiding physician-patient conflicts of interests by ensuring medical decisions are not made based on financial incentives; Safeguarding responsible Medicare spending funded by taxpayer dollars; Lowering healthcare costs for citizens generally; using copay assistance to induce patient and physician decisions; and Maintaining transparency and accountability to avoid distrust between patients and healthcare entities.

237.    Assignors' injuries were the intended and foreseeable consequence of Defendants' conduct, and/or were a substantial factor in bringing about the alleged harm. For instance: Teva concealed price concealed the nature of the Scheme to avoid Assignors from taking steps to stop paying for Copaxone. In doing so, Teva ensured that all Copaxone payments made by MA Plans would be at a higher cost than they otherwise would have but for Teva's Scheme; Defendants successfully abused copay assistance programs to eliminate price sensitivity for Copaxone and induce patients and physicians to increase utilization of Copaxone over far cheaper and equally effective alternative treatments; Teva, CDF, and TAF all certified compliance with federal law and/or OIG guidelines to ensure the illegal conduct remained hidden and MA plans would pay for tainted Copaxone claims that would not have otherwise been paid.

238.    Thus, Defendants' conduct foreseeably resulted in and/or was a substantial factor

in causing Assignors to pay for Copaxone at inflated prices; Assignors paying for more Copaxone claims over cheaper and equally effective alternatives; and Assignors paying for Copaxone claims that were tainted, and therefore unpayable.

239. Defendants' conduct alleged in this Complaint occurred throughout the United States, including the State of New York. For example, the following conduct occurred within the State of New York: advertisement, transport, sale, and purchase of Copaxone; solicitation of and communication with New York residents (including Assignors' beneficiaries and other patients) for purchase of Copaxone; solicitation of and communication with New York medical physicians; the transfer and disbursement of Teva's illicit funds from CDF and TAF to New York residents (including Assignors' beneficiaries and other patients); the submission of tainted, unpayable claims for payment by Assignors and Class Members; the disbursement of funds for tainted, unpayable claims induced by Defendants' Scheme; publication of misrepresentations regarding the independence of CDF and TAF, and all false certifications of compliance with the federal and state laws discussed herein.

240. For the same reasons mentioned above, Defendants' conduct occurred within the trade and commerce of New York and primarily and substantially within the State of New York.

241. The Assignors were harmed in the State of New York for each purchase of Copaxone within the state.

242. Analysis of the Assignors' data identified one or more purchases of Copaxone in the State of New York.

243. Accordingly, Defendants violated N.Y. Gen. Bus. Law § 349.

244. As a result of the foregoing willful, knowing, and wrongful conduct alleged herein, Assignors suffered damages, and seek all just and proper remedies and any other appropriate relief available.

## (7) Ohio Consumer Protection Laws
### (Ohio Rev. Code. Ann. §§ 4165 *et seq.*)

245.    A *person*[25] who is injured by a person who commits a deceptive trade practice that is listed in division (A) of section 4165.02 of the Revised Code may commence a civil action to recover actual damages from the person who commits the deceptive trade practice. Ohio Rev. Code Ann. § 4165.03.

246.    Ohio Rev. Code. Ann. § 4165.02(A) states, in relevant part, that a person engages in a deceptive trade practice when the person's business, vocation, or occupation, the person does any of the following:

    a.  Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

    b.  Causes likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another; and

247.    Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has sponsorship, approval, status, affiliation, or connection that he does not have.

248.    Defendants' conduct constitutes deceptive acts or practices for the purposes of Ohio Rev. Code. Ann. § 4165.02: First: On multiple occasions, CDF and TAF sought and obtained favorable OIG advisory opinions by omitting material facts, including their roles as Teva's conduits in the Scheme. Second: CDF and TAF publicly advertised their favorable advisory opinion, representing themselves as legitimate, independent charities to deceive the OIG, Medicare, Part D Sponsors, and individuals—which turned out to be false. Third: As stated above, for Copaxone to be eligible for payment by a federal health care program, Teva necessarily

---

[25] "Person" means an individual, corporation, business trust, estate, trust, partnership, unincorporated association, limited liability company, two or more of any of the forgoing having a joint or common interest, or any other legal or commercial entity. Ohio Rev. Code Ann. § 4165.01. Thus, the Assignors and Defendants are considered "Persons" for purposes of Ohio Rev. Code Ann. § 4165.

certified compliance with numerous federal and state health care laws, including the AKS. However, as demonstrated by the allegations contained herein, those certifications were unequivocally contradicted by Teva's involvement in the Scheme. By falsely certifying compliance, Teva misled Part D Sponsors, including the Assignors, into believing that Copaxone was eligible for payment. <u>Fourth</u>: like Teva, ACS' participation in the Medicare program necessarily required ACS to certify compliance with numerous federal and state health care laws, including the AKS. However, as demonstrated by the allegations contained herein, those certifications were unequivocally contradicted by ACS' involvement in the Scheme. Each time ACS steered a patient into CDF's or TAF's MS fund, and subsequently submitted that patient's claim to a Part D Sponsor, like the Assignors, ACS necessarily certified that the claim was free and clear of any legal defects that would otherwise prohibit payment. ACS deceived the Assignors by certifying compliance, thereby ensuring the Assignors continued paying for tainted Copaxone claims. But for ACS knowingly omitting material facts and/or falsely certifying each claim to be free and clear of legal defects, the Assignors would not, nor could have, paid for Copaxone claims. <u>Fifth</u>: because AssistRx contracted to Medicare providers and suppliers (i.e., Teva and ACS), AssistRx necessarily was required to abide by the same federal and state health care laws, including the AKS. AssistRx's role in the Scheme unequivocally contradicts those requirements.

249.    As a result of the Scheme, the Assignors paid more than $57 million for Copaxone, including claims paid in the State of Ohio. The over $57 million in Copaxone payments represents an ascertainable loss of the Assignors' money or property resulting from Defendants' unfair and deceptive acts or practices. The precise measurement of damages will be proven at trial.

250.    Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the trade or commerce of the State of Ohio. For example, the following conduct occurred within the State of Ohio: (1) the advertisement, transport, sale, and purchase of

Copaxone, as well as advertising patient co-pay assistance through CDF's and TAF's MS funds; (2) Teva, ACS, AssistRx, CDF, and TAF solicited and communicated with Ohio residents (including Assignors' beneficiaries and other patients) with the intent to steer patients into CDF's or TAF's MS funds; (3) Teva, ACS, AssistRx, CDF, and TAF solicited and communicated with Ohio medical physicians with the intent to influence physician decisions with Teva's illicit drug subsidies; (4) The transfer and disbursement of Teva's illicit funds through CDF and TAF, was provided on behalf of the Ohio resident prescribed Copaxone; (5) The submission of tainted Copaxone claims for payment by Assignors and Class Members; and (6) The disbursement of funds for tainted Copaxone claims induced by Defendants' Scheme.

251.    Analysis of the Assignors' data identified Copaxone purchases in the State of Ohio. The Assignors and Class Members were harmed in the State of Ohio for each purchase of Copaxone within the state.

252.    Accordingly, Defendants violated Ohio Rev. Code Ann. §4165.

253.    Plaintiffs seek actual economic losses, punitive damages, attorney's fees, and any other just and proper relief pursuant to Ohio Rev. Code Ann. § 4165.

<div align="center">

**(8) Washington Consumer Protection Act**
**(Wash. Rev. Code §§ 19.86.919 *et seq.*)**

</div>

254.    To prevail under the Washington Consumer Protraction Act ("WCPA"), a plaintiff must establish: (1) the defendant has engaged in an unfair or deceptive or practice; (2) in trade or commerce; (3) that impacts the public interest; (4) the plaintiff suffered an injury in his business or property; and (5) a causal link exists between the conduct and injury.

255.    An act or practice is "unfair" if: (1) without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, common law, or otherwise; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers, competitors, or other businessmen.

256.    An act or practice is "deceptive" if: there is a representation, omission or practice that is likely to mislead a reasonable consumer.

257.    Defendants' conduct constitutes unfair acts or practices for purposes of WCPA. First, Defendants' Scheme circumvented Congressionally imposed price restrictions and market safeguards enabling Teva to raise its prices to exorbitant levels—which Teva did—leaving the Assignors with increasingly expensive Copaxone costs. Second, Defendants used Teva's drug subsidies to induce patients and physicians to opt for Copaxone over other treatment options. Between 2006-2017 alone, Copaxone's price increased at 20 times the rate of inflation. Third: TAF and CDF operated as Teva's conduits, rather than independent charities, to funnel Teva's illegal subsidies to patients, which largely was paid directly to the dispensing pharmacy—i.e., ACS. Fourth: due to the increasingly unaffordable Copaxone prices, Defendants, in essence, created a greater need for co-pay assistance. Teva's Shared Solutions program, with the aid of AssistRx and ACS patient services, ensured that the vast majority of patients in need would receive assistance through TAF or CDF. Fifth: Defendants circumvented mandatory certifications and/or conditions to conceal the Schemes thereby ensuring that Assignors and Class Members continue paying for tainted Copaxone claims at inflated prices. Sixth: With the assistance of ACS and AssistRx, Teva steered patients away from free Copaxone programs, so that Defendants could profit from additional Copaxone sales which were largely funded, in part, by Teva's subsidies. Seventh: Scheme undermines and offends significant public policy considerations, including, but not limited to: encouraging development and use of affordable drugs; streamlining access to affordable health care; Part D Sponsors' ability to negotiate lower drug prices, as Congress intended; preserving a fair and competitive market for prescription medications; avoiding patient-physician conflicts of interest by ensuring medical decisions are not made based on financial incentives; safeguarding responsible Medicare spending funded by taxpayer dollars; lowering

healthcare costs for U.S. citizens generally; and maintaining transparency and accountability to avoid distrust between patients and healthcare entities.

258.    Defendants' conduct also constitutes deceptive acts or practices for purposes of WCPA. First: On multiple occasions, CDF and TAF sought and obtained favorable OIG advisory opinions by omitting material facts, including their roles as Teva's conduits in the Scheme. Second: CDF and TAF publicly advertised their favorable advisory opinion, representing themselves as legitimate, independent charities to deceive the OIG, Medicare, Part D Sponsors, and individuals—which turned out to be false. Third: As stated above, for Copaxone to be eligible for payment by a federal health care program, Teva necessarily certified compliance with numerous federal and state health care laws, including the AKS. However, as demonstrated by the allegations contained herein, those certifications were unequivocally contradicted by Teva's involvement in the Scheme. By falsely certifying compliance, Teva misled Part D Sponsors, including the Assignors, into believing that Copaxone was eligible for payment. Fourth: like Teva, ACS' participation in the Medicare program necessarily required ACS to certify compliance with numerous federal and state health care laws, including the AKS. However, as demonstrated by the allegations contained herein, those certifications were unequivocally contradicted by ACS' involvement in the Scheme. Each time ACS steered a patient into CDF's or TAF's MS fund, and subsequently submitted that patient's claim to a Part D Sponsor, like the Assignors, ACS necessarily certified that the claim was free and clear of any legal defects that would otherwise prohibit payment. ACS deceived the Assignors by certifying compliance, thereby ensuring the Assignors continued paying for tainted Copaxone claims. But for ACS knowingly omitting material facts and/or falsely certifying each claim to be free and clear of legal defects, the Assignors would not, nor could have, paid for Copaxone claims. Fifth: because AssistRx contracted to Medicare providers and suppliers (i.e., Teva and ACS), AssistRx necessarily was

required to abide by the same federal and state health care laws, including the AKS. AssistRx's role in the Scheme unequivocally contradicts those requirements.

259.    These allegations, and those throughout the Complaint, constitute unfair or deceptive acts or practices for the purposes of WCPA.

260.    The Assignors' injuries were a foreseeable risk of and/or were substantially caused by Defendants' unfair and deceptive acts or practices. First: Due to Medicare cost-sharing, the Assignors and Class Members are obligated to cover an independent and exclusive portion of total drug expenses for their beneficiaries. Because Assignors and Class Members cost-sharing is based on an annual fixed percentage of total drug expenses, an increase in drug prices necessarily increases the total expenses to the Assignors and Class Members. Thus, as Defendants utilized the Scheme to increase price for Copaxone, the Assignors and Class Members were necessarily left with significantly higher expenses. Second: to effectuate the Scheme, the Defendants necessarily engaged in prohibited conduct thereby rendering Copaxone claims generated by the Scheme to be tainted. By concealing the Scheme and/or omitting material facts, Defendants caused Assignors to pay for tainted claims that they would not have, nor could have, but for Defendants' efforts to conceal it. Third: as demonstrated by Teva's internal documents, Defendants intended to—and did—utilize Teva's drug subsidies to induce patient and physician medical decisions. But for Teva's drug subsidies, many (if not most) of the Copaxone claims would not have been generated, dispensed, and paid for by the Assignors.

261.    As a result of the Scheme, the Assignors paid more than $57 million for Copaxone, including claims paid in the State of Washington. The over $57 million in Copaxone payments represents an ascertainable loss of the Assignors' money or property resulting from Defendants' unfair and deceptive acts or practices. The precise measurement of damages will be proven at trial.

262.    Defendants' conduct alleged in this Amended Complaint occurred throughout the

United States, including in the trade or commerce of the State of Washington. For example, the following conduct occurred within the State of Washington: (1) the advertisement, transport, sale, and purchase of Copaxone, as well as advertising patient co-pay assistance through CDF's and TAF's MS funds; (2) Teva, ACS, AssistRx, CDF, and TAF solicited and communicated with Washington residents (including Assignors' beneficiaries and other patients) with the intent to steer patients into CDF's or TAF's MS funds; (3) Teva, ACS, AssistRx, CDF, and TAF solicited and communicated with Washington medical physicians with the intent to influence physician decisions with Teva's illicit drug subsidies; (4) The transfer and disbursement of Teva's illicit funds through CDF and TAF, was provided on behalf of the Washington resident prescribed Copaxone; (5) The submission of tainted Copaxone claims for payment by Assignors and Class Members; and (6) The disbursement of funds for tainted Copaxone claims induced by Defendants' Scheme.

263.    Analysis of the Assignors' data identified Copaxone purchases in the State of Washington. The Assignors and Class Members were harmed in the State of Washington for each purchase of Copaxone within the state.

264.    Accordingly, Defendants violated the WCPA.

265.    Plaintiffs are entitled to recover their actual damages, punitive damages, and attorneys' fees and costs, and any other remedies that are just and proper.

## (9) Wisconsin Deceptive Trade Practices Act
### (Wis. Stat. §§ 100.18 *et seq.*)

266.    Wis. Stat. § 100.18(1) states, "No person, firm, corporation or association, or agent or employee thereof, with intent to sell, distribute, increase the consumption of or in any wise dispose of any real estate, merchandise, securities, employment, service, or anything offered by such person, firm, corporation or association, or agent or employee thereof, directly or indirectly, to the public for sale, hire, use or other distribution, or with intent to induce the public in any

manner to enter into any contract or obligation relating to the purchase, sale, hire, use or lease of any real estate, merchandise, securities, employment or service, shall make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in this state, in a newspaper, magazine or other publication, or in the form of a book, notice, handbill, poster, bill, circular, pamphlet, letter, sign, placard, card, label, or over any radio or television station, or in any other way similar or dissimilar to the foregoing, an advertisement, announcement, statement or representation of any kind to the public relating to such purchase, sale, hire, use or lease of such real estate, merchandise, securities, service or employment or to the terms or conditions thereof, which advertisement, announcement, statement or representation contains any assertion, representation or statement of fact which is untrue, deceptive or misleading."

267.    Under the Wisconsin Deceptive Trade Practices Act ("WDTPA"), a plaintiff must allege that (1) the defendant made a representation to the public with the intent to induce an obligation; (2) the representation was untrue, deceptive, or misleading; and (3) the representation materially caused a pecuniary loss to the plaintiff.

268.    Defendants' conduct constitutes unfair acts or practices for purposes of WDTPA. First, Defendants' Scheme circumvented Congressionally imposed price restrictions and market safeguards enabling Teva to raise its prices to exorbitant levels—which Teva did—leaving the Assignors with increasingly expensive Copaxone costs. Second, Defendants used Teva's drug subsidies to induce patients and physicians to opt for Copaxone over other treatment options. Between 2006-2017 alone, Copaxone's price increased at 20 times the rate of inflation. Third: TAF and CDF operated as Teva's conduits, rather than independent charities, to funnel Teva's illegal subsidies to patients, which largely was paid directly to the dispensing pharmacy—i.e., ACS. Fourth: due to the increasingly unaffordable Copaxone prices, Defendants, in essence,

created a greater need for co-pay assistance. Teva's Shared Solutions program, with the aid of AssistRx and ACS patient services, ensured that the vast majority of patients in need would receive assistance through TAF or CDF. <u>Fifth</u>: Defendants circumvented mandatory certifications and/or conditions to conceal the Schemes thereby ensuring that Assignors and Class Members continue paying for tainted Copaxone claims at inflated prices. <u>Sixth</u>: With the assistance of ACS and AssistRx, Teva steered patients away from free Copaxone programs, so that Defendants could profit from additional Copaxone sales which were largely funded, in part, by Teva's subsidies. <u>Seventh</u>: Scheme undermines and offends significant public policy considerations, including, but not limited to: encouraging development and use of affordable drugs; streamlining access to affordable health care; Part D Sponsors' ability to negotiate lower drug prices, as Congress intended; preserving a fair and competitive market for prescription medications; avoiding patient-physician conflicts of interest by ensuring medical decisions are not made based on financial incentives; safeguarding responsible Medicare spending funded by taxpayer dollars; lowering healthcare costs for U.S. citizens generally; and maintaining transparency and accountability to avoid distrust between patients and healthcare entities.

269. Defendants' conduct also constitutes deceptive acts or practices for purposes of WDTPA. <u>First</u>: On multiple occasions, CDF and TAF sought and obtained favorable OIG advisory opinions by omitting material facts, including their roles as Teva's conduits in the Scheme. <u>Second</u>: CDF and TAF publicly advertised their favorable advisory opinion, representing themselves as legitimate, independent charities to deceive the OIG, Medicare, Part D Sponsors, and individuals—which turned out to be false. <u>Third</u>: As stated above, for Copaxone to be eligible for payment by a federal health care program, Teva necessarily certified compliance with numerous federal and state health care laws, including the AKS. However, as demonstrated by the allegations contained herein, those certifications were unequivocally contradicted by Teva's

involvement in the Scheme. By falsely certifying compliance, Teva misled Part D Sponsors, including the Assignors, into believing that Copaxone was eligible for payment. Fourth: like Teva, ACS' participation in the Medicare program necessarily required ACS to certify compliance with numerous federal and state health care laws, including the AKS. However, as demonstrated by the allegations contained herein, those certifications were unequivocally contradicted by ACS' involvement in the Scheme. Each time ACS steered a patient into CDF's or TAF's MS fund, and subsequently submitted that patient's claim to a Part D Sponsor, like the Assignors, ACS necessarily certified that the claim was free and clear of any legal defects that would otherwise prohibit payment. ACS deceived the Assignors by certifying compliance, thereby ensuring the Assignors continued paying for tainted Copaxone claims. But for ACS knowingly omitting material facts and/or falsely certifying each claim to be free and clear of legal defects, the Assignors would not, nor could have, paid for Copaxone claims. Fifth: because AssistRx contracted to Medicare providers and suppliers (i.e., Teva and ACS), AssistRx necessarily was required to abide by the same federal and state health care laws, including the AKS. AssistRx's role in the Scheme unequivocally contradicts those requirements.

270. These allegations, and those throughout the Complaint, constitute unfair or deceptive acts or practices for the purposes of WDTPA.

271. The Assignors' injuries were a foreseeable risk of and/or were substantially caused by Defendants' unfair and deceptive acts or practices. First: Due to Medicare cost-sharing, the Assignors and Class Members are obligated to cover an independent and exclusive portion of total drug expenses for their beneficiaries. Because Assignors and Class Members cost-sharing is based on an annual fixed percentage of total drug expenses, an increase in drug prices necessarily increases the total expenses to the Assignors and Class Members. Thus, as Defendants utilized the Scheme to increase price for Copaxone, the Assignors and Class Members were necessarily left

with significantly higher expenses. <u>Second</u>: to effectuate the Scheme, the Defendants necessarily engaged in prohibited conduct thereby rendering Copaxone claims generated by the Scheme to be tainted. By concealing the Scheme and/or omitting material facts, Defendants caused Assignors to pay for tainted claims that they would not have, nor could have, but for Defendants' efforts to conceal it. <u>Third</u>: as demonstrated by Teva's internal documents, Defendants intended to—and did—utilize Teva's drug subsidies to induce patient and physician medical decisions. But for Teva's drug subsidies, many (if not most) of the Copaxone claims would not have been generated, dispensed, and paid for by the Assignors.

272.    As a result of the Scheme, the Assignors paid more than $57 million for Copaxone, including claims paid in the State of Wisconsin. The over  $57 million in Copaxone payments represents an ascertainable loss of the Assignors' money or property resulting from Defendants' unfair and deceptive acts or practices. The precise measurement of damages will be proven at trial.

273.    Defendants' conduct alleged in this Amended Complaint occurred throughout the United States, including in the trade or commerce of the State of Wisconsin. For example, the following conduct occurred within the State of Wisconsin: (1) the advertisement, transport, sale, and purchase of Copaxone, as well as advertising patient co-pay assistance through CDF's and TAF's MS funds; (2) Teva, ACS, AssistRx, CDF, and TAF solicitated and communicated with Wisconsin residents (including Assignors' beneficiaries and other patients) with the intent to steer patients into CDF's or TAF's MS funds; (3) Teva, ACS, AssistRx, CDF, and TAF solicited and communicated with Wisconsin medical physicians with the intent to influence physician decisions with Teva's illicit drug subsidies; (4) The transfer and disbursement of Teva's illicit funds through CDF and TAF, was provided on behalf of the Wisconsin resident prescribed Copaxone; (5) The submission of tainted Copaxone claims for payment by Assignors and Class Members; and (6) The disbursement of funds for tainted Copaxone claims induced by Defendants' Scheme.

274.     Analysis of the Assignors' data identified Copaxone purchases in the State of Wisconsin. The Assignors and Class Members were harmed in the State of Wisconsin for each purchase of Copaxone within the state.

275.     Accordingly, Defendants violated the WDTPA.

276.     Plaintiffs seek damages, court costs, and attorneys' fees under Wis. Stat. § 100.18(11)(b)(2), and any other just and proper relief available under the WDTPA.

## SECOND CLAIM FOR RELIEF

### Unjust Enrichment Under State Law
*Against All Defendants*

277.     Plaintiff re-allege and incorporate by reference paragraphs 1–218 of this Complaint as if fully set forth herein.

278.     Plaintiffs' analysis of its Assignors' data identified one or more payment/purchase for Copaxone in each of the following States and Territories: California, Connecticut, Florida, Illinois, Iowa, Maine, Massachusetts, Mississippi, Nebraska, New York, Ohio, Virginia, Washington, and Wisconsin.

279.     The laws of each state are materially similar and require a plaintiff to demonstrate the following elements: (1) the plaintiff conferred a benefit onto the defendant(s); (2) the defendant had an appreciation or knowledge of the benefit; and (3) the retention of the benefit by the defendant(s) under the circumstances would be unjust.[26]

280.     Defendants' conduct directly resulted in the unjust enrichment of Defendants through the sale of Copaxone in each State and Territory mentioned above.

281.     Defendants used the copay Scheme to increase and/or maintain Copaxone prices at

---

[26] For those states where unjust enrichment is not a standalone cause of action, Plaintiffs seek restitution, as an alternative form of relief, for the unjust enrichment arising from Defendants' misconduct.

exorbitant levels.

282.    The copay scheme intended to induce patients and physicians to utilize Copaxone over far cheaper, equally effective alternatives.

283.    Defendants benefitted from mountainous profits from Copaxone sales at the expense of Assignors.

284.    Defendants knowingly and voluntarily accepted and retained those benefits and have been unjustly enriched as a result, to Assignors' unjust detriment.

285.    By virtue of the forgoing, Assignors are entitled to recover the amount of Defendants' unjust enrichment, to be determined at trial, and other relief.

### THIRD CLAIM FOR RELIEF
**Violation of 18 U.S.C. § 1964(c) Through the Use of the Co-Payment Scheme**
*Against All Defendants*

286.    Plaintiffs re-allege and incorporate by reference paragraphs 1–218 of this Complaint as if fully set forth herein.

287.    At all relevant times, Defendants were "persons" under 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through the pattern of racketeering activity detailed throughout this Complaint in violation of 18 U.S.C. § 1962(c).

288.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

289.    Section 1964(c) provides that "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." The elements of a RICO claim under § 1964(c) pursuant to

a violation of§ 1962(c) are: (i) conduct; (ii) of an enterprise; (iii) through a pattern of; (iv) racketeering activity.

### Description of the Co-Payment Circumvention Enterprise

290.    RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union group or individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

291.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprises' purpose.

292.    The Co-Payment Circumvention Enterprise is an association-in-fact enterprise under 18 U.S.C. § 1961(4), consisting of Defendants Teva, CDF, TAF, ACS, and Assist Rx, including their directors, officers, employees, and agents.

293.    The Co-Payment Circumvention Enterprise functioned as an ongoing and continuing unit. The Co-Payment Circumvention Enterprise was created and used as a tool to carry out a pattern of racketeering activity. Each of the Enterprise participants is a "person" distinct from the Co-Payment Circumvention Enterprise.

294.    The Co-Payment Circumvention Enterprise had a common purpose that united its members. One purpose was to defraud Medicare payors and steal funds from the Medicare Trust Fund by circumventing Medicare's cost-sharing obligations. Another purpose was to generate personal profits for Defendants' executives from unlawful bribes and kickbacks.

295.    Defendants' common purposes were, among other things, (1) growing CDF's and TAF's funds and CDF's and TAF's executive compensation; (2) eliminating price sensitivity for patients and health care providers; (3) misleading government agencies, insurers, health care providers, and beneficiaries regarding the legitimacy of CDF's and TAF's operations and its

conduct; (4) applying to Medicare programs on behalf of beneficiaries; (5) increasing the profits that Teva received from dispensing of Copaxone; and (6) violating OIG regulations, including by providing data to allow Teva to conduct continuous ROI calculations, all of which resulted in the unlawful depletion of state and federal dollars, increased the number of patients who had their drugs purchased by Assignors and Class Members, and increased the personal gains received by Defendants' executives through the payment of AKS-tainted claims and drugs at inflated prices.

296.    By funneling patients into CDF's and TAF's co-pay assistance funds, the Co-Payment Circumvention Enterprise increased Teva's number of covered "customers," thereby triggering the Assignors' and Class Members' coverage obligations for their Enrollees and eliminating price sensitivity for Copaxone.

297.    Each of the Defendants received substantial revenue from participating in the Co-Payment Circumvention Enterprise. Such revenue was exponentially greater than it would have been without such Enterprise.

298.    Each portion of the Enterprise benefitted as intended from the existence of the other parts.

299.    The Co-Payment Circumvention Enterprise has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between the Defendants.

300.    There were interpersonal relationships between those associated with the Co-Payment Circumvention Enterprise. This includes (1) relationships among CDF's and TAF's officers and directors, Teva's officers, directors, principals, and agents, and ACS's and Assist Rx's officers, directors, principals and agents; and (2) relationships between Teva, CDF, TAF, ACS, and Assist Rx. This is evidenced by routine communications (through the U.S. Mail and Wire) between Teva and CDF and TAF to ensure that its "donations" were sufficient to drive increased

profits. Assist Rx would facilitate this process by sharing CDF and TAF data with Teva to ensure that Teva's "donations" achieved their proper purpose of paying co-pays for Copaxone, thereby increasing profits for Teva and substantially depleting state and federal funds. Teva, CDF, and TAF knew and intended Assist Rx to facilitate this illegal sharing of information.

301.    The OIG explicitly warned CDF and TAF not to send pharmaceutical manufacturers this information because doing so would violate the AKS and FCA, and CDF and TAF certified its understanding and compliance with the OIG's warnings. But Defendants participated in this conduct anyway.

302.    Teva, CDF, and TAF were communicating—directly and through Assist Rx—information important to their Scheme through the mail and wires to profit illegally and that they had a relationship.

303.    The Co-Payment Circumvention Enterprise had longevity sufficient to permit its associates to pursue the enterprise's purpose. Since at least 2006, Teva made "donations" to CDF, a purportedly "independent" charity, and CDF continued to increase their executive compensation. As part of the distribution chain for Copaxone, increased the number of prescriptions they could fill by ensuring Teva had sufficient data from CDF and TAF to verify that they used Teva's "donations" to pay the co-pays of Copaxone patients. Teva further insulated the price sensitivity of Copaxone. Teva's use of anticompetitive and illegal tactics increased the number of "customers" buying Copaxone, facilitating increased profits.

304.    Teva carried out its business activities both with and without CDF, TAF, ACS, and Assist Rx, including using other co-payment charities. Similarly, CDF and TAF operated other funds without Teva. ACS and Assist Rx also conducted other business apart from CDF, TAF, and Teva. The Scheme thus did not involve parallel conduct because the Defendants participate in transactions with co-payment charities that do not result violations of the AKS, FCA, RICO,

Consumer Protection Laws, OIG regulations, or other state and federal laws.

### *Conduct of the Enterprise's Affairs*

305.    Each Defendant conducted or participated in, either directly or indirectly, the conduct of the Co-Payment Circumvention Enterprise's affairs. Each Defendant was part of the Co-Payment Circumvention Enterprise and each operated and managed the Co-Payment Circumvention Enterprise. Such participation included, but is not limited to: (1) CDF and TAF shared data (through the U.S. mail and wire facilities) with Teva, ACS, and Assist Rx, and Assist Rx and ACS shared data (through the U.S. mail and wire facilities) with Teva, so Teva could effectively conduct ROI analyses on the amounts of Teva's "donations" to CDF and TAF for Copaxone co-pays; (2) Teva provided necessary bribes, disguised as donations, for the co-payments, thus triggering the payment obligations of Assignors; (3) CDF, TAF, Assist Rx, and Teva steered and funneled patients into CDF's and TAF's funds; and (4) CDF, TAF, and Teva coordinated the establishment of MS funds to subsidize patient co- payments, thus eliminating price sensitivity and raising the quantity of Copaxone dispensed.

306.    At all relevant times, each Defendant was aware of the Co-Payment Circumvention Enterprise's conduct and has been a knowing and willing participant in the racketeering conduct of the Enterprise.

### *Defendants' Pattern of Racketeering Activity*

307.    To carry out their illegal and collusive bribery Scheme, Defendants knowingly conducted or participated, directly or indirectly, in the affairs of the Co-Payment Circumvention Enterprise through a pattern of racketeering activity under 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c), and employed the use of the mail, wire, and other facilities in interstate commerce, to promote, manage, establish, and carry out the Co-Payment Circumvention Enterprise in violation of 18 U.S.C. § 1952 (Travel Act), § 1341 (mail fraud), and § 1343 (wire fraud).

308.    Defendants intended to, and in fact did, commit bribery in violation of state and federal law, specifically 42 U.S.C. § 1320a-7b; Cal. Bus. & Prof. Code § 650 and Cal. Ins. Code §§ 750 and 754; Conn. Gen. Stat. §§ 53a-161c and 53a-161d; Fla. Stat. §§ 456.054 and 817.505; 740 Ill. Comp. Stat. 92/5; Mass. Gen. Laws ch. 175H, § 3; Ohio Rev. Code § 3999.22; and Va. Code Ann. § 32.1-315 (collectively, "unlawful activity"). Defendants used interstate mail and wire facilities with the intent to (1) distribute the proceeds from this unlawful activity and (2) promote, manage, establish, carry on, or facilitate the promotion, management, establishing, or carrying on of this unlawful activity.

309.    Defendants' pattern of racketeering involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mail and interstate wire facilities to further the Co-Payment Circumvention Enterprise. Each of these mailings and interstate wire transmissions constitutes an instance of "racketeering activity" under 18 U.S.C. § 1961(1)(B) by violating the underlying predicate acts of § 1952, § 1341, § 1343. Collectively, these violations constitute a "pattern of racketeering activity," under 18 U.S.C. § 1961(5), to advance Defendants' intentional and illegal Scheme.

310.    Defendants engaged in a Scheme to profit at the direct expense of insurers, including the Assignors and Class Members. They funneled and steered patients into CDF's and TAF's copayment assistance program, knowing insurers such as the Assignors and Class Members would ultimately bear the cost of Copaxone. Defendants knew their Scheme to funnel, steer, and refer were violative of federal and state laws including, but not limited to, the AKS and the FCA and that they were transmitting false and illegal information through mail and wire communications.

311.    Defendants' use of the mails and wires to perpetuate their Co-Payment Circumvention Enterprise involved thousands of communications which involved, among others,

the following:

    a. Communications from Teva, CDF, TAF, and Assist Rx and ACS to patients, steering them to Teva's and CDF's and TAF's co-payment assistance program;

    b. Transmittal of bribes, disguised as donations, by Teva to CDF and TAF, which were used, in part, to pay the co-payments of Copaxone "customers";

    c. Submission of certifications by Teva, TAF, and CDF, in which they claimed to be in compliance with federal law and OIG regulations;

    d. Submissions of data from CDF and TAF to Teva and Assist Rx, permitting Teva to conduct ROI analyses on its "donations" to CDF and TAF, to forecast the ROI resulting from said "donations" and to see how much more revenue it could generate by increasing its "donations";

    e. Communications between CDF, TAF, and Teva to ensure that CDF's and TAF's MS funds were open to patients seeking copay assistance for Copaxone;

    f. Certifications by CDF and TAF that it would determine eligibility according to a "uniform measure of financial need that is applied in a consistent manner" when in fact CDF and TAF prioritized patients taking Copaxone based on Teva's bribes, not financial need;

    g. Causing false claims, in violation of the FCA and AKS, to be submitted by innocent, non-party pharmacies to the Assignors and Class Members;

    h. Using the mail and wire to mislead the government agencies (i.e., the OIG, IRS, DOJ, and state departments of record) through false certifications and misrepresentations;

    i. Misleading insurers, health care providers, investors, government agencies, and the general public into believing the legitimacy of Defendants' Scheme; and

312. Defendants violated the Travel Act by using the mail and wire facilities to commit, promote, manage, establish, and carry on their bribery and/or kickback scheme in violation of the laws of the United States, namely, the AKS, as well as the laws of several States, namely, (1) Cal. Bus. & Prof. Code § 650 and Cal. Ins. Code §§ 750 and 754; (2) Conn. Gen. Stat. §§ 53a-161c and 53a-161d; (3) Fla. Stat. §§ 456.054 and 817.505; (4) 740 Ill. Comp. Stat. 92/5; (5) Mass. Gen. Laws ch. 175H, § 3; (6) Ohio Rev. Code § 3999.22; and (7) Va. Code Ann. § 32.1-315. Defendants further used the mail and wire facilities to distribute the proceeds of their bribery and/or kickback scheme. Defendants' activity was intended to and did in fact violate the federal AKS by knowingly

and willfully offering (by Teva) and accepting (by CDF and TAF) bribes (i.e., "donations") in return for CDF and TAF referring, accepting referrals for, and arranging for Assignors and Class Members to buy, and beneficiaries to receive, Copaxone, including from ACS.

313.   Defendants' activity was intended to and did in fact violate Cal. Bus. & Prof. Code § 650. Specifically, as "a person licensed under"[27] the California Business and Professional Code, Teva was prohibited from offering or delivering "any rebate, refund, commission, preference, patronage dividend, discount, or other consideration, whether in the form of money or otherwise, as compensation or inducement for referring patients, clients, or customers to any person." Teva did that, and the Charities facilitated the same, by bribing the Charities to refer patients for receipt of Copaxone and to pay the co-payments of these patients directly to the dispensing pharmacies. This illegal activity was performed in California and used interstate mail and wire facilities.

314.   Defendants' activity was intended to and did in fact violate Cal. Ins. Code §§ 750 and 754. Specifically, as persons "who engage[d] in the practice of processing, presenting, or negotiating claims," CVC and Actelion were prohibited from "offer[ing], deliver[ing], receiv[ing], or accept[ing] any rebate, refund, commission, or other consideration, . . . as compensation or inducement to or from any person for the referral or procurement of clients, cases, patients, or customers." Cal. Ins. Code § 750(a). Yet this is exactly what Defendants did when Teva bribed the Charities to seek, gather, and sign thousands of patients up to receive co-payment assistance from Actelion to receive Copaxone. Further, "[i]t is unlawful for any person to solicit, receive, offer, or pay any referral fee for the referral of an individual for the furnishing of services or goods for

---

[27] *See* Cal. Bus. & Prof. Code § 653 (defining "person" to include, *inter alia*, a "firm, partnership, association, corporation, limited liability company), and 12 Op. Atty. Gen. 38 (stating that Cal. Bus. & Prof. Code § 4033 requires that all "pharmaceutical manufacturers shipping their products into California for sale or distribution through their own branch houses or other wholesalers or agencies must be licensed.")

which the person knows or should have known whole or partial reimbursement is or may be made, directly or indirectly, by any insurer. As used in this section, a referral fee is a fee paid by a person furnishing goods or services to another in return for the referral of an individual to that person for the furnishing of services or goods. It includes any referral fee, kickback, bribe, or rebate, whether made directly or indirectly, overtly or covertly, or in cash or in kind." Cal. Ins. Code § 754(a). Teva paid these illegal "referral fees" in the form of sham donations to the Charities in order for the Charities to refer its grant recipients to Teva. Both the Charities and Teva had actual knowledge and banked on these drug claims being paid for by insurers.

315.    Defendants' activity was intended to and did in fact violate Conn. Gen. Stat. §§ 53a161c and 53a-161d. These two laws prohibit two sides of the same scheme. Under Conn. Gen. Stat. § 53a-161c(a), it is illegal to "knowingly solicit[], accept[] or agree[] to accept any benefit, in cash or in kind, from another person upon an agreement or understanding that such benefit will influence such person's conduct in relation to referring an individual or arranging for the referral of an individual for the furnishing of any goods, facilities or services to such other person under contract to provide goods, facilities or services to a local, state or federal agency." This was violated by TAF and CDF accepting money from Teva to influence the charities' conduct in referring and arranging for the referral of beneficiaries of Assignors and Class Members, who are under contract to provide health insurance benefits on behalf of state and federal agencies (e.g., CMS). Similarly, it is illegal under Conn. Gen. Stat. § 53a-161d(a) to "knowingly offer[] or pay[] any benefit, in cash or kind, to any person with intent to influence such person: (1) To refer an individual, or to arrange for the referral of an individual, for the furnishing of any goods, facilities or services for which a claim for benefits or reimbursement has been filed with a local, state or federal agency; or (2) to purchase, lease, order or arrange for or recommend the purchasing, leasing or ordering of any goods, facilities or services for which a claim of benefits or reimbursement has

been filed with a local, state or federal agency." Defendants' Scheme operated in Connecticut and thereby violated these state laws.

316.     Defendants' activity was intended to and did in fact violate Fla. Stat. §§ 456.054 and 817.505. Specifically, under Fla. Stat. § 456.054(2) "[i]t is unlawful for . . . any provider of health care services to offer, pay, solicit, or receive a kickback, directly or indirectly, overtly or covertly, in cash or in kind, for referring or soliciting patients." Teva is a provider of health care services and paid kickbacks to TAF and CDF, and to pharmacies through TAF and CDF, for referring patients to receive Copaxone. Similarly, under Fla. Stat. § 817.505(1) it is illegal "for any person . . . to (a) [o]ffer or pay a commission, benefit, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, . . . to induce the referral of a patient or patronage to or from a health care provider or health care facility." Likewise, subsection (b) prohibits soliciting or receiving the same. Here, Teva paid, and TAF and CDF received, bribes to induce the referral of patients to receive Copaxone. Defendants' Scheme operated in Florida and resulted in claims being submitted therein and thereby violated these state laws.

317.     Defendants' activity was intended to and did in fact violate 740 Ill. Comp. Stat. 92/5 "it is unlawful to knowingly offer or pay any remuneration directly or indirectly, in cash or in kind, to induce any person to procure clients or patients to obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured person or the person's insurer." Teva bribed TAF and CDF to procure patients to receive co-payment assistance from Teva for Copaxone knowing and requiring that these patients were insured and would submit a claim to Assignors and Class Members. Defendants' Scheme operated in Illinois and resulted in claims being submitted therein and thereby violated this state law.

318.     Defendants' activity was intended to and did in fact violate Mass. Gen. Laws ch. 175H, § 3. Specifically, it is illegal for any person to "offer[] or pay[] [(or solicit or receive)] any

remuneration, including any bribe or rebate, except as provided in subsection (b), directly or indirectly, overtly or covertly, in cash or in kind to induce any person to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering of any good, facility, service, or item for which payment is or may be made in whole or in part by a health care insurer." Mass. Gen. Laws ch. 175H, § 3. Teva offered and paid, and TAF and CDF solicited and received, bribes in return for TAF and CDF referring patients to receive Copaxone and arranging for the purchase of same by funneling Teva's money to these patients. Defendants' Scheme operated in Massachusetts and resulted in claims being submitted therein and thereby violated this state law.

319.   Defendants' activity was intended to and did in fact violate Ohio Rev. Code Ann. § 3999.22. Under Ohio law, "No person shall knowingly solicit, offer, pay, or receive any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for referring an individual for the furnishing of health care services or goods for which whole or partial reimbursement is or may be made by a health care insurer[.]" Ohio Rev. Code Ann. § 3999.22. Teva offered and paid, and the Charities solicited and received, bribes in return for the Charities referring patients to receive Copaxone for which the non-co-payment portion was paid by a health insurer (i.e., Assignors and Class Members). Defendants' Scheme operated in Ohio and resulted in claims being submitted therein and thereby violated this state law.

320.   Defendants' activity was intended to and did in fact violate Va. Code Ann. § 32.1-315. Under Virginia law, it is illegal for any person to "knowingly and willfully solicit[] or receive[] any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in-kind, or causes such remuneration to be solicited or received . . . [i]n return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under medical assistance; or . . . [i]n return for purchasing, leasing, ordering, or arranging for or recommending purchasing,

leasing or ordering any goods, facility, service or item for which payment may be made in whole or in part under medical assistance." Va. Code Ann. § 32.1-315(A). It is also illegal for any person to "knowingly and willfully offer[] or pay[] any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in-kind to any person to induce such person, or causes such remuneration to be offered or paid . . . [t]o refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made, in whole or in part, under medical assistance; or . . . [t]o purchase, lease, order, or arrange for or recommend purchasing, leasing or ordering any goods, facility, service or item for which payment may be made in whole or in part under medical assistance." *Id*. § 32.1-315(B). Teva offered and paid, and the Charities solicited and received, bribes in return for the Charities referring patients to receive Copaxone and arranging for the purchase of same by funneling the Teva's money to these patients. Defendants' Scheme operated in Virginia and thereby violated these state laws.

321.    The predicate act violations of the Travel Act, as well as mail and wire fraud, had the same purpose; that is, to make money by growing the co-pay assistance program as large as possible so CDF's and TAF's officers and directors could justify increasing their compensation, in order to induce patients and physicians to purchase and prescribe Copaxone, thereby increasing their own profits, and so Teva could get as many "customers" for the Copaxone as possible, at the expense of the Assignors and Class Members.

322.    All of the predicate acts detailed above, including the certifications made by Teva, CDF, and TAF, as well as the wire communications in furtherance of their Scheme, were for the purpose of the Scheme.

323.    If CDF and TAF had not falsely certified that they used uniform measures of financial eligibility, and if Teva, Assist Rx, CDF, and TAF had not deceptively caused innocent,

non-party physicians to submit claims for payment, the Assignors and Class Members would not have paid artificially inflated prices or for improperly increased quantities of Copaxone. Defendants caused innocent, non-party physicians to send false bills for payment over the mail and wire so Teva could make larger bribes to CDF and TAF, thereby inducing patients and physicians to utilize Copaxone over far cheaper alternatives, in turn harming the Assignors and Class Members.

324.    If the Scheme did not exist, physicians would not have submitted the tainted claims to Assignors and Class Members. If the Scheme did not exist, Teva would not have been able to maintain Copaxone's extremely high price and remain profitable to the extent that it was.

325.    These predicate acts allowed the continuance of the Scheme to increase the quantity of Copaxone and maintain inflated prices. As a result, the Assignors and Class Members paid inflated prices for Copaxone, and for more Copaxone claims than they otherwise would have.

326.    As a result of Defendants' Scheme, Assignors and Class Members unknowingly paid tainted claims.

327.    These predicate acts perpetuated the Scheme to increase the prices and dispensed quantities of Copaxone, over cheaper alternatives. As a result, the Assignors and Class Members paid the inflated prices for an improperly increased quantity of Copaxone.

328.    Teva, CDF, TAF, ACS, and Assist Rx, including their officers, directors, agents, and principals, participated in all of the predicate acts. These individuals sent, or caused to be sent, all of the false certifications through the mail or wire facilities. These individuals communicated with each other, and others, in furtherance of the Scheme.

329.    The intended and most direct victims of the Scheme are the Assignors and Class Members.

330.    The violations of the Travel Act and mail and wire fraud included transmission of

false claims and the unlawful transmission of data and communications to further the racketeering Scheme over a period of at least ten years involving harm to multiple parties.

331.    The Co-Payment Circumvention Enterprise's illegal Scheme and its predicate acts proximately caused injury to the Assignors' and Class Members' business and property by triggering the Assignors' and Class Members' duty to purchase Copaxone. Defendants' Scheme rendered the claims for Copaxone unpayable, and Assignors and Class Members would not have (and could not have) paid if Defendants had not concealed their Scheme.

332.    Accordingly, Defendants' violations of 18 U.S.C. § 1962(c) directly and proximately caused injuries and damages to the Assignors and Class Members. Defendants' actions entitle Plaintiffs to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees under 18 U.S.C. § 1964(c).

### FOURTH CLAIM FOR RELIEF

**Violation of 18 U.S.C. § 1964(d) Through the Co-Payment Scheme**
*Against All Defendants*

333.    Plaintiff re-allege and incorporate by reference paragraphs 1–218 of this Complaint as if fully set forth herein.

334.    Section 1962(d) makes it unlawful for "any person to conspire to violate" section 1962(c), among other provisions.

335.    Defendants violated § 1962(d) by conspiring to violate § 1962(c). The object of this conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs of the Co-Payment Circumvention Enterprise described previously, through a pattern of racketeering activity.

336.    Teva knowingly agreed with CDF, TAF, ACS, and Assist Rx that each would perform services that would facilitate the illicit activities of the Co-Payment Circumvention

Enterprise. Teva, through CDF, TAF, and Assist Rx, steered patients to CDF's and TAF's co-payment assistance programs.

337.     Teva also provided CDF and TAF with bribes disguised as donations for the charity to subsidize the co-payments of Copaxone "customers" using the co-payment assistance programs.

338.     Teva also used Copaxone data provided by CDF, Assist Rx, and TAF in violation of the AKS and FCA. The shared data allowed Teva to perform ROI analyses on its "donations" to forecast the effect of donations on revenue and profit. Teva thus set out a roadmap of illegal activities and profits.

339.     Teva, CDF, and TAF also caused false certifications to be sent over the interstate mail and wire facilities claiming they were in compliance with federal law, including the AKS and FCA.

340.     Further, CDF and TAF knowingly agreed with Teva and Assist Rx that they would perform services that would facilitate the activities of the Co-Payment Circumvention Enterprise and those who were running it in an illegal manner. Some of the services that CDF and TAF performed were steering people towards their co-payment assistance funds.

341.     CDF and TAF caused false certifications to be sent over the interstate mail and wire facilities claiming they were in compliance with federal law, including the AKS and FCA.

342.     CDF and TAF sent data to Assist Rx and Teva in violation of the AKS and FCA, so Teva could see how much money it was making from its "donations" to CDF and TAF, and how much more money it could make by increasing its "donations." Indeed, this conduct shows that Defendants did not engage in parallel conduct but worked together and had a meeting of the minds that they could each profit from the Co-Payment Circumvention Enterprise. CDF and TAF knew that if Teva provided more "donations," Teva would make more money. Thus, by illegally providing data to Teva, CDF and TAF were soliciting greater contributions.

343.     Further, Assist Rx knowingly agreed with Teva, CDF, and TAF that they would perform services that would facilitate the activities of the Co-Payment Circumvention Enterprise and those who were running it in an illegal manner. Some of the services that Assist Rx performed were steering people towards CDF's and TAF's co-payment assistance funds by sharing CDF and TAF data with Teva to ensure Teva could verify that its "donations" provided co-pays for Copaxone.

344.     Teva knowingly agreed with CDF, TAF, ACS, and Assist Rx that one or all of them would commit at least two instances of Travel Act violations or mail and wire fraud (or cause an innocent third- party to send false statements over the mails and wires). In short, Teva knew that Teva, ACS, Assist Rx, CDF, and TAF had to abide by the AKS and FCA, and Teva knew the Scheme would violate those statutes. Teva knew that CDF and TAF certified with the OIG that CDF and TAF would use a uniform measure of financial need when providing co-pay assistance, when in fact CDF and TAF were mere conduits to provide co-pay assistance for patients taking Copaxone. Teva also knew that each time a physician treated a patient using CDF's and TAF's co-pay assistance, any certifications made, or claims submitted by the physician would be in violation of federal law.

345.     Defendants knew that any communication they had over the telephone, email, or text message in furtherance of the Scheme would be predicate acts. Each Defendant intended to further this endeavor, which, as described above, when completed, violated 18 U.S.C. § 1962(c) that proximately and directly injured the Assignors and Class Members.

346.     Plaintiffs bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees under 18 U.S.C. § 1964(d).

### FIFTH CLAIM FOR RELIEF

**Violations of the Civil Remedies for Criminal Practices Act (Fla. Stat. §§ 772.101 *et seq*)**
*Against All Defendants*

124

347.    Plaintiff re-allege and incorporate by reference paragraphs 1–218 of this Complaint as if fully set forth herein.

348.    At all times, as set forth above, Defendants' actions were unlawful under Fla. Stat. § 772.103(3), as they were all "employed by, or associated with, any enterprise through a pattern of criminal activity."

349.    Defendants violated Fla. Stat. §§ 772.101 et seq., by participating in or conducting the affairs of the Co-Payment Circumvention Enterprise (as described more fully above) through a pattern of racketeering activity.

350.    The Assignors and the Class Members are "persons" as defined in Fla. Stat § 1.01, injured in their business or property, because of Defendants' racketeering violations.

### Description of the Co-Payment Circumvention Enterprise

351.    Defendants are "persons" under Fla. Stat. § 1.01.

352.    Teva, CDF, TAF, ACS, and Assist Rx are members of and constitute an "association in-fact enterprise."

353.    The Co-Payment Circumvention Enterprise is an association-in-fact of individuals and corporate entities under Fla. Stat. § 772.101 and consists of "persons" associated for a common purpose.

354.    The purpose of the Co-Payment Circumvention Enterprise was to maximize Teva's profits and CDF's and TAF's executive compensation.

355.    The Co-Payment Circumvention Enterprise had an ongoing organization with an ascertainable structure and functioned as a continuing unit with separate roles and responsibilities. Teva is the source of the alleged Scheme, including providing kickbacks to subsidize payments for Copaxone whose co-payments were provided by CDF and TAF.

356.    CDF and TAF accepted Teva's bribes and provided unlawful payments for

Copaxone. CDF, TAF, and Assist Rx facilitated and illegally provided grant assistance data to Teva.

357.    Teva, CDF, TAF, ACS, and Assist Rx, individually and collectively, fulfilled their roles in the Co-Payment Circumvention Enterprise.

358.    Teva, CDF, TAF, ACS, and Assist Rx were distinct legal entities with distinct purposes. For Teva, the sole purpose was to make as much money off of Copaxone as possible. For CDF and TAF, it was to raise the amount of money in the funds to justify paying higher salaries to their executives.

359.    The Co-Payment Circumvention Enterprise had an existence that was distinct from the pattern of racketeering in which Teva, CDF, TAF, ACS, and Assist Rx engaged. Each Defendant conspired with each other to minimize and conceal the amount of information Assignors and the Class Members received about the claims for payment of Copaxone, materially resulting in Assignors' and the Class Members' payment of the inflated purchase price of Copaxone that they would not have otherwise paid for. *See* Fla. Stat. § 817.234 ("A person commits insurance fraud punishable . . . if that person, with the intent to injure, defraud, or deceive any insurer . . . [p]resents or causes to be presented any written or oral statement, as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy or a health maintenance organization subscriber or provider contract, knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claims[.]").

360.    At all relevant times, Teva, CDF, TAF, ACS, and Assist Rx operated, controlled, and managed the Co-Payment Circumvention Enterprise. Teva, CDF, and TAF failed to disclose a material fact about the existence of the bribes in violation of Fla. Stat. § 817.234, which prohibits causing innocent, non-party pharmacies and physicians to submit false submissions of payments to Assignors and the Class Members.

361.     Teva's, CDF's, TAF's, ACS's, and Assist Rx's participation in the Co-Payment Circumvention Enterprise was necessary for the successful operation of the Scheme. The members of the Co-Payment Circumvention Enterprise all served a common purpose, which was to increase the fund to an enormous size while knowing each payment was an illegal kickback, funded by bribes from Teva, while minimizing the amount of information that Assignors, the Class Members, and the innocent non-party pharmacies and physicians, knew about the program. These affirmative acts and strategic omissions were material to Assignors' and the Class Members' decision to issue payment for Copaxone. The Co-Payment Circumvention Enterprise's actions maximized the revenue and profitability of the Enterprises' members by knowingly causing payments for Copaxone.

362.     Fla. Stat. § 772.102 provides that criminal activity is any activity chargeable by indictment or information under Florida law, including Fla. Stat. § 817.234. Section 817.234 criminalizes situations where health care companies, such as Assignors and the Class Members, are provided incomplete or misleading information about any fact or thing material to a claim for payment. As discussed below, Teva, CDF, and TAF have violated Fla. Stat. § 817.234 by providing incomplete or misleading information material to Assignors' and the Class Members' decision to issue payment for Copaxone.

363.     Teva, CDF, TAF, ACS, and Assist Rx committed numerous acts of racketeering by providing incomplete or misleading information related to Copaxone. Teva, CDF, TAF, ACS, and Assist Rx knew or had reason to know that they were providing incomplete or misleading information about these claims.

364.     Teva, CDF, TAF, ACS, and Assist Rx knew or had reason to know that they were providing incomplete or misleading information under Fla. Stat. § 817.234. Despite knowledge of these facts, they induced Assignors and the Class Members to make payment for claims that they

otherwise would not have paid. Instead, Teva, CDF, TAF, ACS, and Assist Rx knowingly provide incomplete information to enrich their bottom line.

365.    Based on these omissions, Assignors and the Class Members provided payments for the Copaxone throughout the United States, including Florida, based on half-truths, inaccurate information, and deliberate omissions. Defendants' omissions were material to the payment of Copaxone that the Assignors and Class Members paid for. Had the Assignors and Class Members known of the Co-Payment Circumvention Enterprise, they would not have issued payments for Copaxone.

366.    The Assignors and Class Members were the primary, intended, and most direct victims of Defendants' unlawful Scheme. The Assignors and Class Members paid for Copaxone throughout the United States, including Florida, based on Defendants' omissions of material information under Fla. Stat. § 817.234.

367.    As part of this Scheme, Defendants caused innocent, non-party pharmacies to submit false certifications and misled Assignors and the Class Members into paying for prescriptions of Copaxone. Defendants conducted or participated, directly or indirectly, in the Co-Payment Circumvention Enterprise through a pattern of unlawful activity.

368.    By reason of and as a result of Defendants' illegal conduct, the Assignors and Class Members were injured in their business or property.

369.    Defendants' violations directly and proximately caused injuries and damages to the Assignors and Class Members; and Plaintiffs have a right to bring this action for the alleged damages.

370.    Under Fla. Stat. § 772.11, Plaintiffs seek their reasonable attorneys' fees and costs associated with prosecution of this action.

<u>**SIXTH CLAIM FOR RELIEF**</u>

### Tortious Interference with Contract
*Against All Defendants*

371.    Plaintiff re-allege and incorporate by reference paragraphs 1–218 of this Complaint as if fully set forth herein.

372.    Assignors' Medicare coverage plans is materially similar to the terms of CMS' model evidence of coverage.[28]

373.    Assignors' MA plans require that covered patients personally bear the cost-sharing responsibility provided by the plans when obtaining prescription drugs, such as Copaxone.

374.    Teva knew that Assignors' MA plans contained these cost-sharing provisions, which are standard features for nearly all MA plans. Teva deliberately sought to subvert these provisions through its illegal copay scheme. By rendering Copaxone cost-free for patients, Teva improperly increased the demand for Copaxone and maintained Copaxone's exorbitant price, improperly increasing the costs Assignors and other healthcare plans were required to pay for Copaxone.

375.    In doing so, Teva intentionally and tortiously interfered with the cost-sharing provisions in the Assignors' contracts. Teva's interference caused Assignors' beneficiaries to breach their agreements with Assignors by failing to pay the cost-sharing obligations set forth in their healthcare plans.

376.    Teva's interference and procurement of those contractual breaches was wrongful and without justification and intended to defeat the structure of Assignors' managed care system and to benefit Teva financially at the Assignors' expense.

377.    The contractual breaches caused by Teva have directly and proximately cause significant damages to Assignors in the form of payments made by Assignors that it would not

---

[28] Available at https://www.cms.gov/files/document/nyiageocchapter9cy2020.docx

have made is Assignors had known that identifiable claims were tainted by Teva's illegal scheme.

378.    By virtue of the foregoing, the Assignors are entitled to compensatory and punitive damages, in amounts to be determined at trial, and other relief.

## DEMAND FOR JUDGEMENT

WHEREFORE, Plaintiffs and the Class Members demand judgment against Defendants as follows:

1.    Awarding Plaintiffs and the Class Members actual, consequential, compensatory, statutory, treble, punitive, and other damages, in an amount to be proven at trial, including pre- and post- judgment interest at the statutory rates;

2.    Awarding Plaintiffs and the Class Members equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

3.    Declaring the alleged acts to be unlawful under the state statutes set forth above, and the common law of unjust enrichment of the states and territories set forth above;

4.    Determining that this action is a proper class action, designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel.

5.    Awarding Plaintiffs and the Class Members their reasonable costs and expenses, including attorneys' fees; and

6.    Awarding such other legal or equitable relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs and the Class Members demand a jury trial on all claims so triable under Federal Rule of Civil Procedure Rule 38.

Dated: Augst 16, 2024                    Respectfully submitted,


By       */s/ George H. Flanders*
George H. Flanders        # 78706
**RODERICK & FLANDERS LAW FIRM**
PO Box 7467
North Kansas City, Missouri 64116
Telephone: (816) 200-7576
george@roderickandflanderslawfirm.com
***Attorneys for Plaintiff***


Shereef H. Akeel (MI Bar No. P54345)
Adam S. Akeel (MI Bar No. P81328)
Samuel R. Simkins (MI Bar No. P81210)
Daniel W. Cermak (MI Bar No. P84460)
Hayden E. Pendergrass (MI Bar No. P86888)
Emad R. Hamadeh (MI Bar No. P86849)
**AKEEL & VALENTINE, PLC**
888 W. Big Beaver Road, Ste. 350
Troy, Michigan 48084
shereef@akeelvalentine.com (pro hac vice
forthcoming)
adam@akeelvalentine.com (pro hac vice
forthcoming)
sam@akeelvalentine.com (pro hac vice
forthcoming)
daniel@akeelvalentine.com (pro hac vice
forthcoming)
hayden@akeelvalentine.com (pro hac vice
forthcoming)
emad@akeelvalentine.com (pro hac vice
forthcoming)


John W. Cleary (Fla. Bar No. 118137)
Aida M. Landa (Fla. Bar No. 136451)
**MSP RECOVERY LAW FIRM**
2701 S. LeJeune Road, 10th Floor
Coral Gables, Florida 33134
(305) 614-2222
jcleary@msprecoverylawfirm.com (pro hac vice
forthcoming)
alanda@msprecoverylawfirm.com (pro hac vice
forthcoming)
***Attorneys for Plaintiffs***