## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| SERIES 17-03-615, *a designated series of* *MSP Recovery Claims, Series LLC*, et al., ) ) ) | |
| Plaintiffs, ) | **CIVIL ACTION** |
| v. ) ) | **No. 24-2366-KHV** |
| TEVA PHARMACEUTICALS USA, INC., et al., ) ) | |
| Defendants. ) ) | |

## MEMORANDUM AND ORDER

On August 16, 2024, plaintiffs filed a class action suit against Teva Pharmaceuticals USA, Inc. and Teva Neuroscience, Inc. (collectively, "Teva"), Advanced Care Scripts, Inc. ("ACS"), AssistRx, Inc., Chronic Disease Fund ("CDF") and The Assistance Fund ("TAF"). Plaintiffs are limited liability corporations which purchase legal claims from insurance companies that manage Medicare Advantage drug plans.[1] Plaintiffs allege that in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and various state laws, defendants submitted fraudulent claims to these health plans.

On November 18, 2024, defendants filed five separate motions to dismiss. See Teva Defendants' Motion To Dismiss (Doc. #80); Defendant Advanced Care Scripts, Inc.'s Motion To Dismiss (Doc. #82); Defendant Chronic Disease Fund, Inc.'s Motion To Dismiss (Doc. #84); The Assistance Fund's Motion To Dismiss And Accompanying Memorandum Of Law (Doc. #86); AssistRx, Inc.'s Motion To Dismiss (Doc. #89). None of plaintiffs' responses directly addressed

---

[1] Plaintiffs bring suit for themselves and on behalf of Medicare Advantage health plans that, from 2006 through the present, offered Medicare benefits, provided services, purchased Copaxone, provided payment relating to, or possessed recovery rights for some or all the purchase price of Copaxone. Class Action Complaint (Doc. #1) filed April 16, 2024, ¶ 148.

all of any movant's stated grounds for dismissal. Therefore, on January 2, 2025, the Court ordered plaintiffs to show cause in writing why the Court should not grant defendants' motions as uncontested as to those arguments which plaintiffs had not addressed. <u>Order To Show Cause</u> (Doc. #102) at 2–3. This matter is before the Court on defendants' five motions to dismiss and the parties' responses to the order to show cause. For reasons stated below, plaintiffs have not shown good cause why the Court should not grant defendants' motions to dismiss as to grounds which plaintiffs did not directly address in opposition. On various grounds, the Court therefore sustains each of defendants' five motions to dismiss. Furthermore, on the merits, the Court dismisses plaintiffs' RICO and state law claims against all defendants.

### <u>Legal Standards</u>

Defendants seek to dismiss plaintiffs' complaint under Rules 12(b)(1), 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure.

### I.    Rule 12(b)(1) – Article III Standing

Article III standing is a threshold question of subject matter jurisdiction, which the Court considers under Rule 12(b)(1). <u>Kerr v. Polis</u>, 20 F.4th 686, 692 (10th Cir. 2021). Rule 12(b)(1) motions generally take the form of facial attacks on the complaint or factual attacks on the accuracy of its allegations. <u>Laufer v. Looper</u>, 22 F.4th 871, 875 (10th Cir. 2022). A facial attack assumes that the allegations in the complaint are true and argues that they fail to establish jurisdiction. <u>Baker v. USD 229 Blue Valley</u>, 979 F.3d 866, 872 (10th Cir. 2020). A factual attack goes beyond the allegations in the complaint and adduces evidence to contest jurisdiction. <u>Id.</u> When a defendant raises a factual attack, the Court has wide discretion to allow affidavits, other documents and a limited evidentiary hearing to resolve disputed jurisdictional facts. <u>Id.</u>

## II.    Rule 12(b)(2) – Lack Of Personal Jurisdiction

Rule 12(b)(2), Fed. R. Civ. P., governs motions to dismiss for lack of personal jurisdiction. Plaintiffs bear the burden of establishing a prima facie showing of personal jurisdiction. XMission, L.C. v. PureHealth Rsch., 105 F.4th 1300, 1314 (10th Cir. 2024).  At the motion to dismiss stage, plaintiffs' burden to establish personal jurisdiction is light.  Id.  Plaintiffs may defeat a motion to dismiss by presenting evidence—either uncontested allegations in their complaint or evidence in the form of an affidavit or declaration—that if true would support jurisdiction over defendant.  Eighteen Seventy, LP v. Jayson, 32 F.4th 956, 965 (10th Cir. 2022).  In determining whether plaintiffs have satisfied their burden, the Court takes as true all plausible, nonconclusory facts alleged in the complaint and must resolve any factual disputes in favor of plaintiffs. XMission, 105 F. 4th at 1307.

## III.    Rule 12(b)(6) – Failure To State A Claim

In ruling on a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., the Court assumes as true all well-pleaded factual allegations and determines whether they plausibly give rise to an entitlement of relief.  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim which is plausible—and not merely conceivable—on its face.  Id.; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  In determining whether a complaint states a plausible claim for relief, the Court draws on its judicial experience and common sense.  Iqbal, 556 U.S. at 679–80.

Plaintiffs bear the burden to frame their claims with enough factual matter to suggest that they are entitled to relief; it is not enough to make threadbare recitals of a cause of action accompanied by conclusory statements.  See Twombly, 550 U.S. at 556.  Plaintiffs make a facially plausible claim by pleading factual content from which the Court can reasonably infer that

defendants are liable for the misconduct alleged.  Iqbal, 556 U.S. at 678.  Plaintiffs must show

more than a sheer possibility that defendants have acted unlawfully—it is not enough to plead facts

that are "merely consistent with" liability.  Id. (quoting Twombly, 550 U.S. at 557).

A pleading which offers labels and conclusions, a formulaic recitation of the elements of a

cause of action or naked assertions devoid of further factual enhancement will not stand.  Iqbal,

556 U.S. at 678. Similarly, where the well-pleaded facts do not permit the Court to infer more than

the mere possibility of misconduct, the pleading has alleged—but has not shown—that the pleader

is entitled to relief.  See id. at 679.  The degree of specificity necessary to establish plausibility and

fair notice depends on context, because what constitutes fair notice under Rule 8(a)(2), Fed. R.

Civ. P., depends on the type of case.  Robbins v. Oklahoma, 519 F.3d 1242, 1248 (10th Cir. 2008).

## **Factual Background**

### I.    **Allegations Of Complaint**

Highly summarized and simplified, plaintiffs' 131-page Class Action Complaint (Doc. #1)

alleges as follows:[2]

Plaintiffs are limited liability corporations which purchase legal claims from insurance

---

[2]    The complaint piggybacks on a related investigation which resulted in separate
government settlements with TAF in 2019, ACS in 2020 and Teva in 2024.  Indeed, the 131-page
complaint largely reiterates facts from the investigation by the Department of Justice ("DOJ") and
its lawsuit against Teva in the United States District Court for the District of Massachusetts.  See
United States v. Teva Pharms. USA, Inc., et al., No. 20-11458 (D. Mass.).  In that lawsuit, the
government alleged that Teva violated the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–33,
because it coordinated with ACS, AssistRx, CDF and TAF to use charitable patient assistance
programs as conduits to cover Medicare patient copay obligations for Copaxone.  See Class Action
Complaint (Doc. #1), Exh. 4 – Complaint filed in D. Mass. No. 20-11458 and Exh. 7 – United
States' Statement Of Facts filed in D. Mass. No. 20-11458.  Plaintiffs maintain that the DOJ
settlements only resolved claims involving the federal government's financial exposure, not claims
for injuries sustained by Medicare health insurance companies.  See Plaintiffs' Response In
Opposition To Teva's Motion To Dismiss The Complaint ("Plaintiffs' Response To Teva's
Motion") (Doc. #96) filed December 18, 2024 at 18–19.

companies who sell Medicare Advantage health plans that include Part D coverage, which is prescription drug insurance.[3]  Plaintiffs allege that seven health insurance companies or related organizations assigned their claims to them: AvMed, ConnectiCare, Inc., Emblem, Fallon Community Health, Health Alliance Medical Plans, Inc., Network Health, Inc. and SummaCare, Inc.

Medicare Part D operates on a private market model.  The Centers for Medicare & Medicaid Services ("CMS") contracts with private companies to administer and sell drug insurance to individuals.  Federal and state laws bar Medicare participants—drug manufacturers, pharmacies, service providers and others—from paying or receiving kickbacks, i.e. remuneration to induce or reward referrals or claims for Medicare payments.

Under Medicare Part D, individuals who buy prescription drug insurance must share in the cost of each prescription.[4]  Before a pharmacy dispenses a drug to a patient, it collects the

---

[3]     Through Medicare, the federal government provides health insurance for people over 65 years old and individuals with certain disabilities.  See Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 et seq.  Traditional Medicare includes hospital insurance (Part A) and medical insurance (Part B).  Medicare Part C—also known as Medicare Advantage—is a public–private partnership under which private health plans offer Part A and Part B benefits to Medicare-eligible individuals.  Pharm. Care Mgmt. Ass'n v. Mulready, 78 F.4th 1183, 1205 n.21 (10th Cir. 2023).  Medicare Advantage plans usually offer Part D prescription drug coverage as well.  This case only concerns Medicare Part D.

[4]     In 2018, Medicare Part D plans included four payment stages: (1) an annual deductible, (2) initial coverage, (3) a coverage gap and (4) catastrophic coverage.  At each stage, the individual, the insurance company and Medicare paid specified portions of the total cost under a cost-sharing paradigm.  In 2018, the Part D standard benefit had a $405 deductible and 25 per cent coinsurance up to an initial coverage limit of $3,750 in total drug costs, followed by a coverage gap.  In the deductible stage, the patient paid the full negotiated price for covered prescription drugs.  In the initial coverage stage, the insurance company paid 75 per cent and the patient paid 25 per cent of the cost.  In the coverage gap stage, insurance companies covered 15 per cent of the cost of brand-name drugs and 56 per cent of the cost of generic drugs.  In the catastrophic coverage stage, patients paid a maximum of five per cent, insurance companies paid 15 per cent and Medicare covered the remaining portion.

copayment and submits a claim to the patient's insurance company.  After the insurance company receives the claim, it submits to CMS an electronic record of claim called a Prescription Drug Event ("PDE").   Class Action Complaint (Doc. #1), ¶ 50B.[5]   The PDE contains specific representations about the details of each claim, e.g., patient name, drug provider, drug prescriber, drug name and amount dispensed, and the insurance company relies on the pharmacy to submit accurate underlying data for the PDE.  When the insurance company submits the PDE to CMS, it must certify that based on its "best knowledge, information, and belief," such data is true, accurate and complete.  42 C.F.R. § 423.505(k); see Class Action Complaint (Doc. #1), ¶ 51B.[6]  Plaintiffs allege that for a PDE to be true, accurate and complete and in compliance with all applicable federal health care laws, "the dispensing pharmacy must first certify that the submitted claim for payment is free and clear of any material defects that would otherwise prohibit payment."  Class Action Complaint (Doc. #1), ¶ 51B.

Federal laws, including the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), prohibit pharmaceutical manufacturers from paying the cost-sharing obligation of patients who

---

[5]    The complaint begins with 53 numbered paragraphs and then restarts numbering with paragraph 1.  References to the first 53 paragraphs of the complaint include the letter A after the paragraph number; references to the next 53 paragraphs include the letter B.

[6]    With limited exceptions, the Administrative Simplification Compliance Act ("ASCA"), Pub. L. No. 107–105, 115 Stat. 1003 (2001), mandates that as of October 16, 2003, providers and suppliers electronically submit all Medicare claims.  ASCA Self Assessment, https://www.cms.gov/medicare/coding-billing/electronic-billing/administrative-simplification-compliance-act-self-assessment (last visited Mar. 19, 2025).  Certain providers and suppliers (e.g., those with fewer than 25 employees, those that submit less than ten claims per month) may be able to submit paper claims.  Id.  If a provider or supplier submits a paper claim, it must use CMS Form 1500, which requires the provider or supplier to certify that each claim "complies with all Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal Anti-Kickback statute."  Class Action Complaint (Doc. #1), ¶ 48B.  Plaintiffs do not allege that any defendant submitted a claim for Copaxone in paper form, so the Court need not delve further into that certification.

receive their drugs. Specifically, the AKS makes it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce or reward the referral or generation of business reimbursable by any federal healthcare program. 42 U.S.C. § 1320a-7b(b). Plaintiffs claim that Part D insurance companies must certify compliance with the AKS and under their contract with CMS, they cannot pay claims that are "tainted" by an AKS violation or are rendered unpayable due to disqualifying conduct by an underlying medical provider or pharmacy. See Class Action Complaint (Doc. #1), ¶ 49B (citing 42 C.F.R. § 422.504(h)(1)).

To help some patients afford copays, the Office of Inspector General ("OIG") allowed independent foundations to provide financial aid to Part D beneficiaries through patient assistance programs ("PAPs"). See Internal Revenue Code, 26 U.S.C. § 501(c)(3). To prevent abuse, the OIG established strict rules to ensure that PAPs are independent of drug manufacturers and do not serve as conduits for drug manufacturers to seek ill-gotten gains. According to the OIG, it is illegal for PAPs to guarantee that manufacturers will receive returns on investment for their donations or for PAPs to control or unequally fund PAP operations. For a PAP to comply with federal law, its function must be truly independent, and not influenced by the interests of drug manufacturers who donate to the PAP.

Teva manufactures Copaxone, an injectable drug for multiple sclerosis ("MS"). The annual cost per Copaxone patient ranged from $17,000 in 2006 to $88,000 in 2024. When Part D went into effect in 2006, Teva implemented its "Shared Solutions" program to eliminate financial barriers for patients who could not otherwise buy Copaxone because of large copays. From 2006 to the present, Teva funneled hundreds of millions of dollars through two third-party foundations—CDF and TAF—to subsidize Copaxone copayment obligations of such patients. For new Copaxone prescriptions, Teva instructed physicians to submit patient enrollment forms for

the program directly to Teva.

If a patient was eligible for Part D coverage, Teva referred the patient to one specialty pharmacy—ACS.  If a patient did not have Part D coverage, ACS helped enroll the patient in a plan which covered Copaxone and on the patient's behalf, applied for copay assistance through CDF or TAF.  ACS informed Teva how many patients were receiving copay assistance, so Teva could decide how much money each foundation needed to cover Copaxone for new and existing patients.  Teva then paid each foundation accordingly.

In September of 2010, AssistRx started running Teva's free drug program for Copaxone patients who did not have insurance.  As part of that program, AssistRx identified Medicare-eligible patients who were receiving free Copaxone and referred them to ACS, which then sought copay funding for them through CDF or TAF.

Teva used ACS and structured its donations to CDF to ensure that its donations would only benefit patients taking Copaxone, not patients who were taking competing MS medications.  Later, Teva substituted TAF for CDF as a "pass-through" donation vehicle to get Teva money into the hands of patients who wanted Copaxone.[7]  Originally, Teva provided Copaxone free of charge to needy patients.  By signing them up for Medicare Part D, Teva and ACS converted non-paying Medicare-eligible patients into paying customers on Medicare-paid claims.  Thus, for Teva, both

_____

[7]    To execute the scheme, Teva and TAF agreed that TAF would not maintain a waitlist.  Instead, ACS and AssistRx prepared "batch files" comprised of all Medicare-eligible patients awaiting assistance to purchase Copaxone—many of whom AssistRx had helped obtain Part D coverage.  TAF shared these files with Teva, which calculated the necessary payment to TAF to cover copays for those patients.  Teva then paid TAF while instructing ACS and AssistRx to simultaneously send the batch file to TAF, ensuring that Teva's funds were used exclusively for patients who wanted Copaxone.  TAF would keep its MS Fund closed until receiving Teva's payment, at which point it reopened the fund to enroll ACS-queued patients.  Likewise, CDF agreed not to maintain a waitlist, so that no other patients could get assistance before those referred by ACS and AssistRx.

CDF and TAF functioned not as charities for MS patients, but as pass-through vehicles for Teva to give money to MS patients to buy Copaxone. Teva understood that if it did not use CDF and TAF to subsidize the copays for these patients, its Copaxone revenue would suffer. Teva ensured that Copaxone revenue would increase by regularly paying CDF and TAF whatever was necessary to subsidize copays for MS patients.

Between 2008 and 2019, CDF disbursed over $97 million in copay waivers so that approximately 14,000 patients could buy Copaxone. From 2008 to 2017, Medicare and Part D insurance companies paid approximately $1.5 billion for Copaxone claims associated with patients whom Teva had referred to ACS or AssistRx and who received copay assistance from CDF or TAF. In total, CDF and TAF used Teva funds to waive copay obligations for at least 530,000 Copaxone claims.[8]

Defendants' scheme circumvented the congressional design of Part D, which requires patient copays to act as market constraints against increasing prices. By insulating patients from Medicare cost-sharing obligations, Teva raised Copaxone prices to exorbitant levels. From 1997, when Teva launched Copaxone, to 2017, Teva raised its price 27 times, by approximately 825 per cent.

Under Medicare cost-sharing parameters, insurance companies incur a portion of total drug

---

[8]     The complaint alleges that from 2006 to 2022, Teva referred approximately 30,300 Copaxone patients to ACS. Class Action Complaint (Doc. #1), ¶ 70. The complaint suggests that "innocent, non-party pharmacies" also filled Copaxone prescriptions and submitted false certifications and claims for the drug to insurance companies. Id., ¶¶ 311.g., 367; see also id., ¶ 156 (CDF and TAF misled "certain pharmacies" to believe that they were legitimate charitable organizations when in fact they served as illegal conduits for Teva). Plaintiffs do not allege how many innocent non-party pharmacies filled Copaxone prescriptions. Plaintiffs have attached to the complaint a 441-page, non-exhaustive list of Copaxone claims the insurance companies paid, but it does not identify which pharmacies submitted particular claims. See Class Action Complaint (Doc. #1), Exh. 2.

costs, independent of expenses covered by Medicare.  Plaintiffs allege that insurance companies

had to pay a portion of patients' prescription costs, so defendants' scheme—which increased prices

and utilization of Copaxone—necessarily resulted in injury to them.

Plaintiffs allege that for Copaxone to remain eligible for reimbursement by federal health

care programs, Teva and ACS necessarily certified to CMS that they were in compliance with

federal health care laws, including the AKS and FCA.[9]  Class Action Complaint (Doc. #1), ¶¶ 46B,

139, 311.c., 339; id., ¶ 52B (for Copaxone to remain eligible for payment by federal health care

programs, Teva and ACS necessarily and repeatedly certified compliance with federal health care

laws throughout duration of scheme).[10]  Specifically, plaintiffs claim that for Copaxone to be

eligible under Medicare Part D health plans, Teva necessarily agreed that it would "comply with

the requirements imposed by CMS . . . for purposes of administering the program."  Id., ¶ 48B

---

[9]    In 2010, Congress amended the AKS to include language which provided that any Medicare claim that includes items or services resulting from a violation of the AKS constitutes a false or fraudulent claim for purposes of the FCA.  42 U.S.C. § 1320a-7b(g).  In other words, a person violates the FCA when he or she knowingly submits claims to federal health care programs that result from violations of the AKS.  31 U.S.C. § 3729(a) (claims submitted to federal health care programs that result from violations of AKS per se false or fraudulent within meaning of FCA).

[10]    Plaintiffs also allege that defendants used the mail and wires to mislead government agencies (i.e. the OIG, Internal Revenue Service ("IRS"), DOJ and state departments of record) through false certifications and misrepresentations.  Id., ¶ 311.h.  Plaintiffs do not detail any certifications to the IRS, DOJ or state departments of record.  Plaintiffs allege that for tax purposes from 2012 to 2017, Teva treated its "donations" to CDF and TAF as advertising expenses, but they do not allege how Teva certified any such information to the IRS or how such information was false.  Id., ¶ 188.  Likewise, plaintiffs allege that CDF and TAF took affirmative steps to conceal the fraudulent scheme by misleading the DOJ to believe the entities were independent charitable organizations under Section 501(c)(3) of the Internal Revenue Code, but plaintiffs do not allege in what communications any defendant made a specific representation (or omission) to the DOJ.  Id., ¶ 156.  Finally, the complaint does not appear to allege any specific representations or omissions to "state departments of record."

Because the complaint does not detail defendants' alleged certifications to the IRS, DOJ and state departments of record, the Court only considers plaintiffs' allegation in Paragraph 311.h. as it relates to the OIG.

(quoting 42 C.F.R. § 423.2315).  Likewise, to enroll in Medicare as suppliers and providers, Teva and ACS had to submit an enrollment application to CMS and "attest[] that the information submitted is accurate and that the provider or supplier is aware of, and abides by, all applicable statutes, regulations, and program instructions."  Id., ¶ 46B (quoting 42 C.F.R. § 424.510(d)(3)). In the enrollment application to CMS, Teva and ACS also certified that they "understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b) (section 1128B(b) of the Social Security Act) and the Physician Self-Referral Law (Stark Law), 42 U.S.C. section 1395nn (section 1877 of the Social Security Act))."  Id. (quoting CMS Form 855i).

On multiple occasions, to obtain favorable advisory opinions from the OIG, CDF and TAF certified compliance with OIG guidelines and federal law.  Id., ¶¶ 80, 130, 311.c., 339, 341. Specifically, CDF and TAF each certified that (a) it understood that if it shared data with a pharmaceutical manufacturer, it would violate the AKS and FCA and (b) it would determine patient eligibility from a uniform measure of financial need applied in a consistent manner.  Id., ¶¶ 301, 311.f., 344; see also id., ¶ 80 (shortly before May of 2010, TAF certified to OIG that it would "not provide Donors with any data that would facilitate the Donor in correlating the amount and frequency of its donations with the amount or frequency of the use of its products or services" and "Donors would not be permitted to earmark contributions for specific Specialty Medications").

Plaintiffs claim that for every Copaxone claim which ACS submitted to an insurance company, it "necessarily represented" that all prior events, including cost-sharing, complied with Medicare rules and regulations and that the claim was free of any material defects that would prohibit payment.  See id., ¶ 52B; see id., ¶ 49B (when party submits bill to Medicare contractor,

bill carries "implied certification" that it is free from material misrepresentations, including violations of AKS and analogous state bribery laws).

According to the complaint, defendants' scheme was a "Copayment Circumvention Enterprise." Id., ¶ 292. Defendants allegedly knew that the scheme violated federal and state law including the AKS and FCA. The purpose of the Copayment Circumvention Enterprise was (1) to defraud insurance companies and steal funds from Medicare by circumventing Medicare cost-sharing obligations and (2) to generate personal profits for defendants' executives through unlawful bribes and kickbacks. The Copayment Circumvention Enterprise violated OIG regulations because ACS and AssistRx provided data to Teva so that it could conduct continuous return on investment calculations, all of which resulted in the unlawful depletion of state and federal dollars, increased the number of Copaxone prescriptions and increased personal gains to defendants' executives.[11]

In thousands of communications, defendants used the mails and wires to perpetuate their Copayment Circumvention Enterprise. These included (1) communications to patients from Teva, CDF, TAF, AssistRx and ACS, steering patients to the copayment assistance program; (2) Teva's transmission of bribes, disguised as donations to CDF and TAF for Copaxone copayments; (3) certifications by Teva, TAF and CDF which claimed compliance with federal law and OIG regulations; (4) data from CDF and TAF to Teva and AssistRx which permitted Teva to conduct return on investment analyses to forecast the return on investment from said "donations" and see

---

[11]     Plaintiffs do not allege how the insurance companies' payment of AKS-tainted claims at inflated prices increased the "personal gains" or "personal profits" for executives of Teva, ACS or AssistRx. Id., ¶¶ 294–95. For executives at CDF and TAF, plaintiffs allege generally that the scheme allowed them "to raise the amount of money in the funds to justify paying higher salaries to their executives." Id., ¶ 358.

how much more revenue it could generate by increasing its "donations;" (5) communications between CDF, TAF and Teva to ensure that CDF and TAF funds were open to MS patients seeking copay assistance for Copaxone; (6) certifications by CDF and TAF that they would determine eligibility according to a "uniform measure of financial need that is applied in a consistent manner;" (7) in violation of the FCA and AKS, false claims to insurance companies by innocent, non-party pharmacies; (8) use of mail and wires to mislead the OIG through false certifications and misrepresentations; and (9) misleading insurers, health care providers, investors, government agencies and the general public into believing the legitimacy of defendants' scheme.  Id., ¶ 311.

Defendants allegedly used mail and wire facilities to commit, promote, manage, establish and carry on their bribery and/or kickback scheme in violation of the AKS and state law. Defendants further used mail and wire facilities to distribute proceeds of their bribery and/or kickback scheme.  Defendants' activity was intended to and did violate the federal AKS by knowingly and willfully offering bribes (Teva) and accepting bribes (CDF and TAF)— i.e. donations"—in return for CDF and TAF referring, accepting referrals for and arranging for insurance companies to buy, and patients to receive, Copaxone from ACS and other pharmacies. Id., ¶ 312.

## II.    Plaintiffs' Notice Of DOJ Investigation Of Teva And Codefendants

As noted above, this case piggybacks on a related investigation which resulted in separate DOJ settlements with TAF in 2019, ACS in 2020 and Teva in 2024.  In 2017, the government subpoenaed information from Teva about its donations to PAPs.  In support of a statute of limitations defense, defendants have attached to their motions to dismiss several documents which are not referenced in the complaint.  Specifically, defendants have presented (1) news articles from 2005 to 2020, (2) an OIG advisory published in the Federal Register in May of 2014, (3) Teva's

filings from 2017 through 2020 with the Securities and Exchange Commission ("SEC") about the DOJ investigation and (4) DOJ press releases about the government's settlements with TAF and ACS.  On a motion to dismiss under Rule 12(b)(6), when a party presents matters outside of the pleadings for consideration, the Court ordinarily must either exclude the materials or treat the motion as one for summary judgment.  Alexander v. Oklahoma, 382 F.3d 1206, 1214 (10th Cir. 2004).  Here, no party requests that the Court convert defendants' motion to dismiss into a motion for summary judgment, and the Court declines to do so.  Accordingly, the Court must determine whether it can consider defendants' exhibits.

Plaintiffs argue that in evaluating a statute of limitations defense on a motion to dismiss under Rule 12(b)(6), the Court should not consider any documents beyond the complaint and exhibits.  Plaintiffs' Response In Opposition To Defendant Advanced Care Scripts, Inc.'s Motion To Dismiss The Complaint ("Plaintiffs' Response To Advance Care Scripts' Motion") (Doc. #92) filed December 18, 2024 at 17.  Generally, when deciding a motion to dismiss under Rule 12(b)(6), the Court may not look beyond the four corners of the complaint.  Dean Witter Reynolds, Inc. v. Howsam, 261 F.3d 956, 961 (10th Cir. 2001), rev'd on other grounds, 537 U.S. 79 (2002).  One exception to this rule permits the Court to consider facts which are subject to judicial notice, i.e. facts which are not subject to reasonable dispute because they are generally known or capable of accurate and ready determination from sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b); see Grynberg v. Koch Gateway Pipeline Co., 390 F.3d 1276, 1278 n.1 (10th Cir. 2004) (facts subject to judicial notice may properly be considered in a motion to dismiss).  Plaintiffs do not dispute the authenticity of defendants' exhibits or otherwise explain why the documents do not satisfy the requirements for judicial notice.  The Court therefore takes

judicial notice of these documents.[12]  In doing so, the Court emphasizes that it takes judicial notice only to determine whether these documents put plaintiffs on notice of potential claims, not to prove the truth of disputed matters asserted within the documents.[13]

Highly summarized, plaintiffs' complaint, as supplemented by documents subject to judicial notice, alleges as follows:

On December 1, 2005, a front-page article in the Wall Street Journal highlighted criticisms that manufacturers used PAPs to keep drug prices high and profit by shifting the costs for expensive medicines to insurance companies, which passed on those costs to consumers.  Geeta Anand, *Through Charities, Drug Makers Help People–And Themselves*, Wall St. J. at A1 (Dec. 1, 2005), https://www.wsj.com/articles/SB113339802749110822 (last visited April 17, 2025).  The article included quotations from Denise Lynch, Teva's director of customer management, who

---

[12]     See Renewable Fuels Ass'n v. EPA, 948 F.3d 1206, 1258 (10th Cir. 2020) (information on government website subject to judicial notice if information not subject to reasonable factual dispute and part of source whose accuracy cannot reasonably be questioned), rev'd on other grounds, 594 U.S. 382 (2021); Winzler v. Toyota Motor Sales U.S.A., Inc., 681 F.3d 1208, 1213 (10th Cir. 2012) (judicial notice of administrative agency's publicly available files); Taleff v. Sw. Airlines Co., 554 F. App'x 598, 599 (9th Cir. 2014) (judicial notice of DOJ press release); New Mexico ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 702 n.22 (10th Cir. 2009) (judicial notice of two federal agency websites); Kavowras v. N.Y. Times Co., 328 F.3d 50, 57 (2d Cir. 2003) (judicial notice of SEC filings);  LC Cap. Partners, LP v. Frontier Ins. Grp., Inc., 318 F.3d 148, 155 (2d Cir. 2003) (affirming dismissal of complaint based on "storm warnings" evident from complaint and in related publicly available documents).

[13]     See Jones v. Crow, No. 21-6139, 2021 WL 5277462, at *4 n.9 (10th Cir. Nov. 12, 2021) (judicial notice of news articles may be appropriate for proof that fact is publicly known, but not for truth of article's other assertions); Staehr v. Hartford Fin. Servs. Group, Inc., 547 F.3d 406, 425 (2d Cir. 2008) (proper to take judicial notice of fact that press coverage, prior lawsuits or regulatory filings contained certain information, without regard to truth of contents, in deciding whether "storm warnings" adequate to trigger inquiry notice); Tal v. Hogan, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) (documents only considered to show contents, not to prove truth of matters asserted therein); Benak ex rel. All. Premier Growth Fund v. All. Cap. Mgmt. L.P., 435 F.3d 396, 401 n.15 (3d Cir. 2006) (articles serve only to indicate what was in public realm, not whether contents of articles were in fact true).

stated that while Teva "didn't calculate the profit it could receive when" donating to PAPs, "from a common-sense perspective, you can get there."  Id.

On October 19, 2013, Barrons reported that CDF had received more than $900 million in donations "mostly from drug companies," making its founder a "rich man" and raising the question whether CDF had adequately ensured that "a drug maker's contributions weren't earmarked for its own products."  Bill Alpert, *Too Close for Comfort?*, Barron's (Oct. 19, 2013), https://www.barrons.com/articles/SB50001424053111904462504579137163650125276  (last visited April 17, 2025).

On December 18, 2013, the New York Times reported that CDF was in "turmoil" after an internal investigation had resulted in the resignation of its president, and that it had "long been an open secret" that the "bulk of the contributions to these charities come from the pharmaceutical companies" and "raise drug company sales and profits."  Andrew Pollack, *Drug Maker's Donations To Co-Pay Charity Face Scrutiny*, N.Y. Times at B1 (Dec. 18, 2013), https://www.nytimes.com/2013/12/19/business/shake-up-at-big-co-pay-fund-raises-scrutiny-on-similarcharities.html (last visited April 17, 2025).

On May 30, 2014, in the Federal Register, the OIG issued a warning that PAPs present a risk of fraud, waste and abuse with respect to Medicare and the AKS because those entities had practices which were apparently designed to steer patients into certain drugs and encourage manufacturers to increase prices.  OIG, *Supplemental Special Advisory Bulletin: Independent Charity Assistance Programs*, 79 Fed. Reg. 31120, 31122 (May 30, 2014).  The OIG further warned that such entities may correlate funding by drug manufacturers so that donors can channel their financial support to copayment of their own products.  Id. at 31123.

In May of 2017, Teva publicly disclosed in an SEC filing that it had received a subpoena

-16-

from the U.S. Attorney's office in Boston, Massachusetts requesting documents related to Teva's donations to patient assistance programs.  See SEC Form 6-K (Teva Pharm. Indus. Ltd.), Exh. 6 to Alison Tanchyk's Declaration In Support Of Teva Defendants' Motion To Dismiss (Doc. #81-2) filed November 18, 2024 ("Tanchyk's Declaration").  From August 3, 2017 through November 5, 2020, in some 14 SEC filings, Teva made that same disclosure about the DOJ subpoena.[14]

By June 26, 2019, AvMed, ConnectiCare, Emblem, Fallon, HEAL, NHPN and SummaCare had each assigned to plaintiffs at least some of their claims.  Plaintiffs acquired all rights to recover payments by the insurance companies.  The assignments conveyed legal and beneficial ownership of the identified claims and authorized plaintiffs to pursue all legal rights of recovery and reimbursement for health care services and benefits.  Class Action Complaint (Doc. #1), ¶ 50A.  Each of the assignors paid "for Copaxone as Medicare Part C (or Medicare Advantage) Plan . . . and/or Medicare Part D sponsors."  Id., ¶ 47A.

On November 20, 2019, the DOJ announced a settlement with TAF, resolving allegations that TAF violated the FCA because it coordinated with Teva and ACS to ensure Copaxone patients received a disproportionate share of grants when the fund opened after a Teva payment.  See DOJ, *Third Foundation Resolves Allegations That It Conspired With Pharmaceutical Companies To Pay Kickbacks To Medicare Patients* (Nov. 20, 2019) ("2019 DOJ Press Release"), https://www.justice.gov/usao-ma/pr/third-foundation-resolves-allegations-it-conspired-

---

[14]     Tanchyk's Declaration Exs. 7–20, Form 6-K (Aug. 3, 2017); Form 6-K (Nov. 2, 2017); Form 10-K (Feb. 12, 2018); Form 10-Q (May 3, 2018); Form 10-Q (Aug. 2, 2018); Form 10-Q (Nov. 1, 2018); Form 10-K (Feb. 19, 2019); Form 10-Q (May 2, 2019); Form 10-Q (Aug. 7, 2019); Form 10-Q (Nov. 7, 2019); Form 10-K (Feb. 21, 2020); Form 10-Q (May 7, 2020); Form 10-Q (Aug. 5, 2020); Form 10-Q (Nov. 5, 2020).

pharmaceutical-companies-pay-kickbacks (last visited April 16, 2025).   The 2019 DOJ Press

Release stated as follows:

> *TAF's solicitation and receipt of payments from Teva that correlated with TAF's spending on Copaxone renewal patients*. . . .  In the month of December prior to each of the years 2011-2015, TAF conveyed to Teva how much money TAF's MS fund needed to renew co-pay grants for the fund's existing Copaxone patients in the upcoming year.  In order to determine these amounts, which ranged from over $18 million to over $30 million per year, TAF multiplied the number of Copaxone patients in the fund by the fund's average grant amount, and then added the cost of TAF's administrative fee.   TAF understood that Teva knew how TAF was calculating the amounts of these funding requests, and that, accordingly, Teva was using TAF's MS fund as a conduit to cover Medicare co-pays for Copaxone patients.
>
> * * *
>
> *TAF's coordination with Teva*.  During the period from 2011 to 2014, Teva not only made large payments to TAF's MS fund to cover the renewal of grants for Copaxone patients at the beginning of each year, but also made numerous smaller payments, typically less than $3 million each, to TAF's MS fund at subsequent times during each year.  In conjunction with each of these smaller payments, TAF coordinated with Teva and [ACS], to ensure that Copaxone patients received a disproportionate share of the grants from the fund during each window when the fund opened after a Teva payment.  Each time that Teva was prepared to make a payment, TAF understood that ACS had told Teva how many Copaxone patients were awaiting assistance.  Meanwhile, TAF had told Teva the average MS fund grant amount at the time of the payment. TAF knew that Teva was multiplying the average grant amount by the number of waiting Copaxone patients to determine the amounts Teva would pay to TAF's MS fund.  TAF further knew that, whenever Teva made a payment to TAF's MS fund and the fund opened, ACS immediately would send a "batch file" of Medicare co-pay assistance applications for Copaxone patients.  As a result, each time TAF's MS fund opened after one of Teva's post-January payments during this period, Copaxone patients received a substantial majority of the grants that the fund provided, even though Copaxone accounted for much less than a majority of the overall MS drug market.  Further, TAF maintained a "portal" that gave ACS real-time access to the enrollment status of the patients ACS referred; the portal, as TAF knew, enabled ACS to update Teva on the number of Copaxone patients who had received grants from TAF's MS fund.

Id.  On November 20, 2019, the OIG also announced the settlement on its website with a link to

the full DOJ press release.  See OIG, *Third Foundation Resolves Allegations That It Conspired*

*With Pharmaceutical Companies To Pay Kickbacks To Medicare Patients* (Nov. 20, 2019),

https://oig.hhs.gov/fraud/enforcement/third-foundation-resolves-allegations-that-it-conspired-

with-pharmaceutical-companies-to-pay-kickbacks-to-medicare-patients/ (last visited April 16, 2025). On November 21 and December 2, 2019, Healthleaders, MercoPress and Reuters published the announcement of the TAF Settlement.[15]

On August 13, 2020, the DOJ announced a settlement with ACS that resolved allegations that ACS served as a kickback conduit by conspiring with Teva to pay kickbacks to Copaxone patients through CDF and TAF. See DOJ, *Specialty Pharmacy Advanced Care Scripts Agrees To Pay $3.5 Million To Resolve Allegations That It Served As A Kickback Conduit* ("2020 DOJ Press Release"), https://www.justice.gov/usao-ma/pr/specialty-pharmacy-advanced-care-scripts-agrees -pay-35-million-resolve-allegations-it (last visited April 16, 2025). The 2020 DOJ press release stated as follows:

> As part of today's settlement, ACS acknowledged certain facts, including that it relayed data from two foundations, Chronic Disease Fund (CDF) and The Assistance Fund (TAF), to Teva so that Teva could correlate its payments to the foundations with the amounts of money the foundations spent on Copaxone patients. ACS further acknowledged that, when the foundations lacked funding and were not accepting new applications for Medicare co-pay coverage, ACS provided regular updates to Teva on the number of Medicare Part D patients serviced by ACS who had prescriptions for Copaxone, met the criteria for foundation co-pay coverage, and were awaiting foundation co-pay coverage. At least one ACS employee understood that Teva would use the number of waiting Copaxone patients to help determine the amount of its next payment to CDF or TAF. Teva sometimes provided ACS with advance notice of its payments to CDF or TAF. Once ACS learned that CDF or TAF had re-opened its co-pay fund, ACS promptly would send the foundation a "batch file" that consisted almost entirely of Copaxone patients' applications for Medicare co-pay coverage. Thereafter, ACS often received notice from the foundation that most or all of the applications submitted by ACS had been approved to receive co-pay funding. When a Copaxone patient's application was approved, ACS no longer included that patient in its reports to Teva on the number

---

[15]    John Commins, *Foundation to Pay $4M to Settle Kickback Allegations* (Nov. 21, 2019), https://www.healthleadersmedia.com/strategy/foundation-pay-4m-settle-kickback- allegations (last visited April 16, 2025); *Biogen, Novartis, Teva Involved In Major Kickback Controversy With US Medicare*, (Nov. 21, 2019), https://en.mercopress.com/2019/11/21/biogen- novartis-teva-involved-in-major-kickback-controversy-with-us-medicare (last visited April 16, 2025); Nate Raymond, Reuters, Charity To Pay $4 million To Resolve U.S. Pharma Kickback Probe, 33 No. 16 WJGOVC 10 (Dec. 2, 2019).

of Copaxone patients awaiting foundation co-pay coverage.

"According to the allegations in today's agreement, ACS knowingly enabled a large pharmaceutical manufacturer to pay kickbacks to Medicare patients taking its expensive drug," said Andrew E. Lelling, United States Attorney for the District of Massachusetts. "Such conduct undermined the Medicare program's co-pay structure, which Congress created as a safeguard against inflated drug prices. We commend ACS for expeditiously resolving this matter."

"Advanced Care Scripts (ACS) willingly served as a pawn in a kickback scheme, putting profit over patient needs, by helping Teva to time its foundation payments to boost sales of Teva's own drug, which ACS then dispensed," said Joseph R. Bonavolonta, Special Agent in Charge of the FBI Boston Division. "Today's settlement should be a warning to others that the FBI will continue to aggressively go after vendors like ACS who conspire with pharmaceutical companies to disguise kickbacks as charitable contributions, at the expense of hard-working taxpayers who support the Medicare program."

Id. On August 13, 2020, Reuters and Law360 published the announcement of the ACS Settlement.[16]

On August 18, 2020, in the United States District Court for the District of Massachusetts, the government sued Teva for violations of the FCA because it coordinated with ACS, AssistRx, CDF and TAF to use charitable patient assistance programs as conduits to cover Medicare patient copay obligations for Copaxone. See Class Action Complaint (Doc. #1), Exh. 4 – Complaint filed in D. Mass. No. 20-11458.

Plaintiffs allege that assignors did not know—and had no reasonable way of discovering—defendants' scheme until it became public knowledge as a result of the DOJ complaint filed against

---

[16]     Nate Raymond, Reuters, *Pharmacy To Pay $3.5 million To Resolve U.S. Claims It Helped Teva Pay Kickbacks* (Aug. 13, 2020), https://www.reuters.com/article/business/healthcare-pharmaceuticals/pharmacy-to-pay-35-million-toresolve-us-claims-it-helped-teva-pay-kickbacks-idUSKCN2592KW/ (last visited April 16, 2025); Brian Dowling, Law360, *Pharmacy Pays $3.5M To Settle DOJ Medicare Kickback Probe* (Aug. 13, 2020)), https://www.law360.com/articles/1300920/pharmacy-pays-3-5m-to-settle-doj-medicare-kickback-probe (last visited April 16, 2025).

Teva on August 18, 2020.  In addition, plaintiffs allege that after the DOJ complaint, they discovered documents, which give rise to additional claims that were not available at the time of filing the DOJ complaint (such as the claim that Teva enrolled patients in health plans).  Class Action Complaint (Doc. #1), ¶ 158.  Plaintiffs argue that assignors did not discover facts that would have caused a reasonable person to suspect that defendants were engaged in the alleged scheme, and a reasonable diligent investigation would not have disclosed such facts.  Id., ¶ 160.

Plaintiffs allege that defendants took affirmative steps to conceal the wrongful conduct. Specifically, plaintiffs allege that Teva used CDF and TAF as conduits and concealed such use under the guise of "donations" to "independent" copayment assistance charities.  Id., ¶ 154. Insurance companies allegedly had no way of knowing that Teva arranged to have patients enrolled in a Medicare plan.  Id., ¶ 155.  CDF and TAF also misled the OIG, DOJ, health care providers, certain pharmacies, beneficiaries, insurance companies and the public into believing that they were legitimate and independent Section 501(c)(3) charitable organizations when in fact, they were illegal conduits for Teva.  Id., ¶ 156.

Plaintiffs allege that defendants' unlawful conduct has inflicted continuing and accumulating harm and that defendants continued the unlawful copay scheme long after 2018.  Id., ¶ 161.  Plaintiffs allege that their claims are equitably tolled because defendants concealed the Copayment Circumvention Scheme and made misrepresentations about it with the intent that assignors and class members would rely on said misrepresentations and pay Copaxone claims.  Id., ¶ 164.

**Procedural Background**

On August 16, 2024, plaintiffs filed suit against Teva, ACS, AssistRx, CDF and TAF.  As noted, plaintiffs are limited liability corporations which purchase legal claims from third-party

assignors such as insurance companies that provide Medicare plans with Part D prescription coverage. Plaintiffs allege that because defendants submitted fraudulent claims to these insurance companies, they violated and conspired to violate RICO, 18 U.S.C. § 1961 (Counts 3 and 4). As predicate acts for their RICO claims, plaintiffs allege that defendants violated the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, and the Travel Act, 18 U.S.C. § 1952.[17] Plaintiffs allege (1) violations of consumer protection statutes in nine states (Connecticut, Florida, Illinois, Maine, Massachusetts, New York, Ohio, Washington and Wisconsin) (Count 1); (2) unjust enrichment under the laws of 14 states (California, Connecticut, Florida, Illinois, Iowa, Maine, Massachusetts, Mississippi, Nebraska, New York, Ohio, Virginia, Washington and Wisconsin) (Count 2); (3) violation of the Florida Civil Remedies for Criminal Practices Act ("Florida RICO"), Fla. Stat. §§ 772.101 et seq. (Count 5) and (4) tortious interference with contract under Kansas law (Count 6).[18] Plaintiffs allege that the assignors purchased Copaxone at inflated prices, through prescriptions that otherwise would not have been generated, in transactions that were not payable under federal law.

On November 18, 2024, defendants filed five separate motions to dismiss.[19] Teva's motion

---

[17]    The mail and wire fraud statutes prohibit use of the mail or wires to obtain money or property by fraudulent means. 18 U.S.C. §§ 1341, 1343. The Travel Act prohibits use of the mail or wires in interstate commerce with intent to promote, manage, establish or carry on certain unlawful activity, including bribery, or to distribute the proceeds of such activity. 18 U.S.C. § 1952(a)(1), (a)(3), (b).

[18]    Plaintiffs allege that defendants intentionally interfered with the Medicare health plans between insurance companies and patients. Specifically, plaintiffs allege that defendants deliberately sought to subvert the patient cost sharing provisions in these health plans which increased the demand and price for Copaxone. Class Action Complaint (Doc. #1), ¶ 374.

[19]    See Teva Defendants' Motion To Dismiss (Doc. #80); Defendant Advanced Care Scripts, Inc.'s Motion To Dismiss (Doc. #82); Defendant Chronic Disease Fund, Inc.'s Motion To Dismiss (Doc. #84); The Assistance Fund's Motion To Dismiss And Accompanying Memorandum Of Law (Doc. #86); AssistRx, Inc.'s Motion To Dismiss (Doc. #89).

asserts that the Court should dismiss plaintiffs' complaint because (1) the statute of limitations bars plaintiffs' RICO and state law claims, (2) under Rule 9(b), Fed. R. Civ. P., plaintiffs fail to allege predicate fraud with particularity, (3) plaintiffs fail to allege that any RICO violation proximately caused their injury, (4) as insurers of patients who purchased Copaxone, plaintiffs are indirect purchasers who lack standing to bring civil RICO claims and (5) plaintiffs do not state claims for violation of state law. See Teva Defendants' Memorandum Of Law In Support Of Their Motion To Dismiss (Doc. #81) filed November 18, 2024 at 7–25. The other four defendants assert similar—but not identical—grounds for dismissal.

On December 18, 2024, plaintiffs filed responses to each of the five motions to dismiss.[20] In doing so, plaintiffs aggregated their responses to similar arguments which multiple defendants raised. For example, each defendant asserted that the statute of limitations barred plaintiffs' RICO and state law claims. In response to the ACS motion, and only that motion, plaintiffs argued that the RICO claims against all defendants are timely. Plaintiffs' Response To Advance Care's Motion (Doc. #92) at 16–25. Likewise, in response to the TAF motion, and only that motion, plaintiffs argued that their state law claims against all defendants are timely. Plaintiffs' Response To TAF's Motion (Doc. #95) at 9–24. As a footnote in the statement of facts in each of plaintiffs' responses, they state that "[g]iven the overlapping similarities of each Defendants' motions, and the fact they are each alleged to be members of an enterprise and co-conspirators subject to joint and several liability, and to avoid unnecessary repetition, Plaintiffs incorporate the Arguments

---

[20]    See Plaintiffs' Response To Teva's Motion (Doc. #96); Plaintiffs' Response In Opposition To The Assistance Fund's Motion To Dismiss The Complaint ("Plaintiffs' Response To TAF's Motion") (Doc. #95) filed December 18, 2024; Plaintiffs' Response In Opposition To Defendant Chronic Disease Fund, Inc.'s Motion To Dismiss The Complaint ("Plaintiffs' Response To CDF's Motion") (Doc. #94) filed December 18, 2024; Plaintiffs' Response In Opposition To AssistRx's Motion To Dismiss ("Plaintiffs' Response To AssistRx's Motion") (Doc. #93) filed December 18, 2024; Plaintiffs' Response To Advance Care's Motion (Doc. #92).

sections from their responses to the other Defendants' motions to dismiss, here." Plaintiffs' Response To Advance Care's Motion (Doc. #92) at 1 n.1.

On December 20, 2024, defendants objected to the format of plaintiffs' response briefs because it required each defendant to respond to plaintiffs' arguments in response to all five motions. See Letter From Laura B. Angelini To The Court (Doc. #97). In response, plaintiffs sent a five-page letter which purported to explain the organizational structure of each brief and asserted that collectively, the five briefs responded to all arguments of each defendant. See Letter From George H. Flanders And Adam S. Akeel To The Court (Doc. #99). Plaintiffs' organizational structure was difficult to follow and on December 23, 2024, the Court notified the parties it would disregard all incorporation by reference, whether by plaintiffs or by defendants. Order (Doc. #100). No party asked for further relief or more time, or sought to refile any brief.

On January 2, 2025, the Court ordered plaintiffs to show cause in writing why the Court should not grant each motion to dismiss as uncontested, except where plaintiffs had directly responded—without incorporation—to a particular argument. Order To Show Cause (Doc. #102) at 2–3. In doing so, the Court advised the parties that consistent with its prior order, it was disregarding the following statements in the parties' briefing:

> "ACS joins the arguments in the briefs of Teva Pharmaceuticals USA, Inc. and Teva Neuroscience, Inc. ("Teva"), AssistRx Inc. ("ARX"), Chronic Disease Fund, d/b/a Good Days ("CDF"), and The Assistance Fund ("TAF") (collectively "Defendants")." Doc. #83 at 1 n.1.

> "TAF hereby incorporates and adopts by cross-reference the additional legal grounds for dismissal that co-defendants Chronic Disease Fund, AssistRx, Inc., Advanced Care Scripts, Inc., and Teva assert in their respective motions to dismiss, including but not limited to dismissal based on the indirect-purchaser rule and the absence of proximate causation." Doc. #86 at 25.

> "See Teva Motion to Dismiss at pp. 4-5 (comparing the Press Release with the allegations against TAF in the Complaint)." Doc. #86 at 12 n.18.

"*see generally* Teva Motion to Dismiss," Doc. #86 at 18 n.28

"AssistRx also hereby adopts and incorporates any pertinent arguments for dismissal contained in the memoranda submitted by the other defendants." Doc. #90 at 25.

"Given the overlapping similarities of each Defendants' motions, and the fact they are each alleged to be members of an enterprise and co-conspirators subject to joint and several liability, and to avoid unnecessary repetition, Plaintiffs incorporate the Arguments sections from their responses to the other Defendants' motions to dismiss, here." Doc. #92 at 1 n.1

"Given the overlapping similarities of each Defendants' motions, and the fact they are each alleged to be members of an enterprise and co-conspirators subject to joint and several liability, and to avoid unnecessary repetition, Plaintiffs incorporate the Arguments sections from their responses to the other Defendants' motions to dismiss, here." Doc. #93 at 1 n.1.

"Given the overlapping similarities of each Defendants' motions, and the fact they are each alleged to be members of an enterprise and co-conspirators subject to joint and several liability, and to avoid unnecessary repetition, Plaintiffs incorporate the Arguments sections from their responses to the other Defendants' motions to dismiss, here." Doc. #94 at 1 n.1.

"Given the overlapping similarities of each Defendants' motions, and the fact they are each alleged to be members of an enterprise and co-conspirators subject to joint and several liability, and to avoid unnecessary repetition, Plaintiffs incorporate the Arguments sections from their responses to the other Defendants' motions to dismiss, here." Doc. #95 at 1 n.1.

"Given the overlapping similarities of each Defendants' motions, and the fact they are each alleged to be members of an enterprise and co-conspirators subject to joint and several liability, and to avoid unnecessary repetition, Plaintiffs incorporate the Arguments sections from their responses to the other Defendants' motions to dismiss, here." Doc. #96 at 1 n.1.

"Plaintiffs discuss the Travel Act in their response to CDF's motion to dismiss." Doc. #96 at 12 n.6.

Order To Show Cause (Doc. #102) at 2–3.

## **Analysis**

## I.    **Responses To Order To Show Cause (Doc. #102)**

As noted above, plaintiffs filed responses to each motion to dismiss, but each response

incorporated all arguments in the other four responses. Such incorporation by reference hindered the Court's ability to review the merits of the substantive arguments and unfairly allowed plaintiffs to avoid page limitations. Concrete Works of Colo., Inc. v. City & Cnty. of Denver, 321 F.3d 950, 979 n.14 (10th Cir. 2003); see also Gaines–Tabb v. ICI Explosives, USA, Inc., 160 F.3d 613, 623–24 (10th Cir. 1998) (allowing litigants on appeal to adopt district court filings by reference would effectively circumvent page limitations and unnecessarily complicate task of appellate judge); Bank of Com. v. State Auto. Mut. Ins. Co., No. CIV-23-204-D, 2023 WL 4092480, at *1 n.1 (W.D. Okla. June 20, 2023) (incorporation of arguments in another brief improper and would result in brief far exceeding page limit).[21]

As noted, for these reasons, on December 23, 2024, the Court notified the parties that in deciding defendants' motions to dismiss, it would disregard all incorporation by reference, by plaintiffs or by defendants. Order (Doc. #100). In the ensuing nine days, no party asked to file an amended memorandum; all parties apparently made the strategic decision to have the Court decide the motions without reference to any incorporation by reference. On January 2, 2025, the Court therefore ordered plaintiffs to show good cause why the Court should not grant each individual motion to dismiss as uncontested, except where plaintiffs had directly responded—without

---

[21]     Plaintiffs' wholesale incorporation of arguments from four other responses is particularly troubling because some defendants raised arguments which did not apply to all defendants. For example, CDF argued that the statute of limitations bars plaintiffs' unjust enrichment claim because plaintiffs do not allege that Teva contributed to CDF's fund after January of 2014. See Defendant Chronic Disease Fund, Inc.'s Memorandum Of Points And Authorities In Support Of Its Motion To Dismiss (Doc. #85) filed November 18, 2024 at 3 n.8, 7. Likewise, AssistRx argued that the complaint does not satisfy the heightened pleading stand under Rule 9(b) as to AssistRx or plausibly allege that AssistRx's conduct constituted participation of the operation or management of the alleged RICO enterprise. See Memorandum In Support Of AssistRx, Inc.'s Motion To Dismiss (Doc. #90) filed November 18, 2024 at 15–20. Plaintiffs' incorporated responses do not appear to address these specific arguments. See Plaintiffs' Response To Teva's Motion (Doc. #96) at 7–11; Plaintiffs' Response To TAF's Motion (Doc. #95) at 18–23.

incorporation—to the motion.

Plaintiffs argue that the Court cannot do so.  See, e.g., Plaintiffs' Show Cause Response Regarding Teva Pharmaceuticals USA, Inc. [And] Teva Neuroscience, Inc.'s Motion To Dismiss The Complaint (Doc. #107) filed January 6, 2025 at 2 (citing Issa v. Comp USA, 354 F.3d 1174, 1177 (10th Cir. 2003), Reed v. Bennett, 312 F.3d 1190, 1195 (10th Cir. 2002) and Murray v. Archambo, 132 F.3d 609, 611 (10th Cir. 1998)).  The principle which plaintiffs cite applies when a party does not respond at all to a motion to dismiss or for summary judgment.  See Issa, 354 F.3d at 1177–78; Reed, 312 F.3d at 1195; Murray, 132 F.3d at 611.  In such cases, the Court cannot grant an unopposed dispositive motion unless it finds that such a ruling is appropriate on the merits or as a sanction.  See Issa, 354 F.3d at 1177–78 (even if plaintiff does not respond to motion to dismiss, district court can grant motion only if it determines that plaintiff has not stated claim or dismissal is appropriate sanction for failure to respond).  Here, as noted, each of plaintiffs' responses addressed some but not all arguments in each defendant's motion.  In doing so, plaintiffs effectively conceded the arguments to which they did not respond.

Under District of Kansas Rule 7.1, if a party does not timely respond to a motion to dismiss, the Court ordinarily will grant the motion as uncontested without further notice.  See D. Kan. R. 7.1(c).  Likewise, under District of Kansas Rule 7.1 and basic litigation principles, when a party files a response to a motion but does not address all arguments which the motion raises, the party has effectively conceded the arguments which it does not address and abandoned any claims which depend on response to such arguments.  C1.G ex rel. C.G. v. Siegfried, 38 F.4th 1270, 1282 (10th Cir. 2022) (district court correctly dismissed plaintiff's facial challenge because he abandoned it by not addressing it in response to defendants' motion to dismiss); see Brown v. Nationwide Ins. Co., No. 21-4122, 2023 WL 4174064, at *8–9 (10th Cir. June 26, 2023) (district

court properly concluded that plaintiff abandoned bad faith claim because she responded to motion to dismiss but ignored arguments on that claim); Lancaster v. Sprint/United Mgmt. Co., 670 F. App'x 984, 984–85 (10th Cir. 2016) (plaintiff waived retaliation claim because she did not respond to defendant's argument on claim).[22]

In their show cause response, plaintiffs alternatively seek leave to file new opposition memoranda which do not incorporate any arguments by reference. That request is moot because on December 23, 2024, the Court effectively struck from plaintiffs' briefing any incorporation by reference. Order (Doc. #100) ("in the briefing on defendants' motions to dismiss, the Court will disregard all incorporation by reference, whether by plaintiffs or by defendants"). In the ensuing nine days, plaintiffs did not seek leave to file amended memoranda, electing to have the Court consider their opposing memoranda without incorporation by reference. Plaintiffs now seek to belatedly file new responses, which the Court construes as a motion for an extension of the deadline to respond.[23]

---

[22]     See also Wannall v. Honeywell, Inc., 775 F.3d 425, 428 (D.C. Cir. 2014) (D.D.C. Local Rule 7(b)—which is substantially the same as D. Kan. Rule 7.1(c)—"is understood to mean that if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded"); In re Dallas Roadster, Ltd., 846 F.3d 112, 126 (5th Cir. 2017) (plaintiff abandoned claim because response did not address defendant's argument in motions to dismiss and for summary judgment that claim was subject to dismissal); Hinsdale v. City of Liberal, 19 F. App'x 749, 768–69 (10th Cir. 2001) (affirming district court grant of summary judgment because plaintiff abandoned claim when he did not address it in response to defendants' motion; page limit does not justify failure to respond to all arguments).

[23]     In the Order To Show Cause (Doc. #102), the Court directed plaintiffs to show cause why the Court should not grant each motion to dismiss as uncontested, except where plaintiffs had directly responded—without incorporation—to the particular motion. The Court did not invite plaintiffs to file a further substantive response to defendants' motions to dismiss. Even so, in plaintiffs' responses to the Court's order to show cause, they have summarily raised substantive arguments in response to each motion to dismiss which they could have raised in their original responses. The Court declines to consider plaintiffs' responses on the substantive merits of defendants' motions to dismiss because they constitute a further attempt to evade the page limit.

Under Rule 6(b)(1)(B) of the Federal Rules of Civil Procedure, "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B); see also D. Kan. Rule 6.1(a) (motion for extension of time must be filed as soon as practicable and "in no event less than 3 days before the specified time"). To determine whether neglect is excusable, the Court considers (1) the danger of prejudice to the opposing party, (2) the length of delay caused by the neglect and its potential impact on judicial proceedings, (3) the reason for delay and whether it was in the reasonable control of the moving party and (4) whether the moving party acted in good faith. Perez v. El Tequila, LLC, 847 F.3d 1247, 1253 (10th Cir. 2017) (citing Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993)). The reason for delay is the most important factor in this analysis. Id.

A.     Prejudice To Defendants

Defendants have already expended resources in filing objections to the format of plaintiffs' responses. Likewise, in reliance on the Court's order which struck all incorporation by reference, most defendants filed reply briefs which responded only to the arguments which plaintiffs raised in their response and not any arguments which they attempted to incorporate by reference.[24] If the Court grants plaintiffs leave to file new responses at this stage, defendants would presumably expend additional resources to file new replies. This factor slightly weighs in favor of defendants.

---

[24]     See Teva Defendants' Reply In Support Of Their Motion To Dismiss (Doc. #121) filed March 6, 2025 at 1 (consistent with court order, Teva addresses only arguments which plaintiffs raised in opposition to Teva's motion); Reply Brief In Further Support Of Defendant Advanced Care Scripts, Inc.'s Motion To Dismiss The Complaint (Doc. #124) filed March 6, 2025 at 1 n.2 (same); Chronic Disease Fund, Inc.'s Reply In Support Of Its Motion To Dismiss (Doc. #123) filed March 6, 2025 at 1 (same); The Assistance Fund's Reply In Further Support Of Its Motion To Dismiss (Doc. #119) filed March 6, 2025 at 1 n.2 (same).

B.    Length Of Delay And Impact On Judicial Proceedings

Defendants' original reply deadline was January 6, 2025. At this stage, if the Court allowed the parties to refile their briefs without incorporation, the briefing would not be complete for months. The delay slightly favors defendants.

C.    Reason For The Delay And Whether It Was In Plaintiffs' Control

Plaintiffs blame defendants' coordinated initial briefs—which had "spurious intertwined arguments," included incorporation by reference and essentially were one omnibus brief—for their tactical decision to not directly respond to the arguments of each individual defendant.[25] The irregular structure of plaintiffs' five briefs is highly unusual, however, and it is an obvious attempt to evade the page limitation of 25 pages. See Order Following Initial Planning And Scheduling Conference (Doc. #59) filed September 25, 2024 at 2. In effect, without leave of Court, plaintiffs have helped themselves to a five-part 125-page omnibus brief. Their strategy requires each defendant and the Court to review 125 pages to determine plaintiffs' response to each defendant's

---

[25]    See Plaintiffs' Show Cause Response Regarding Teva Pharmaceuticals USA, Inc. [And] Teva Neuroscience, Inc.'s Motion To Dismiss The Complaint (Doc. #107) at 5; Letter From George H. Flanders And Adam S. Akeel To The Court (Doc. #99) at 1–2. Plaintiffs do not explain how defendants' arguments were "spuriously" intertwined or how the structure of defendants' memoranda forced plaintiffs to respond to defendants' arguments collectively. Three defendants did improperly incorporate arguments. See Brief In Support Of Defendant Advanced Care Script, Inc.'s Motion To Dismiss The Complaint (Doc. #83) at 1 n.1 (ACS joins arguments in briefs of other defendants); The Assistance Fund's Motion To Dismiss And Accompanying Memorandum Of Law (Doc. #86) at 25 (TAF incorporates additional legal grounds for dismissal by other defendants, including but not limited to dismissal based on the indirect-purchaser rule and the absence of proximate causation); Memorandum In Support Of AssistRx, Inc.'s Motion To Dismiss (Doc. #90) at 25 (AssistRx incorporates any pertinent arguments for dismissal contained in memoranda submitted by other defendants). Even so, each of these defendants addressed how most arguments applied to it. For example, each defendant's memorandum addressed how the statute of limitations applied to RICO and state law claims—no defendant relied solely on its codefendants to argue the issue. In any event, plaintiffs have not shown that defendants' limited incorporation forced plaintiffs to respond to each issue collectively. As explained below, to the extent that plaintiffs thought that they could only respond in this irregular format, they should have sought leave to do so.

arguments and figure out how plaintiffs' general argument as to all defendants applies to each individual defendant. Plaintiffs' counsel had 30 days to respond to the motions to dismiss, which was ample time to alert defense counsel and the Court of any need to exceed the page limits, and seek leave to do so. The decision to adopt this irregular format was clearly within plaintiffs' control.

Moreover, plaintiffs utterly fail to explain why—after learning that the Court would disregard all incorporation—they did not immediately seek leave to file new responses. Understanding the impact of the Court's order—which prohibited all incorporation by reference— was within plaintiffs' control.[26]

This factor weighs strongly in favor of defendants.

D.      Whether Movant Acted In Good Faith

Defendants do not suggest that plaintiffs acted in bad faith. Accordingly, this factor favors plaintiffs.

E.      Balancing Of Factors

Weighing all of the above factors, the Court finds that plaintiffs have not shown excusable neglect for failing to properly respond by the original deadline or to seek leave earlier to file proper responses. As explained above, if the Court granted plaintiffs leave to file new responses to the

---

[26]     Even to date, plaintiffs ignore the impact of the Court's prior ruling about incorporated arguments. In seeking leave to file new responses, plaintiffs argue that the Court should permit plaintiffs additional pages "given Defendants' spurious intertwined arguments." Plaintiffs' Show Cause Response Regarding Teva Pharmaceuticals USA, Inc. [And] Teva Neuroscience, Inc.'s Motion To Dismiss The Complaint (Doc. #107) at 6. Plaintiffs have not identified any arguments which Teva attempted to incorporate from the memoranda of other defendants. Plaintiffs therefore have not shown that they needed more than 25 pages in Plaintiffs' Response To Teva's Motion (Doc. #96). As to the other defendants, the Court has already excluded defendants' attempts at incorporation, so plaintiffs have not shown that they could not have responded to each defendant's arguments within the 25-page limit for their response to each motion.

motions to dismiss, defendants would incur additional attorney fees to file new replies. As noted, the reason for delay is the most important factor and weighs strongly in favor of defendants. The Court cannot countenance counsel's failure to seek leave earlier or otherwise attempt to work with opposing counsel about a schedule to file new responses after the Court notified the parties that it would not permit incorporation. See Sizemore v. State of N.M. Dep't of Labor, 182 F. App'x 848, 852–53 (10th Cir. 2006) (no excusable neglect where counsel ignored deadline, erroneously relied on Rule 6 to calculate deadline and failed to seek extension immediately upon receiving defendant's motion); Quigley v. Rosenthal, 427 F.3d 1232, 1238 (10th Cir. 2005) (no excusable neglect where counsel mistakenly construed rule and failed to timely seek attorney fees); Ghamrawi v. Case & Assocs. Props. Inc., 116 F. App'x 206, 210 (10th Cir. 2004) (no excusable neglect where counsel simply disregarded deadline because of workload). In sum, plaintiffs have not demonstrated excusable neglect for failing to properly respond by the original deadline or to seek leave earlier to file proper responses. The Court therefore overrules plaintiffs' request to file new response briefs in opposition to defendants' motions to dismiss.

The Court recognizes that courts typically prefer to decide cases on the merits. The problem here is that plaintiffs have engaged in a calculated strategy to defeat consideration on the merits: their briefing defies the Court's clear instruction that each defendant file a separate motion to dismiss and plaintiffs respond accordingly. Plaintiffs flout local rules on page limits. The preference for deciding cases on the merits assumes that the parties are not trying to prevent consideration on the merits by blunder-buss obfuscation and violation of local rules. Given plaintiffs' manner of briefing, it ill suits them to fend off dismissal by invoking the Court's preference to resolve cases on the merits.

## II.     <u>Teva Defendants' Motion To Dismiss</u> (Doc. #80)

In responding to Teva's motion to dismiss, plaintiffs do not address Teva's arguments that (1) the statute of limitations bars plaintiffs' RICO and state law claims, (2) as indirect purchasers of Copaxone, plaintiffs lack standing to bring civil RICO claims and (3) plaintiffs have failed to state a claim for violation of state consumer protection statutes (all states), unjust enrichment (Connecticut, Florida, Illinois, Maine, Massachusetts, Nebraska, New York, Ohio, Washington and Wisconsin), violation of the Florida RICO Act or tortious interference with contract.  <u>See Plaintiffs' Response To Teva's Motion</u> (Doc. #96). The Court therefore sustains the <u>Teva Defendants' Motion To Dismiss</u> (Doc. #80) on these grounds and dismisses all counts of plaintiffs' complaint against Teva Pharmaceuticals USA, Inc. and Teva Neuroscience, Inc.[27]

## III.     <u>Defendant Advanced Care Scripts, Inc.'s Motion To Dismiss</u> (Doc. #82)

In responding to ACS's motion to dismiss, plaintiffs do not address ACS's arguments that (1) the statute of limitations bars plaintiffs' state law claims, (2) plaintiffs have failed to allege that any RICO violation proximately caused their injury, (3) plaintiffs have failed to allege a RICO predicate act and (4) plaintiffs have failed to state a claim for violation of state consumer protection statutes (Connecticut, Florida, Illinois, Massachusetts, New York, Washington and Wisconsin), unjust enrichment (all states), violation of the Florida RICO Act or tortious interference with

---

[27]     Teva's standing argument refers to prudential or statutory standing, so the Court dismisses the complaint on this ground under Rule 12(b)(6), rather than Rule 12(b)(1).  <u>See VR Acquisitions LLC v. Wasatch Cnty.</u>, 853 F.3d 1142, 1146 n.4 (10th Cir. 2017) (assuming without deciding that Rule 12(b)(6), rather than Rule 12(b)(1), applies when plaintiff lacks prudential standing rather than Article III standing) (citing <u>Harold H. Huggins Realty, Inc. v. FNC, Inc.</u>, 634 F.3d 787, 795 n.2 (5th Cir. 2011) (unlike dismissal for lack of constitutional standing, dismissal for lack of prudential or statutory standing properly granted under Rule 12(b)(6)); <u>see also</u> <u>Lexmark Int'l, Inc. v. Static Control Components, Inc.</u>, 572 U.S. 118, 128 n.4 (2014) (terms "statutory standing" and "prudential standing" are misleading because absence of valid—as opposed to arguable—cause of action does not implicate subject matter jurisdiction, <u>i.e.</u> court's statutory or constitutional power to adjudicate case).

contract.  See Plaintiffs' Response To Advance Care's Motion (Doc. #92).  The Court therefore sustains Defendant Advanced Care Scripts, Inc.'s Motion To Dismiss (Doc. #82) on these grounds and dismisses all counts of plaintiffs' complaint against ACS.

**IV.    Defendant Chronic Disease Fund, Inc.'s Motion To Dismiss (Doc. #84)**

In responding to CDF's motion to dismiss, plaintiffs do not address CDF's arguments that (1) the statute of limitations bars plaintiffs' RICO and state law claims, (2) as indirect purchasers of Copaxone, plaintiffs lack standing to bring civil RICO claims and (3) plaintiffs have not alleged that any RICO violation proximately caused their injury.  See Plaintiffs' Response To CDF's Motion (Doc. #94).  The Court therefore sustains Defendant Chronic Disease Fund, Inc.'s Motion To Dismiss (Doc. #84) on these grounds and dismisses all counts of plaintiffs' complaint against CDF.

**V.    The Assistance Fund's Motion To Dismiss And Accompanying Memorandum Of Law (Doc. #86)**

Because TAF asserts lack of personal jurisdiction and plaintiffs have responded to this issue in their response to TAF's motion to dismiss, the Court evaluates that argument before addressing the effect of plaintiffs' failure to respond to certain arguments on the merits.  See Steel Co. v. Citizens for Better Env't, 523 U.S. 83, 94 (1998) (jurisdiction must be determined before resolving merits).  To determine personal jurisdiction over a nonresident defendant, the Court examines (1) whether the applicable statute potentially confers jurisdiction by authorizing service of process on defendant and (2) whether the exercise of jurisdiction comports with due process. Peay v. BellSouth Med. Assistance Plan, 205 F.3d 1206, 1209 (10th Cir. 2000).

Plaintiffs argue that the Court can exercise personal jurisdiction over TAF under RICO,

which permits nationwide service of process.[28]  In a civil RICO action, if plaintiffs establish that the Court has personal jurisdiction over at least one defendant, summonses can be served nationwide on other defendants "if required by the ends of justice."  Cory v. Aztec Steel Bldg., Inc., 468 F.3d 1226, 1231 (10th Cir. 2006); see 18 U.S.C. § 1965(b) (in any civil RICO action in any federal district court in which it is shown that ends of justice require that other parties residing in any other district be brought before court, court may cause such parties to be summoned, and process for that purpose be served in any judicial district of United States).  TAF does not dispute that the Court has personal jurisdiction over Teva Neuroscience, which has its principal place of business in Kansas.

TAF argues that because plaintiffs have failed to state a RICO claim, they cannot rely on RICO to establish personal jurisdiction over TAF.  See Gibbs-Squires v. Urb. Settlement Servs., 623 F. App'x 917, 920 (10th Cir. 2015) (district court properly dismissed claims for lack of personal jurisdiction because plaintiffs had not adequately pled RICO claim).  In doing so, TAF incorrectly assumes that any claim which is subject to dismissal under Rule 12(b)(6) is not a "colorable" claim.  See McKenzie v. U.S. Citizenship & Immigration Servs., Dist. Dir., 761 F.3d 1149, 1156 (10th Cir. 2014) (federal question jurisdiction exists only where plaintiff has colorable claim arising under federal law).  A claim is not colorable if it is so "insubstantial, implausible, foreclosed by prior [Tenth Circuit precedent], or otherwise completely devoid of merit as not to involve a federal controversy."  Id. at 1156–57 (internal quotation marks omitted); see Lynn v. Brown, 803 F. App'x 156, 159–60 (10th Cir. 2020); see also Republic of Panama v. BCCI

---

[28]     Plaintiffs also argue that the Court can exercise personal jurisdiction over TAF under the Kansas long-arm statute, K.S.A. § 60-308.  Because plaintiffs have established that personal jurisdiction over TAF is proper under RICO, the Court need not address the Kansas long-arm statute.

Holdings (Luxembourg) S.A., 119 F.3d 935, 942 (11th Cir. 1997) (if asserted federal claim not "wholly immaterial or insubstantial," plaintiff entitled to use federal statutory nationwide service of process provision). As explained below, the Court agrees with defendants that plaintiffs have not stated a claim under RICO. Even so, plaintiffs' RICO claim against TAF is not so insubstantial, implausible or devoid of merit that it does not involve a federal controversy.

Next, TAF argues that plaintiffs cannot rely on RICO to establish personal jurisdiction over TAF because the complaint does not plead that the "ends of justice" require that this case be adjudicated in Kansas. The Assistance Fund's Motion To Dismiss And Accompanying Memorandum Of Law (Doc. #86) at 6. TAF cites no authority for the conclusion that plaintiffs must specifically plead that the ends of justice require that the case be adjudicated in Kansas. Instead, the Court evaluates whether plaintiffs have plausibly alleged facts which establish that the ends of justice require nationwide service of process.

To effectuate RICO's remedial purposes, the Court liberally interprets the "ends of justice" requirement. Cory, 468 F.3d at 1231–32; see id. at 1232 (ends of justice is flexible concept). Teva—which has its principal place of business in Kansas—advertised, marketed and sold Copaxone throughout the United States, including the State of Kansas. Class Action Complaint (Doc. #1), ¶¶ 29–30. Plaintiffs allege that TAF contracted with, conspired with, exchanged data with and received funds from Teva. Plaintiffs also allege that Teva coordinated and directed other defendants who were part of the copayment circumvention scheme. The purpose of RICO would not be promoted by dismissing TAF and allowing the RICO claims to proceed solely against other defendants in Kansas. The ends of justice are best promoted if a single action proceeds against all defendants who allegedly participated in the Copayment Circumvention Enterprise. See Cory, 468 F.3d at 1232 (purpose of RICO to eradicate organized crime not furthered by withholding

nationwide service of process whenever all RICO defendants can be haled into one court for single trial); see also Blue Cross & Blue Shield of Vt. v. Teva Pharm. Indus., Ltd., 712 F. Supp. 3d 499, 558 (D. Vt. 2024) (nationwide conduct related to pharmaceutical pricing that by its nature causes inflated prices on purchasers everywhere, irrespective of state lines, creates sufficient impacts in and connections to any state in which it is reasonable to infer sales occurred). For substantially these reasons, the exercise of jurisdiction over TAF also comports with due process. The Court therefore finds that plaintiffs' RICO claim is sufficient to establish personal jurisdiction over TAF.[29]

In responding to TAF's motion to dismiss, plaintiffs do not address TAF's arguments that (1) the statute of limitations bars plaintiffs' RICO claims, (2) as indirect purchasers of Copaxone, plaintiffs lack standing to bring civil RICO claims, (3) plaintiffs have failed to allege a RICO predicate act, (4) plaintiffs have not alleged that any RICO violation proximately caused their injury and (5) plaintiffs have not stated a claim for violation of state law. Plaintiffs' Response To TAF's Motion (Doc. #95). The Court therefore sustains The Assistance Fund's Motion To Dismiss And Accompanying Memorandum Of Law (Doc. #86) on these grounds and dismisses all counts of plaintiffs' complaint against TAF.

## VI.    AssistRx's Motion To Dismiss (Doc. #89)

AssistRx asserts that plaintiffs lack Article III standing and in response, plaintiffs have opposed this argument. The Court therefore evaluates that argument before addressing the effect

---

[29]    In responding to TAF's motion to dismiss, plaintiffs did not address all of TAF's arguments related to Article III standing. Because Article III standing is a threshold question of subject matter jurisdiction and plaintiffs responded to part of TAF's arguments on standing, the Court will address this issue on the merits. For reasons stated below in the discussion of AssistRx's arguments on standing, plaintiffs have alleged facts which plausibly establish that they have Article III standing. See infra part VI.

of plaintiffs' failure to respond on the merits to other arguments.  In addition, the Court addresses TAF's arguments that plaintiffs lack Article III standing.

Article III of the U.S. Constitution limits the exercise of federal judicial power to cases and controversies.  U.S. Const., art. III, § 2.  To satisfy Article III's standing requirements, plaintiffs must establish (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent," (2) that the injury is fairly traceable to the alleged conduct of defendants and (3) that it is likely— rather than merely speculative—that a favorable decision will redress the injury.  Chiles v. Salazar, 116 F.4th 1178, 1194–95 (10th Cir. 2024) (quoting Lujan v. Defs. Of Wildlife, 504 U.S. 555, 560– 61 (1992)), cert. granted, No. 24-539, 2025 WL 746313 (U.S. Mar. 10, 2025).

TAF argues that plaintiffs have not plausibly alleged that (1) they suffered injury in fact, (2) the alleged injury to insurance companies is "fairly traceable" to its conduct and (3) plaintiffs' claims are within the scope of the assignment agreements with insurance companies.  The Assistance Fund's Motion To Dismiss And Accompanying Memorandum Of Law (Doc. #86) at 14–16.  AssistRx argues that plaintiffs lack Article III standing on all claims because the alleged injury to insurance companies is not "fairly traceable" to its conduct.[30]  Memorandum In Support Of AssistRx, Inc.'s Motion To Dismiss (Doc. #90) at 7–12.  Because the parties raise facial attacks on the sufficiency of the complaint, the Court assumes that the allegations in the complaint are true.  Baker, 979 F.3d at 872.

TAF argues that plaintiffs cannot establish injury in fact because the complaint does not

---

[30]    AssistRx also argues that plaintiffs lack standing because as a matter of law, RICO claims are not assignable.  Because AssistRx's argument relates to prudential or statutory standing and the Court already finds that plaintiffs have not stated a claim under Rule 12(b)(6), the Court declines to address this argument.  See Lexmark, 572 U.S. at 128 n.4 (absence of valid—as opposed to arguable—cause of action does not implicate subject matter jurisdiction); see also MSP Recovery Claims, Series LLC v. Lundbeck LLC, 130 F.4th 91, 104 n.7 (4th Cir. 2025) (even if RICO claims not assignable, defect not jurisdictional).

identify a single Copaxone payment which the insurance companies paid at an inflated price or that was tainted by an AKS violation. Plaintiffs allege that the insurance companies suffered economic loss because for Copaxone claims, (1) they had to pay inflated prices, (2) they had to pay more claims and (3) the claims which they paid were "tainted and unpayable." Class Action Complaint (Doc. #1), ¶¶ 5, 145, 325, 331. A claim that class members spent money that, absent defendants' conduct, they would not have spent is a "quintessential injury-in-fact." Maya v. Centex Corp., 658 F.3d 1060, 1069 (9th Cir. 2011); see In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig., 336 F. Supp. 3d 1256, 1332 (D. Kan. 2018) (injury in fact established from allegation that defendant's conduct caused class members to pay inflated prices for EpiPen and but for unlawful conduct, they would have purchased lower cost alternatives). As explained below, in 2005, the OIG recognized that if drug manufacturer PAPs paid patient cost-sharing amounts, increased prices *could* result. See Publication Of OIG Special Advisory Bulletin On Patient Assistance Programs For Medicare Part D Enrollees, 70 Fed. Reg. 70623-03, 70626 (Nov. 22, 2005) ("2005 OIG Special Advisory"). For purposes of Article III standing, plaintiffs have adequately pled injury in fact from higher prices, more claims and tainted claims.

AssistRx and TAF argue that plaintiffs have failed to allege injury to insurance companies that is "fairly traceable" to their conduct. AssistRx argues that the non-exhaustive list of Copaxone claims attached to the complaint does not identify which patients received copay assistance from TAF or CDF or whether any patient received support services from AssistRx. Likewise, TAF argues that the list of Copaxone claims does not set forth what claims it allegedly subsidized. The "fairly traceable" requirement does not require plaintiffs to establish that each defendant's conduct is the proximate cause of their injury or that a "defendant's actions are the very last step in the chain of causation." Santa Fe All. for Pub. Health & Safety v. City of Santa Fe, N.M., 993 F.3d

802, 814 (10th Cir. 2021) (quoting <u>Bennett v. Spear</u>, 520 U.S. 154, 169 (1997)). Instead, at the motion to dismiss stage, plaintiffs can satisfy the "fairly traceable" requirement by allegations which, if proven, allow for the conclusion that the challenged conduct is a but for cause of the injury. <u>Id.</u> Here, plaintiffs allege facts which plausibly establish that AssistRx and TAF were part of a RICO conspiracy, so each defendant may be liable for the actions of its co-conspirators. <u>See</u> <u>Oki Semiconductor Co. v. Wells Fargo Bank</u>, 298 F.3d 768, 775 (9th Cir. 2002). The Court therefore evaluates whether the alleged wrongful conduct of the Copayment Circumvention Enterprise is "fairly traceable" to plaintiffs' economic loss.

Plaintiffs allege that because defendants subsidized copayments, insurance companies had to pay higher prices, had to pay more claims and had to pay "tainted and unpayable" claims. <u>Class Action Complaint</u> (Doc. #1), ¶¶ 5A, 145, 325, 331. Again, the OIG recognized the risk that a manufacturer's subsidy of copayments *could* lead to higher prices. In addition, because plaintiffs allege that defendants' scheme increased the price of Copaxone for all patients (including those who did not receive copay assistance), the lack of specificity about which patients received copay assistance from TAF or CDF is not fatal for purposes of standing. <u>See</u> <u>MSP Recovery Claims, Series LLC v. Pfizer, Inc.</u>, 728 F. Supp. 3d 89, 102 (D.D.C. 2024) (standing established because complaint alleges charity payouts raised prices for all consumers of Pfizer drugs, even if consumer did not receive copay assistance from defendant); <u>MSP Recovery Claims, Series LLC v. Lundbeck LLC</u>, 664 F. Supp. 3d 635, 650 (E.D. Va. 2023) (plaintiffs suffered economic injury because they pled that insurance companies paid more than $5 million in claims on behalf of covered patients receiving drug and facts alleged lack of price sensitivity for drug), <u>aff'd in relevant part, rev'd in part</u>, 130 F.4th 91 (4th Cir. 2025). For purposes of Article III standing, plaintiffs have adequately pled that their alleged economic loss is "fairly traceable" to the wrongful conduct of the RICO

conspirators, including AssistRx and TAF.  See In re Revlimid & Thalomid Purchaser Antitrust Litig., No. CV 19-7532 (ES) (MAH), 2024 WL 2861865, at *29–30 (D.N.J. June 6, 2024) (plausible to infer that insurance companies suffered economic injury from increase in drug price and price increases "fairly traceable" to defendants' copay circumvention scheme); MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC, No. 18-2211, 2019 WL 1418129, at *10 (D.N.J. Mar. 29, 2019) (injury in fact alleged where complaint pled existence of scheme to inflate insulin prices and purchases made by insurance companies).

TAF argues that plaintiffs lack standing because they have not plausibly alleged that their claims are within the scope of the assignment agreements with insurance companies.  A party who has been assigned a claim from another generally has standing to assert the injury in fact suffered by the party which assigned the claim.  Sprint Commc'ns Co. v. APCC Servs., Inc., 554 U.S. 269, 286 (2008).  Of course, plaintiffs' claims must be within the scope of a valid assignment.  See US Fax L. Ctr., Inc. v. iHire, Inc., 476 F.3d 1112, 1120 (10th Cir. 2007) (invalid assignment defeats standing if assignee has itself suffered no injury in fact).  The complaint alleges that (1) plaintiffs acquired all rights to recover payments by the insurance companies, (2) the assignment agreements convey legal and beneficial ownership of the identified claims and (3) the agreements authorize plaintiffs to pursue all legal rights of recovery and reimbursement for health care services and benefits.  Class Action Complaint (Doc. #1), ¶ 50A.  Plaintiffs also allege and set forth language from each assignment which defines the scope of the claims assigned by each insurance company. See id., ¶¶ 51A (AvMed), 5B (ConnectiCare), 10B-11B (Emblem), 16B (Fallon), 20B (HEAL), 26B-27B (NHPN), 32B (SummaCare).   Plaintiffs allege that each of the insurance companies which assigned claims paid "for Copaxone as Medicare Part C (or Medicare Advantage) Plan . . . and/or Medicare Part D sponsors."  Id., ¶ 47A.  Plaintiffs have plausibly alleged that each of the

insurance companies who assigned claims paid at least some Copaxone claims during the relevant time period and that these fall within the scope of the assignments.  The Court therefore finds that plaintiffs have sufficiently alleged standing.  See MSP Recovery Claims, Series LLC v. Amgen Inc., No. 2:23-CV-03130-MEMF-PD, 2024 WL 3464410, at *6 (C.D. Cal. July 15, 2024) (some payments may not fall within scope of assignment agreements, but that does not establish that MSP does not have standing at all); Pfizer, 728 F. Supp. 3d at 100–01 (allegations that defendants artificially inflated prices and claims for certain drugs paid by insurance companies sufficient to establish standing).

For these reasons, plaintiffs have Article III standing to assert RICO and state law claims against AssistRx.  In responding to AssistRx's motion to dismiss, plaintiffs do not address AssistRx's arguments that (1) the statute of limitations bars plaintiffs' RICO and certain state law claims (Count 1 for all states except Maine, and Counts 2, 5 and 6), (2) plaintiffs have failed to allege a RICO predicate act and (3) plaintiffs have failed to allege that any RICO violation proximately caused their injury.  Plaintiffs' Response To AssistRx's Motion (Doc. #93).  The Court therefore sustains AssistRx, Inc.'s Motion To Dismiss (Doc. #89) on these grounds, and dismisses Counts 2–6 and Count 1 (for all states except Maine) of plaintiffs' complaint against AssistRx.

## VII.    Dismissal Of Plaintiffs' RICO Claims Against All Defendants

As explained above, the Court dismisses plaintiffs' RICO and nearly all state law claims against all defendants because plaintiffs have forfeited these claims.[31]  On the merits, the Court

---

[31]     As to Teva, the Court dismisses plaintiffs' RICO claims because the statute of limitations bars the claims and as indirect purchasers of Copaxone, plaintiffs lack standing to bring civil RICO claims.  The Court dismisses plaintiffs' claims for violation of state consumer

(continued. . .)

also dismisses plaintiffs' RICO claims against all defendants for failure to state a claim on which

relief can be granted.  Specifically, plaintiffs have not plausibly alleged facts which establish that

defendants committed any predicate acts of racketeering, that defendants' alleged violations of

RICO proximately caused plaintiffs' damages or that their claims are timely.

A.     Failure To Allege Predicate Acts Of Racketeering

A RICO violation requires conduct of an enterprise through a pattern of racketeering

---

[31](. . . continued)
protection statutes (all states), unjust enrichment (Connecticut, Florida, Illinois, Maine, Massachusetts, Nebraska, New York, Ohio, Washington and Wisconsin), violation of the Florida RICO Act and tortious interference with contract as untimely and for failure to state a claim.  The Court dismisses plaintiffs' unjust enrichment claims against Teva (California, Iowa, Mississippi and Virginia) as untimely.  See supra Part II.

As to ACS, the Court dismisses plaintiffs' RICO claims because plaintiffs have failed to allege a RICO predicate act or that any statutory violation proximately caused their injury.  The Court dismisses plaintiffs' claims for unjust enrichment, violation of the Florida RICO Act and tortious interference with contract as untimely and for failure to state a claim.  The Court dismisses plaintiffs' claims for violation of state consumer protection statutes as untimely (all states) and for failure to state a claim (Connecticut, Florida, Illinois, Massachusetts, New York, Washington and Wisconsin).  See supra Part III.

As to CDF, the Court dismisses plaintiffs' RICO claims because (1) the statute of limitations bars the claims, (2) as indirect purchasers of Copaxone, plaintiffs lack standing to bring civil RICO claims and (3) plaintiffs have not alleged that any statutory violation proximately caused their injury.  The Court dismisses plaintiffs' state law claims against CDF as untimely.  See supra Part IV.

As to TAF, the Court dismisses plaintiffs' RICO claims because (1) the statute of limitations bars such claims, (2) as indirect purchasers of Copaxone, plaintiffs lack standing to bring civil RICO claims, (3) plaintiffs have failed to allege a RICO predicate act and (4) plaintiffs have not alleged that any RICO violation proximately caused their injury.  The Court dismisses plaintiffs' state law claims against TAF for failure to state a claim.  See supra Part V.

As to AssistRx, the Court dismisses plaintiffs' RICO claims because (1) the statute of limitations bars such claims, (2) plaintiffs have failed to allege a RICO predicate act and (3) plaintiffs have failed to allege that any RICO violation proximately caused their injury.  The Court dismisses plaintiffs' claims for violation of state consumer protection statutes (Count 1 for all states except Maine), unjust enrichment (all states), violation of the Florida RICO Act and tortious interference with contract as untimely.  See supra Part VI.

In other words, because plaintiffs did not properly respond to each defendant's arguments, the Court dismisses all claims except plaintiffs' consumer protection claim against AssistRx under Maine law.

activity.  18 U.S.C. § 1962(c); see Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985).

Racketeering activity is frequently described as a "predicate act" or "predicate acts" which consist

of certain federal and state crimes identified in 18 U.S.C. § 1961(1), including mail fraud, 18

U.S.C. § 1341, wire fraud,  18 U.S.C. § 1343, and violation of the Travel Act, 18 U.S.C. § 1952.[32]

To establish a pattern of racketeering, plaintiffs must allege at least two predicate acts.  See 18

U.S.C. § 1961(5).  Defendants argue that plaintiffs have failed to plead RICO predicate acts of

mail fraud, wire fraud or violation of the Travel Act.

      1.    Mail And Wire Fraud

To state a claim for mail and wire fraud, plaintiffs must plausibly allege (1) a

scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses,

representations or promises, (2) defendants participated in the scheme with specific intent to

defraud and (3) defendants used the mails or wires to execute the scheme.  United States v. Zander,

794 F.3d 1220, 1226 (10th Cir. 2015); see United States v. Hanson, 41 F.3d 580, 583 (10th Cir.

1994) (mail or wire fraud require evidence that defendants intended to deceive).  A scheme or

artifice to defraud "connotes a plan or pattern of conduct which is intended to or is reasonably

calculated to deceive persons of ordinary prudence and comprehension."  Clinton v. Sec. Benefit

Life Ins. Co., 63 F.4th 1264, 1282 (10th Cir. 2023) (quotations and citations omitted).  A scheme

to defraud often involves material misrepresentations, but not every scheme will involve an

affirmative falsehood.  Id.; see United States v. Gallant, 537 F.3d 1202, 1228 (10th Cir. 2008)

(scheme to defraud focuses on intended result; affirmative misrepresentations not essential).  Even

---

[32]    Plaintiffs allege that defendants were able to accomplish the purposes of the scheme because Teva provided kickbacks to subsidize copayments of Copaxone in violation of the AKS. Class Action Complaint (Doc. #1), ¶ 355.  As predicate acts under RICO, plaintiffs do not allege violations of the AKS or FCA.  See 18 U.S.C. § 1961(1) (list of RICO predicates does not include AKS or FCA).

absent a fiduciary duty to disclose information, a misleading omission may be actionable as fraud under the mail and wire fraud statutes "if it is intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled." Clinton, 63 F.4th at 1283 (quotations and citations omitted).

Rule 9(b), Fed. R. Civ. P., requires plaintiffs to plead mail and wire fraud with particularity. Therefore plaintiffs must "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." George v. Urban Settlement Servs., 833 F.3d 1242, 1254 (10th Cir. 2016); see Fed. R. Civ. P. 9(b) (in alleging fraud, party must state with particularity circumstances constituting fraud). In other words, Rule 9(b) requires that plaintiffs allege the who, what, where, when and how of the alleged fraud. Clinton, 63 F.4th at 1277.

Plaintiffs argue that they have alleged both a scheme to defraud and a scheme to obtain money through false pretenses. The complaint does not identify two separate fraud theories and plaintiffs have not attempted to explain the purported distinction between these two theories. In any event, the gravamen of their complaint is that defendants executed a Copayment Circumvention Enterprise based on Teva's donations to CDF and TAF, which ultimately increased the costs to insurance companies for patients who took Copaxone.[33] Plaintiffs allege that defendants knew that this "bribery and/or kickback scheme" violated federal and state laws,

---

[33]     Specifically, plaintiffs allege that (1) Teva donated money to CDF and TAF for Copaxone copays; (2) Teva received data from the other defendants so that it could calculate the return on investment for those donations; (3) CDF, TAF, AssistRx and Teva steered patients into CDF and TAF funds; and (4) CDF, TAF and Teva coordinated the establishment of MS funds to subsidize patient copayments, thus eliminating price sensitivity and raising the quantity of Copaxone dispensed. Class Action Complaint (Doc. #1), ¶¶ 93, 96–97, 305. Plaintiffs allege that this scheme damaged health insurance companies who paid for Copaxone for patients who received copayment assistance from CDF and TAF.

including the AKS and the FCA, but that in communications with insurance companies and federal agencies, defendants falsely certified that they had complied with the law.  Class Action Complaint (Doc. #1), ¶¶ 310, 312, 355.  Specifically, plaintiffs allege two types of predicate acts of mail and wire fraud under RICO: (1) ACS submitted false certifications to insurance companies to obtain payment for Copaxone prescriptions which it filled and (2) all defendants made false promises to government agencies to avoid detection and enable execution of the scheme.  Plaintiffs' Response To Teva's Motion (Doc. #96) at 12–13.  Defendants argue that plaintiffs have not alleged with particularity the predicate acts of mail and wire fraud.

### a.    ACS Certification Of PDE Data

Plaintiffs allege that ACS submitted false certifications to insurance companies to obtain payment for Copaxone prescriptions which it filled.  Class Action Complaint (Doc. #1), ¶¶ 52B–53, 328.  Specifically, plaintiffs allege that when ACS submitted PDE data to insurance companies, it falsely certified that the PDE data was "true, accurate, and complete."  Id., ¶ 51B.  As noted, the PDE data consists of the details of each claim: patient name, drug provider, drug prescriber, drug name and quantity dispensed.  Id. (citing 42 C.F.R. § 423.505(k)).  CMS regulations require that Part D insurance companies and pharmacies certify that PDE claim data is "accurate, complete, and truthful and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement."  42 C.F.R. § 423.505(k)(3).  Contrary to what plaintiffs claim, however, federal regulations do not require insurance companies and pharmacies to more broadly certify that overall, "the submitted claim for payment is free and clear of any material defects that would otherwise prohibit payment."  Class Action Complaint (Doc. #1), ¶ 51B.  Plaintiffs cite no legal authority for this proposition and allege no facts which would justify the leap of logic which would be necessary to plausibly suggest that PDE data certified under 42

C.F.R. § 423.505(k)(3) cannot be "true, accurate and complete" unless it also certifies that the overall claim is pristine and untainted by any "material defects" that might prohibit payment. Plaintiffs have plausibly alleged that ACS certified that PDE claims data was accurate, complete and truthful and acknowledged that the information would be used for the purposes of obtaining federal reimbursement.[34]  That's it.  Plaintiffs have not alleged that any PDE data which ACS certified was false, i.e. that ACS failed to provide accurate, complete and truthful information as to patient name, drug provider, drug prescriber, drug name or quantity dispensed.  Class Action Complaint (Doc. #1), ¶ 51B.[35]  Furthermore, the complaint does not plausibly suggest that ACS expressly certified anything other than the accuracy of the PDE information.  See Humana, 126 F.4th at 105 (insufficient to make conclusory assertion that defendant made fraudulent certification without identifying fraudulent statement itself or what exactly was certified).

The *sine qua non* of plaintiffs' claim is that independent of its certification of PDE data under 42 C.F.R. § 423.505(k)(3), ACS "necessarily represented" or gave an "implied certification" that each claim was free and clear of any material defects that would prohibit payment (in particular, any violation of the AKS or analogous state bribery laws).  See id., ¶¶ 49B, 52B, 140. Plaintiffs cite no factual basis for this theory and identify no legal source of this "necessary" and

_____

[34]    Plaintiffs have attached to the complaint a non-exhaustive list of Copaxone claims which their assignors paid.  See Class Action Complaint (Doc. #1), Exh. 2.  The complaint and the attached list do not identify which pharmacies they paid—ACS or other pharmacies.  Even if the Court assumes that the list includes only claims paid to ACS, the complaint and the list do not identify what representations—if any—ACS made to any insurance company with respect to any claim.  See Humana, Inc. v. Biogen, Inc., 126 F.4th 94, 105 (1st Cir. 2025) (conclusory assertion that defendant made fraudulent certification insufficient without identifying fraudulent statement itself or what exactly was certified).

[35]    The complaint also does not provide the details of when ACS submitted such claims and to whom.  As noted, plaintiffs have attached to the complaint a 441-page, non-exhaustive list of Copaxone claims which plaintiffs paid, but neither the complaint nor the attached list identify who paid or who filled the prescription.

"implied" representation.  Plaintiffs have not plausibly alleged that any insurance company paid

any particular claim because of any "implied certification."  Cf. Universal Health Servs., Inc. v.

United States, 579 U.S. 176, 194 (2016) (under FCA, misrepresentation not material merely

because  (1) government  designates  compliance  with  statutory,  regulatory  or  contractual

requirement as condition of payment or (2) government would have option to decline to pay if it

knew of noncompliance).  Also, plaintiffs cite no law or facts which plausibly suggest that in

requesting payment, ACS expressly or implicitly certified that it and other entities in the supply

chain had complied with the law.  See Chambers v. Habitat Co., 68 F. App'x 711, 715–16 (7th

Cir. 2003) (absent allegation that billed amount was for work not performed or that bill overstated

amount due, mailing bill to plaintiff—though potentially prohibited by statute—not fraudulent);

McLaughlin v. Anderson, 962 F.2d 187, 192–93 (2d Cir. 1992) (plaintiff must allege element of

deception based on mail fraud; mere allegation of wrongful conduct insufficient); Rothman v.

Vedder Park Mgmt., 912 F.2d 315, 317 (9th Cir. 1990) (by itself, landlord letter demanding

payment not allowed under statute insufficient to establish mail fraud; violation of statute alone

does not demonstrate scheme to defraud).  As noted, plaintiffs do not allege that ACS presented

misleading or fraudulent PDE data to insurance companies.[36]  Therefore, presenting that same PDE

data for purposes of payment cannot constitute mail or wire fraud.[37]  See Humana, 126 F.4th at

---

[36]     At most, plaintiffs' alleged Copayment Circumvention Enterprise is a RICO
scheme to conceal a scheme to violate the AKS.  Class Action Complaint (Doc. #1), ¶ 312
(defendants violated AKS because Teva offered "bribes" to CDF and TAF so that charities would
arrange for insurance companies to buy, and patients to receive, Copaxone).  Any injury to
plaintiffs is from the underlying kickback scheme, however, and not the failure to disclose it.  If
ACS falsely certified compliance, it concealed but did not cause the alleged RICO injury.  See
George Lussier Enters., Inc. v. Subaru of New England, Inc., 393 F.3d 36, 51 (1st Cir. 2004) (no
RICO proximate cause where "injurious conduct" was fraudulent concealment of scheme).

[37]     As noted, the complaint suggests that "innocent, non-party pharmacies" also filled
(continued. . .)

105–07 (ACS submission of claims to insurance company insufficient to support "implied certification" of compliance with law).

        b.    <u>Defendants' Certification Of Compliance To Government Entities</u>

Plaintiffs allege that all defendants submitted false certifications to federal agencies in furtherance of the Copayment Circumvention Enterprise. To establish predicate acts of fraud, plaintiffs argue how and when defendants made certifications to federal agencies. Unfortunately, plaintiffs largely fail to identify which defendants made false certifications to which government agencies, whether defendants made misrepresentations or misleading omissions or what paragraphs of the complaint support their arguments. See <u>Plaintiffs' Response To Teva's Motion</u> (Doc. #96) at 1 (*defendants* made "certifications and promises" as condition of receiving Medicare funds); <u>id.</u> at 12 (*defendants* made "false promises to government agencies"); <u>id.</u> at 18 (*defendants* "repeatedly lied" to government); <u>see also</u> <u>id.</u> at 9 (failing to specify when or in what documents CDF and TAF made misrepresentations or misleading omissions to OIG); <u>id.</u> at 14 (failing to specify when *any defendant* expressly certified knowledge of laws and regulations governing use of PAPs or what paragraphs of complaint so allege); <u>id.</u> at 15 (without specifying nature or date of false representation, which defendants made "false representations" to OIG or what paragraphs of complaint so allege).

---

[37](. . . continued)
Copaxone prescriptions and submitted false certifications and claims to insurance companies. <u>Class Action Complaint</u> (Doc. #1), ¶¶ 311.g., 367; <u>see also</u> <u>id.</u>, ¶ 156 (CDF and TAF misled "certain pharmacies" to believe that they were legitimate charitable organization when in fact they served as illegal conduits for Teva). If innocent non-party pharmacies also provided false certifications, as plaintiffs claim, plaintiffs cannot plausibly claim that insurance companies paid claims based on "implied certifications." Innocent non-party pharmacies would not know the precise dealings of other entities in the supply chain and could not certify that no entity had violated the AKS. Also, if ACS and innocent non-party pharmacies were equally involved in false certifications, plaintiffs cannot plausibly establish the necessary elements of proximate causation. <u>See</u> <u>infra</u> part VII.B.

To understand plaintiffs' theory about defendants' purported misrepresentations and misleading omissions to government agencies, the Court has reviewed the 131-page class action complaint, some 1,300 pages of exhibits to the complaint, various regulations and government forms. This review has been like searching for Easter Eggs in an Atari video game or Taylor Swift song lyrics. The Court persevered, however, searching in vain for a revelation of the source of defendants' alleged duty to certify that every Copaxone claim submitted for payment was "untainted." Ultimately, however, plaintiffs lack the factual allegations or the law to support such a theory of liability. Putting lipstick on a pig cannot improve something which is fundamentally flawed, and compliance with court-ordered conditions of release cannot be established by changing your dog's name to Probation Officer.[38]  Conversely, one cannot criminalize otherwise ordinary commercial transactions simply by loose pejorative invective like "fraud," "bribery," "lies," etc.

As to Teva and ACS, plaintiffs do not plausibly allege that they necessarily certified to CMS that they complied with federal health care laws, including the AKS and the FCA. Class Action Complaint (Doc. #1), ¶ 46B (citing 42 C.F.R. § 424.510(d)(3) and CMS Form 855i); id., ¶¶ 52B, 139, 311.c., 339.

As to CDF and TAF, plaintiffs allege that in certifications to the OIG, they each acknowledged that (1) if they shared data with pharmaceutical manufacturers like Teva, they would violate the AKS and FCA and (2) they would determine patient eligibility from a uniform measure of financial need applied in a consistent manner. Id., ¶¶ 80, 130, 301, 311.c., 311.f., 341, 344. The complaint alleges some detail about the content of these certifications, but it omits the precise dates of the certifications, how they took place or how the certifications to government

---

[38]    See Matt Parker, Humble Pi: When Math Goes Wrong In The Real World 128 (2020).

agencies were deceptive as to the insurance companies which ultimately paid the Copaxone claims. Plaintiffs do not plausibly allege how the certifications by CDF and TAF comprise predicate acts of mail or wire fraud as to these plaintiffs.  See Lundbeck, 130 F.4th at 106 (questioning sufficiency of detail about manufacturer and charity's implied certification that claims complied with federal law including AKS, but dismissing complaint on alternative grounds).

2.     Travel Act

To state a claim for violation of the Travel Act, plaintiffs must allege that a defendant (1) traveled in interstate or foreign commerce or used the mail or wires in interstate or foreign commerce; (2) with the intent to promote, manage, establish, carry on or facilitate the promotion, management, establishment or carrying on of any unlawful activity; and (3) performed or attempted to perform an act of promotion, management, establishment or carrying on of the enumerated unlawful activity.  United States v. Welch, 327 F.3d 1081, 1090 (10th Cir. 2003); see 18 U.S.C. § 1952(a)(3).  The Travel Act prohibits not the specified unlawful activity, but use of interstate mail or wires with the intent to promote or facilitate such unlawful activity.  Id. at 1092. Defendants seek to dismiss plaintiffs' complaint because they have not alleged "unlawful activity" for purposes of the Travel Act.

Unlawful activities under the Travel Act include bribery in violation of state or federal law. 18 U.S.C. § 1952(b)(i)(2).  Bribery under the Travel Act means "generic" bribery.  Perrin v. United States, 444 U.S. 37, 42–43, 45 n.11, 49 (1979); see Lundbeck, 130 F.4th at 106; Pfizer, 728 F. Supp. 3d at 110.  Under the generic or ordinary meaning of bribery, plaintiffs must allege that a defendant made or accepted a payment meant to induce a "breach of fidelity," either as a public servant or as a private individual holding a particular position of trust.  Pfizer, 728 F. Supp. 3d at 110 (quoting Model Penal Code § 224.8 (Am. L. Inst. 1980)); see Perrin, 444 U.S. at 45 n.11 ("all

relations which are recognized in a society as involving special trust should be kept secure from the corrupting influence of bribery") (quotations and citations omitted); In re EpiPen Direct Purchaser Litig., No. 20-cv-827, 2022 WL 1017770, at *4–5 (D. Minn. Apr. 5, 2022) (generic bribery requires "relations which are recognized in a society as involving special trust") (quoting Perrin, 444 U.S. at 45 n.11).

Here, plaintiffs allege that Teva coordinated with CDF and TAF so that its donations went only to Copaxone patients. Class Action Complaint (Doc. #1), ¶¶ 74–77, 312. Plaintiffs label Teva's donations to TAF and CDF as "bribes," id., ¶¶ 305, 311, 312, 314, and "kickbacks" in violation of the AKS, id., ¶¶ 161, 294, 305.[39] Because the AKS does not include a "special trust" requirement, a violation of the statute does not necessarily establish bribery under the Travel Act. See In re EpiPen Direct Purchaser Litig., 2022 WL 1017770, at *6.

More fundamentally, the complaint does not plausibly allege generic bribery. Plaintiffs do not allege that CDF or TAF had a position of trust relative to doctors who prescribed Copaxone or insured patients who wanted to take it. See Lundbeck, 130 F.4th at 107 (complaint does not plead facts suggesting that PAP owed duty of fidelity to anyone to abstain from referring patients to certain prescription drug); cf. United States v. Gross, 370 F. Supp. 3d 1139, 1150 (C.D. Cal. 2019) (kickback arrangement involving fraud in medical billing constituted bribery under Travel Act because payments meant "to induce a person, often a doctor, to use his or her position of trust to influence another, often the patient, for the purpose of financially benefitting a third party because that third party has agreed to pay the influencer a portion of revenue generated by the referral").

---

[39]    Plaintiffs also allege that the "bribes" and "kickbacks" violated state laws. Many state laws do not include a "special trust" requirement, so a violation of those laws does not necessarily establish bribery under the Travel Act. See In re EpiPen Direct Purchaser Litig., 2022 WL 1017770, at *6.

Indeed, plaintiffs allege that patients sought copayment assistance from CDF and TAF *after* their physicians had prescribed the drug.  Class Action Complaint (Doc. #1), ¶¶ 68–69, 71, Exh. 11 at 5, 8, 10.  Plaintiffs do not allege facts which plausibly suggest that CDF or TAF held a position which society recognizes as one of special trust or how Teva's donations corrupted them in any such position of trust.[40]  See Pfizer, 728 F. Supp. 3d at 109 (duties of fidelity require "special relationship of trust or confidence," a relationship that charities do not typically hold with beneficiaries and that PAP did not seem to hold with anyone); see also Lundbeck, 130 F.4th at 106–07 (plaintiffs' allegation that charity accepted money from drug manufacturer in exchange for referring patients to manufacturer's drug likely fails to establish "bribery" under Travel Act, but dismissing complaint on alternative grounds).  Plaintiffs therefore have not alleged a violation of the Travel Act.[41]

## B.    Proximate Causation

A RICO plaintiff's damages must "flow from the commission of the predicate acts." Sedima, 473 U.S. at 497.  To state a RICO claim, plaintiffs must plausibly allege that a defendant's

---

[40]    The complaint generally alleges that recommendations for medical products involve "exceptional position[s] of public trust."  Class Action Complaint (Doc. #1), ¶ 47B (citing OIG Advisory Op. No. 11-08, 2011 WL 4526111, at *4).  The cited OIG Advisory Opinion involves "white coat marketing" where "physicians and other health care professionals are in an exceptional position of public trust."  2011 WL 4526111, at *4.  Plaintiffs have not alleged facts which plausibly establish that charities which assist patients to cover medical copays occupy a similar position of trust.

[41]    Without actually citing the complaint, plaintiffs argue that Teva "bribed" AssistRx and ACS to facilitate Part D enrollment for beneficiaries, refer patients to TAF and CDF, share patient data and submit false certifications to induce payments from third-party payors.  Plaintiffs' Response To CDF's Motion (Doc. #94) at 4–5; see also Plaintiffs' Response To Advance Care Scripts' Motion") (Doc. #92) at 15 (Teva paid "bribes" to CDF, TAF, AssistRx and ACS).  In fact, the complaint does not have a single allegation which characterizes Teva payments to AssistRx or ACS as "bribes."  The bribery allegations are limited to the claim that Teva offered bribes to CDF and TAF.  See, e.g., Class Action Complaint (Doc. #1), ¶¶ 305, 311b., 312, 314, 316–20. Therefore plaintiffs have not plausibly alleged that Teva bribed AssistRx and ACS.

RICO violation was both the but for cause and proximate cause of their injury. Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 654 (2008); see 18 U.S.C. § 1964(c) (plaintiff must be "person injured in his business or property by reason of a violation of section 1962"). Proximate cause is a flexible concept, which labels "generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts." Bridge, 553 U.S. at 654 (quotations and citations omitted). Even so, to establish proximate cause under RICO, plaintiffs must allege that RICO predicate acts led directly to their injuries. Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006); see Hemi Grp., LLC v. City of New York, N.Y., 559 U.S. 1, 13 (2010) (compensable injury flowing from RICO violation necessarily is harm caused by predicate acts); Bridge, 553 U.S. at 654 (proximate causation requires "some direct relation between the injury asserted and the injurious conduct alleged") (quotation and citation omitted).[42]  Unlike the common law requirement of proximate cause, RICO's proximate cause requirement does not turn on foreseeability, but instead "the existence of a sufficiently 'direct relationship' between the fraud and the harm." Hemi, 559 U.S. at 12; see id. at 9 (plaintiff must establish link between RICO predicate acts and injury that is not too remote, purely contingent or indirect).

Plaintiffs allege that defendants' Copayment Circumvention Enterprise caused three related injuries to insurance companies: (1) they had to pay inflated prices for Copaxone claims, (2) they had to pay more Copaxone claims and (3) the claims which they paid were "tainted" and

---

[42]    Several policy reasons underlie the requirement that a RICO plaintiff establish a direct relation between the alleged injury and the predicate acts of racketeering: (1) the difficulty in measuring indirect injury from a statutory violation apart from other independent factors; (2) because multiple parties may incur indirect injuries and to obviate the risk of multiple recoveries, courts would have to adopt complicated rules apportioning damages among plaintiffs depending on how directly the wrongful conduct caused their injury; and (3) directly injured victims generally will adequately vindicate the law as private attorneys general, without problems associated with suits by plaintiffs injured more remotely. Holmes v. Sec. Inv. Prot. Corp., 503 U.S. 258, 269–70 (1992) (Clayton Act).

were actually "unpayable." Class Action Complaint (Doc. #1), ¶¶ 5A, 145, 325, 331. Defendants argue that plaintiffs cannot establish proximate cause because the complaint does not allege a direct relationship between the Copayment Circumvention Enterprise and plaintiffs' alleged damages.

Plaintiffs first respond that insurance companies suffered direct injury because fraudulent certifications by ACS led directly to payment of Copaxone claims. Plaintiffs' Response To Teva's Motion (Doc. #96) at 17. As explained above, plaintiffs have not plausibly alleged that the ACS presentation of PDE data was fraudulent. See supra Part VII.A.1.a. In addition, plaintiffs do not explain how the ACS certification—as opposed to any underlying violation of the AKS—caused their injuries.[43] See Lundbeck, 130 F.4th at 109 (complaint does not detail what defendants

---

[43]     Plaintiffs implied certification theory posits that if ACS had disclosed that a Copaxone claim was the result of a violation of the AKS, the insurance companies would not have paid the "tainted" claim. Cf. U.S. ex rel. Wilkins v. United Health Grp., Inc., 659 F.3d 295, 314 (3d Cir. 2011) (government does not get what it bargained for when defendant paid for services tainted by kickback); United States v. Teva Pharms. USA, Inc., No. 13-civ-3702, 2016 WL 750720, at *23–24 (S.D.N.Y. Feb. 22, 2016) ("any claim connected in any way to an AKS violation" ineligible for reimbursement, even if party that submitted claim had no knowledge of AKS violation). For purposes of the motions to dismiss, defendants do not dispute that plaintiffs have plausibly alleged facts which establish that the unlawful conduct of the RICO enterprise was a but for cause of any economic loss to insurance companies. If this case proceeded beyond the pleading stage, plaintiffs would have to offer evidence to establish but-for causation, which would require more than proof that a claim is related to a violation of the AKS. In the government enforcement action against Teva under the FCA, the district court held that the government need not prove but for causation, i.e. proof that but for Teva's charitable donations, the prescription claims for Copaxone would not have been submitted for Medicare reimbursement. See United States v. Teva Pharms. USA, Inc., 682 F. Supp. 3d 142, 148 (D. Mass. 2023). Even so, the district court certified the question for interlocutory appeal. At the same time, the First Circuit Court of Appeals agreed to take an interlocutory appeal of another district court ruling which reached a different conclusion. See United States v. Regeneron Pharms., Inc., No. 20-11217, 2023 WL 6296393, at *10 (D. Mass. Sept. 27, 2023) (government bore burden to prove AKS violation actually caused physician to provide different medical treatment and thus caused false claims). While the appeals were pending, Teva settled with the government. In the related appeal, the First Circuit held that to demonstrate falsity under the 2010 amendment to the AKS, the government must show that an illicit kickback was the but for cause of a submitted claim. United States v. Regeneron Pharms., Inc., 128 F.4th 324, 336 (1st Cir. 2025).

       Here, on plaintiffs' RICO claim which is based on underlying violations of the AKS,

                                                                                    (continued. . .)

-55-

certified, when, where, or to whom, how alleged misrepresentations reached insurance companies or what role such misrepresentations played in their decision-making); see also Humana Inc. v. Biogen, Inc., 126 F.4th 94, 105 (1st Cir. 2025) (conclusory assertions of fraudulent certifications insufficient). Plaintiffs have not plausibly alleged facts which establish a direct relationship between the allegedly fraudulent certification of each claim by ACS and higher prices for Copaxone, increased claims or payment of tainted claims.

Plaintiffs next argue that injury to the insurance companies was a direct and foreseeable result of the larger pattern of racketeering activity to eliminate copays for certain Copaxone patients. Plaintiffs' Response To Teva's Motion (Doc. #96) at 17–18. Plaintiffs have not sufficiently alleged a pattern of racketeering activity. Even if they had done so, the alleged injuries (higher prices, more claims and payment of tainted claims) are too far attenuated from the fraudulent scheme to establish proximate causation under RICO. Plaintiffs do not plausibly allege how copayment subsidies from CDF and TAF directly raised the price of Copaxone or increased the number of Copaxone claims. Plaintiffs allege that because certain patients did not have to pay copays for Copaxone, they had a reduced incentive to locate less expensive, equally effective drugs, but plaintiffs do not allege that less expensive, equally effective drugs were actually available, let alone suitable for particular patients or groups of patients. Class Action Complaint (Doc. #1), ¶ 60 (citing 2005 OIG Special Advisory). The OIG Advisory from some 20 years ago expressed "concern[] about the use of cost-sharing subsidies to shield beneficiaries from the economic effects of drug pricing, thus eliminating a market safeguard against inflated prices" and

---

[43](. . . continued)
plaintiffs likewise would have to establish that but for Teva's charitable donations (the alleged kickbacks), the prescription claims for Copaxone would not have been submitted to the insurance companies for reimbursement.

warned that inflated prices *could* have a "spillover" effect on the size of direct subsidies, reinsurance payments and risk corridor payments paid by Medicare to Part D plans in future years. 70 Fed. Reg. at 70626.  The OIG recognized that if drug manufacturer PAPs subsidized Part D cost-sharing amounts, increased prices were a risk.  Id.  Under this hypothesis, injury to insurance companies is a mere possibility—and one that is indirect, at best.

The complaint alleges that because of defendants' conduct, insurance companies "paid for tainted Copaxone claims that they otherwise would not have and paid for Copaxone at inflated prices."  Class Action Complaint (Doc. #1), ¶ 145.  This conclusory allegation does not plausibly allege a direct relationship between defendants' alleged unlawful conduct and plaintiffs' injuries. The direct injury element of proximate causation is meant to avoid the speculative nature of determining damages from indirect injuries and to prevent intricate, uncertain inquiries about apportioning damages from overrunning RICO litigation.  Anza, 547 U.S. at 459–60.  Therefore, on a motion to dismiss, the Court must determine whether plaintiffs have alleged facts which plausibly establish a "direct relationship" between the elimination of copays for certain Copaxone patients and higher prices, more claims and payment of tainted claims.  Hemi, 559 U.S. at 12.  In doing so, the Court draws on its judicial experience and common sense.  Iqbal, 556 U.S. at 679–80.

Between Teva's donations to CDF and TAF and the ultimate payment of each Copaxone claim, several independent decision-makers influenced the demand for Copaxone, its price and the number of claims: (1) patients, who considered the efficacy and safety of Copaxone and any alternative treatments; (2) physicians, who exercised independent judgment to prescribe Copaxone instead of potential alternatives; and (3) insurance companies, who exercised independent judgment to place the drug on their formularies for reimbursement.  Lundbeck, 130 F.4th at 108;

Lundbeck, 664 F. Supp. 3d at 657; MSP Recovery Claims, Series LLC v. Caring Voice Coalition, Inc., No. 1:21-cv-21317, 2022 WL 3155035, at *11 (S.D. Fla. July 21, 2022) ("CVC I"), report & recommendation adopted, 2022 WL 4448256 (S.D. Fla. Sept. 23, 2022).  The choices by these independent actors are intervening events that render indirect the connection between Teva's payments to CDF and TAF and the insurance companies' ultimate payments to pharmacies.  Hemi, 559 U.S. at 15 (proximate causation lacking where multiple steps separate alleged fraud from asserted injury and independent factors account for plaintiff's injury).[44]  In addition, two market factors—the number of MS patients and the availability (or lack of availability) of competing drugs (especially generic drugs)—are "easily inferable reasons" which also could contribute to an increase in the number and price of Copaxone claims.  Lundbeck, 130 F.4th at 108; see CVC I, 2022 WL 3155035, at *11 (physicians may have increased prescription rates for "other easily inferable reasons:" increase in patients with disease or lack of competing generic drugs); Lundbeck, 664 F. Supp. 3d at 658–59 (alleged causal chain too far attenuated where increased prescription volume could have been caused by "other easily inferable reasons").

Plaintiffs do not plausibly allege facts which show that (1) any physicians participated in

---

[44]     See Lundbeck, 130 F.4th at 109 (causal chain running from defendants' donations to PAPs and alleged misrepresentations to reimbursement of expenses by insurance companies simply too attenuated to support RICO liability); MSP Recovery Claims, Series LLC v. Caring Voice Coalition, Inc., 722 F. Supp. 3d 1296, 1319 (S.D. Fla. 2024) ("CVC II") (specialty pharmacies only assisted patients whose physicians had already prescribed therapies; physicians' independent prescribing decisions break chain of causation between alleged contributions to charity and assignors' alleged payments) (objections to report and recommendation pending); Lundbeck, 664 F. Supp. 3d at 658 (even if defendants committed alleged fraud to benefit themselves, unclear how fraud proximately damaged insurance companies or caused price inflation that directly injured them), aff'd in part, rev'd in part and remanded, 130 F.4th 91 (4th Cir. 2025); CVC I, 2022 WL 3155035, at *9–12 (direct relation between wrongful conduct and injury asserted not established because "licensed physicians, pharmacies, and other healthcare actors must still prescribe and administer medications"); see also Sidney Hillman Health Ctr. of Rochester v. Abbott Lab'ys, 873 F.3d 574, 578 (7th Cir. 2017) (manufacturer's misrepresentations to physicians do not support RICO claim by payors, several levels removed in causal sequence).

the alleged Copayment Circumvention Enterprise, (2) Teva's donations to TAF and CDF influenced the prescribing decisions of any physicians or (3) the extent—if any—that physicians and patients were aware of the copay assistance program before physicians initially prescribed Copaxone. Cf. Blue Cross of Cal. Inc. v. Insys Therapeutics Inc., 390 F. Supp. 3d 996, 1008 (D. Ariz. 2019) (health care plan sufficiently alleged causation against pharmaceutical manufacturer where complaint alleged prescribers received kickbacks and were not exercising independent medical judgment). Plaintiffs allege that the amount of a patient's cost-sharing obligation may generally impact physician decision-making. See Class Action Complaint (Doc. #1), ¶ 45B. The mere possibility of such an impact, however, is not enough. Plaintiffs have not alleged that (1) any physician prescribed Copaxone because of the copay assistance program, (2) less expensive, equally effective alternatives to Copaxone were available, or (3) any prescription for Copaxone was not medically necessary or advisable. Absent such allegations, plaintiffs cannot plausibly establish that the Copayment Circumvention Enterprise directly caused any increase in the price of the drug or quantity of claims. CVC I, 2022 WL 3155035, at *11.

      C.      Statute Of Limitations

All defendants assert that the statute of limitations bars plaintiffs' RICO claims. The statute of limitations for a civil RICO claim is four years from the time the cause of action accrued. See Rotella v. Wood, 528 U.S. 549, 552 (2000). For civil RICO claims, the statute of limitations runs from either the discovery of the injury (the injury-discovery rule) or the date when the injury occurred, even if plaintiffs were unaware of the injury (the injury-occurrence rule). See Dummar v. Lummis, 543 F.3d 614, 621 (10th Cir. 2008). The Tenth Circuit has not adopted either rule.

Robert L. Kroenlein Tr. Ex rel. Alden v. Kirchhefer, 764 F.3d 1268, 1279 (10th Cir. 2014).[45]
Because plaintiffs' claims are untimely under the injury-discovery rule—which is the rule most
favorable to plaintiffs, the Court need not predict which rule the Tenth Circuit would apply.  See
id. at 1279 (declining to select accrual rule because plaintiffs' claims barred under either rule).

Under the injury-discovery rule, "the injury is deemed to be discovered when, in the
exercise of reasonable diligence, it could have been discovered."  Id. at 1275 (internal quotation
marks omitted).  The rule applies only in the exceptional case where reasonably diligent plaintiffs
could not immediately know of the injury and the cause.  Id. at 1276.  The clock starts when
plaintiffs either have actual or inquiry notice of the injury.  Id. at 1280.  The inquiry notice standard
is an objective one.  Id. at 1281.  Plaintiffs are on inquiry notice whenever circumstances exist that
would lead reasonable plaintiffs of ordinary intelligence, through the exercise of reasonable due
diligence, to discover their injury.  Id. at 1280; see Sterlin v. Biomune Sys., 154 F.3d 1191, 1201
(10th Cir. 1998) (in securities context, inquiry notice triggers duty to exercise reasonable diligence;
individual on inquiry notice when sufficient "storm warnings" would alert reasonable person to
possibility that sale of security involved either misleading statements or significant omissions).

As explained above, a RICO violation requires conduct of an enterprise through a pattern
of racketeering activity.  18 U.S.C. § 1962(c).  To bring a civil RICO claim, plaintiffs must allege
injury to their business or property.  Sedima, 473 U.S. at 496.  A RICO "injury" is the "harm from
the predicate acts that constitute racketeering activity."  Kirchhefer, 764 F.3d at 1277.  To be on
notice of injury from potential RICO fraud, plaintiffs need not discover all elements of defendants'
scheme.  Id.; see Ebrahimi v. E.F. Hutton & Co., Inc., 852 F.2d 516, 523 (10th Cir. 1988)

---

[45]     Most circuits apply the injury-discovery rule because "federal courts . . . generally
apply a discovery accrual rule when a statute is silent on the issue, as civil RICO is here."  Id. at
1276.

("possibility of fraud" triggers inquiry notice). For purposes of the injury-discovery rule, discovery of an injury requires only "knowledge of the harm resulting from the [RICO] predicate act . . . not who has committed the harm." <u>Kirchhefer</u>, 764 F.3d at 1278; <u>see also</u> <u>Rotella</u>, 528 U.S. at 553 (under discovery accrual rule, discovery of injury—not discovery of other elements of claim—is what starts clock). Once plaintiffs have inquiry notice of facts that would suggest to reasonable person that they have been injured, plaintiffs have a duty to commence diligent investigation concerning that injury. <u>Kirchhefer</u>, 764 F.3d at 1280. The injury-discovery rule determines when the limitations period begins to run; the rule does not obligate the victims to file suit at that moment—rather, victims have four years under RICO to determine the proper person against whom to file suit. <u>Id.</u> at 1279.

Here, many storm warnings of Teva's potential improper use of PAPs preceded the DOJ settlements with CDF in 2019 and ACS in 2020. As early as December 1, 2005, a front-page article in the Wall Street Journal highlighted criticisms that manufacturers used PAPs to keep drug prices high and profit by shifting the costs for expensive medicines to insurance companies, which passed on those costs to consumers. Geeta Anand, *Through Charities, Drug Makers Help People– And Themselves*, Wall St. J. at A1 (Dec. 1, 2005). The article included a quotation from Denise Lynch, Teva's director of customer management, who stated that while Teva "didn't calculate the profit it could receive when" donating to PAPs, "from a common-sense perspective, you can get there." <u>Id.</u>

On May 30, 2014, the OIG issued a warning that PAPs present a risk of fraud, waste and abuse with respect to Medicare and the AKS because those entities had practices which appeared designed to steer patients into certain drugs and encourage manufacturers to increase prices. 79 Fed. Reg. at 31122. The OIG further warned that such entities may correlate funding by drug

manufacturers so that donors channel their financial support to copayment of their own products. Id. at 31123.

In May of 2017, Teva publicly disclosed in an SEC filing that it had received a subpoena from the U.S. Attorney's office in Boston, Massachusetts requesting documents related to Teva's donations to patient assistance programs. See SEC Form 6-K (Teva Pharm. Indus. Ltd.), Exh. 6 to Tanchyk's Declaration. From August 3, 2017 through November 5, 2020, in some 14 SEC filings, Teva continued to make that same disclosure about the DOJ subpoena.

Between December of 2017 and December of 2018, insurance companies—and those such as plaintiffs who purchase claims from insurance companies—were on notice that several drug manufacturers had settled claims which alleged that they had participated in improper schemes with copayment charities in violation of the AKS and FCA. See *Class Action Complaint* (Doc. #1) filed October 15, 2021 in MSP Recovery Claims Series LLC v. Caring Voice Coalition, Inc., S.D. Fla. No. 21-cv-21317, at 34 n.16 (outlining government settlements of AKS and FCA claims against drug manufacturers based on schemes with copayment charities: (i) in December of 2017, United Therapeutics Corp. for $210 million to resolve claims related to various hypertension drugs; (ii) in May of 2018, Jazz Pharmaceuticals PLC for $57 million to resolve claims related to narcolepsy drug Xyrem; (iii) in May of 2018, Pfizer Inc. for $23.8 million to resolve claims related to renal cell carcinoma drugs Sutent and Inlyta and Pfizer's arrhythmia drug Tikosyn; (iv) in June of 2018, H. Lundbeck A/S for $52.6 million to resolve claims related to Huntington's Disease drug Xenazine; and (v) in December of 2018, Actelion Pharmaceuticals US, Inc. for $360 million to resolve claims related to hypertension drugs Tracleer, Ventavis, Veletri and Opsumit).

On November 20, 2019, the DOJ announced a settlement with TAF, resolving allegations that TAF violated the FCA because it coordinated with Teva and ACS to ensure Copaxone patients

received a disproportionate share of grants when the fund opened after a Teva payment.  See 2019 DOJ Press Release.  The 2019 DOJ Press Release explained that (1) TAF solicited and received payments from Teva that correlated with TAF's spending on Copaxone patients; (2) TAF coordinated with Teva and ACS to ensure that Copaxone patients received a disproportionate share of the grants from the fund during each window when the fund opened after a Teva payment; (3) TAF maintained a portal that gave ACS real-time access to the enrollment status of the patients ACS referred; and (4) TAF knew that the portal enabled ACS to update Teva on the number of Copaxone patients who had received grants from TAF's MS fund.  In the next two weeks, the OIG and several news sources, including Reuters, published the announcement of the TAF Settlement.

On August 13, 2020, the DOJ announced a settlement with ACS that resolved allegations that ACS served as a kickback conduit by conspiring with Teva to pay kickbacks to Copaxone patients through CDF and TAF.  See 2020 DOJ Press Release.  The 2020 DOJ press release explained that (1) ACS acknowledged it had relayed data from CDF and TAF to Teva so that Teva could correlate its payments to the charities with the amounts of money the charities spent on Copaxone patients; (2) ACS acknowledged that when CDF and TAF lacked funding and were not accepting new applications for Medicare copay coverage, ACS provided regular updates to Teva on the number of Part D patients serviced by ACS who had prescriptions for Copaxone, met the criteria for foundation copay coverage and were awaiting foundation copay coverage; (3) Teva sometimes provided ACS with advance notice of its payments to CDF or TAF; and (4) once ACS learned that CDF or TAF had re-opened its copay fund, ACS promptly sent the charity a "batch file" that consisted almost entirely of Copaxone patients' applications for Medicare copay coverage.  The press release quotes the U.S. Attorney for the District of Massachusetts who stated that "ACS knowingly enabled a large pharmaceutical manufacturer to pay kickbacks to Medicare

patients taking its expensive drug," which undermined Medicare's copay structure, which Congress had created as a safeguard against inflated drug prices.  Id.  The press release also quoted an FBI agent who stated that ACS "willingly served as a pawn in a kickback scheme, putting profit over patient needs, by helping Teva to time its foundation payments to boost sales of Teva's own drug, which ACS then dispensed."  Id.  The agent further stated that the settlement should be a warning to others that the government will aggressively investigate "vendors like ACS who conspire with pharmaceutical companies to disguise kickbacks as charitable contributions, at the expense of hard-working taxpayers who support the Medicare program."  Id.

Based on the publicly available information described above, plaintiffs and the insurance company assignors were on inquiry notice of their potential RICO claims against defendants by August 13, 2020—the date on which the DOJ settlement with ACS was publicly announced and published.  Even though the press releases and other publicly available information did not identify AssistRx, plaintiffs were on inquiry notice of their claims against all defendants that participated in the alleged scheme.  See Kirchhefer, 764 F.3d at 1278–79 (discovery of injury requires only knowledge of harm from RICO predicate act—not who has committed harm; injury-discovery rule determines when limitations period begins to run but victims have four years to determine proper defendants).

Plaintiffs argue that they could not have known that they might have a RICO cause of action until the government filed its lawsuit against Teva on August 18, 2020.  Plaintiffs insist that they (and the insurance company assignors) should not have to scour the internet for information about potential fraud involving drug manufacturers and PAPs.  By June 26, 2019, however, plaintiffs had already purchased at least some claims from each of the seven insurance company assignors in this case.  Plaintiffs cannot credibly claim that until the government filed suit against

Teva, they were unaware of their potential RICO claims against defendants.  Why would plaintiffs purchase such claims from insurance companies if they had no inkling of any copayment circumvention scheme or other wrongdoing?  Based on publicly available information which questioned the legitimacy of drug manufacturer donations to PAPs and the DOJ announcements of the settlements with TAF and ACS—as well as plaintiffs' own conduct in buying up potential claims—the Court must conclude that by August 13, 2020, plaintiffs had both inquiry notice and actual knowledge that defendants' scheme had caused injury to them.

The Court does not hold that an individual person must search for news about possible wrongdoing involving every person or entity with which he or she may interact on a daily basis. But insurance companies with Medicare Part D plans and those who purchase the legal claims of those entities are reasonably charged with knowledge of widespread news accounts, government advisories and settlements involving drug manufacturer donations to PAPs.  See generally Sterlin, 154 F.3d at 1204 (Barron's article created sufficient "storm warnings" to put reasonable investor on notice of possibility of fraudulent activity; article need not discuss each and every aspect of the alleged fraudulent activity to put him on notice of the need to inquire).  The factual allegations of plaintiffs' complaint largely track the DOJ press releases about the settlements with TAF and ACS. In other cases, plaintiffs have conceded that the DOJ press releases regarding settlements of similar investigations put them on notice of their claims.[46]  Though not conclusive, plaintiffs' concessions

---

[46]    See MSP Recovery Claims, Series LLC v. Amgen Inc., No. 2:23-cv-3130, 2024 WL 3464410, at *15 (C.D. Cal. July 15, 2024) (DOJ press release about settlement with manufacturer); Second Amended Complaint (Doc. #111) filed July 12, 2024 in MSP Recovery Claims v. Pfizer, Inc., No. 22-01419 (D.D.C.), ¶ 626 (DOJ's multiple press releases); MSP Opposition To Motion To Dismiss (Doc. #53) filed November 14, 2022 in Pfizer, No. 22-01419 (D.D.C.) at 35 (DOJ settlement in May of 2018); cf. MSP Opposition To Motion To Dismiss (Doc. #41) filed November 10, 2023 in MSP v. Astellas Pharma US, Inc., No. 23-cv-1153 (D.D.C.) at 34 (announcement of DOJ settlement in April of 2019); MSP Opposition To CDF Motion To
(continued. . .)

in these other cases support the conclusion that at the latest, plaintiffs and the insurance company assignors were on inquiry notice of their potential RICO claims against defendants by August 13, 2020—the date on which the DOJ announced and published its settlement with ACS.

Plaintiffs filed their complaint on August 16, 2024—three days after the four-year statute of limitations had expired on their RICO claims.  Plaintiffs therefore bear the burden to identify a theory which renders their claims timely.  Herrera v. City of Espanola, 32 F.4th 980, 992 (10th Cir. 2022).  Plaintiffs assert that their cause of action against defendants was tolled on one of four grounds: (1) tolling because the federal government had filed a related proceeding, (2) continuing violation, (3) fraudulent concealment and (4) equitable tolling.

### 1.    Tolling Based On Related Federal Proceeding

Plaintiffs argue that their RICO claims were tolled during the pendency of the federal government's lawsuit against Teva.  The Clayton Act tolls the limitations period for private actions arising under the antitrust laws whenever "any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws."  15 U.S.C. § 16(i).  Only a handful of courts have addressed whether the Clayton Act's tolling provision should be applied in RICO cases.  Plaintiffs cite three district court decisions which held that the

---

[46](. . . continued)
*Dismiss* (Doc. #154) filed November 15, 2022 (in MSP Recovery Claims, Series LLC v. Celgene, No. 21-cv-20451 (D.N.J.)) at 39 (DOJ settlement); *Plaintiffs' Memorandum In Opposition To Lundbeck LLC's Motion To Dismiss* (Doc. #52) filed October 26, 2022 in MSP Recovery Claims, Series LLC v. Lundbeck LLC, No. 22-cv-422 (E.D. Va.) at 8, 10 (DOJ announcement of settlement in April of 2019).

Insurance companies made similar concessions in other lawsuits.  See Humana Inc. v. Mallinckrodt ARD LLC, No. CV 19-06926 DSF (MRW), 2020 WL 3041309, at *12 (C.D. Cal. Mar. 9, 2020) (FTC and DOJ brought conduct to light through investigations, legal actions and settlements); *Complaint* (Doc. #1) filed November 15, 2022 in United Healthcare Servs., Inc. v. United Therapeutics Corp., No. 22-2948 (D. Md.), ¶ 5 (DOJ announcement of settlement exposed unlawful scheme).

Clayton Act's tolling provision applies by implication to RICO claims. See Pension Fund-Mid-Jersey Trucking Indus. v. Omni Funding Grp., 687 F. Supp. 962, 963 (D.N.J. 1988); Gianelli v. Schoenfeld, No. 21-cv-0477, 2021 WL 4690724, at *6 (E.D. Cal. Oct. 7, 2021), report and recommendation adopted, 2021 WL 5154163 (E.D. Cal. Nov. 5, 2021); Pres. Petrified Forrest v. Renzi, No CV-12-8140, 2013 WL 530574, at *3 (D. Ariz. Feb. 12, 2013). No appellate court has addressed the issue, but one district court has declined to apply the federal proceeding tolling provision in the Clayton Act to RICO claims. See Kerman v. Chenery Assocs., Inc., No. 3:06CV-338-S, 2011 WL 1106736, at *3–4 (W.D. Ky. Mar. 23, 2011). Even if the Court assumes that the Clayton Act tolling provision for federal lawsuits applies to RICO claims, plaintiffs have not established that the federal government lawsuit against Teva tolled the limitations period on their RICO claims.

Under the tolling provision of the Clayton Act, a private action for violation of the antitrust laws is tolled only if the federal government files a civil or criminal proceeding which alleges violations of the antitrust laws. 15 U.S.C. § 16(i). Assuming this tolling provision should apply to RICO, a private action for violation of RICO is tolled only if the federal government files a civil or criminal proceeding which alleges violations of RICO or at least violations which constitute RICO predicate acts. Indeed, each of the three district court decisions which applied the Clayton Act tolling provision to civil RICO claims did so because the government had filed a parallel criminal case under RICO. See Pension Fund-Mid-Jersey Trucking, 687 F. Supp. at 963–64; Gianelli, 2021 WL 4690724, at *6; Pres. Petrified Forrest, 2013 WL 530574, at *3. Here, the federal government's case against Teva alleged unjust enrichment and violations of the FCA, not violations of RICO. A violation of the FCA is not a RICO predicate offense. Because the government case against Teva did not allege a violation of RICO or a RICO predicate offense, it

cannot toll the statute of limitations on plaintiffs' civil RICO claims.  See Trump v. Clinton, 626 F. Supp. 3d 1264, 1298 (S.D. Fla. 2022) (even if RICO contained tolling provision analogous to Clayton Act, provision did not apply in RICO action where plaintiff could not identify "civil or criminal proceeding instituted by the United States to prevent, restrain, or punish a RICO violation"); see also Farmer v. D & O Contractors, Inc., 640 F. App'x 302, 308 (5th Cir. 2016) (assuming court adopted Pension Fund–Mid–Jersey Trucking and extended Clayton Act tolling to RICO, tolling would not apply because plaintiffs did not show any "parallel criminal litigation"—only criminal investigation which did not result in indictments).

### 2.     Tolling Based On Fraudulent Concealment

Plaintiffs argue that the complaint alleges that defendants concealed their wrongful conduct through false certifications to government agencies and insurance companies who assigned their claims.  To establish tolling of a claim based on fraudulent concealment, plaintiffs must establish (1) defendants used fraudulent means, (2) which successfully concealed the alleged RICO scheme and (3) plaintiffs did not know or by the exercise of due diligence could not have known that they might have a cause of action.  Dummar, 543 F.3d at 621.  For substantially the reasons stated above, based on the publicly available information, plaintiffs have not alleged facts which plausibly show that by the exercise of due diligence, they could not have known that they might have a cause of action.

### 3.     Continuing Violation

Plaintiffs argue that their RICO claims are timely because they allege a continuing violation.  Under the continuing violation doctrine, the limitations period does not begin to run until the latest in a series of acts, when combined with prior acts, matures into a legal injury.  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002).  A tort is considered "continuing"

-68-

only if the defendants' conduct is ongoing.  Mata v. Anderson, 635 F.3d 1250, 1253 (10th Cir. 2011) (continuing violation doctrine triggered by continual unlawful acts, not continual ill effects from original violation).  Even if the Court assumes that the continuing violation doctrine applies to civil RICO claims, plaintiffs have not met their burden to show that the doctrine applies.[47]

Plaintiffs allege that defendants engaged in a "continuing course of conduct," which has inflicted "continuing and accumulating harm."  Class Action Complaint (Doc. #1), ¶ 161. Plaintiffs note that the complaint alleges that Teva continued payments to "TAF and other third-party foundations through at least 2018—three years beyond the scope of the DOJ's complaint." Id., ¶ 153.  The complaint also alleges that since 2020, the DOJ has "uncovered additional evidence . . . demonstrating that the Schemes continued beyond 2018."  Id.  As for defendants' alleged unlawful conduct through August 13, 2020, plaintiffs do not explain why they could not assert such claims after they were on inquiry notice of the DOJ settlement with  ACS.

Plaintiffs insist that the complaint plausibly alleges that defendants' unlawful scheme continued until at least 2022.  Plaintiffs note that the complaint alleges that from 2006 through 2022, Teva referred more than 30,000 Copaxone patients to ACS, Class Action Complaint (Doc. #1), ¶ 107(a), which suggests that the scheme continued through at least 2022.  On August 13,

---

[47]    It appears that most courts have refused to apply the continuing violation doctrine to RICO cases.  See Serpentfoot v. Rome City Comm'n, 426 F. App'x 884, 887 (11th Cir. 2011) (limitations period on RICO claim starts when plaintiff knew or should have known that it suffered injury that formed basis of its complaint, not upon eventual termination of defendants' misdeeds; rejecting continuing violation theory for RICO claims); Limestone Dev. Corp. v. Vill. of Lemont, 520 F.3d 797, 801 (7th Cir. 2008) (applying continuing violation doctrine to civil RICO claim "does not make good sense, and is not the law"); McCool v. Strata Oil Co., 972 F.2d 1452, 1466 (7th Cir. 1992) (RICO injuries flow from individual predicate acts, not from pattern itself); cf. Klehr v. A.O. Smith Corp., 521 U.S. 179, 186–190 (1997) (referring to continuing violation doctrine under antitrust law and separate accrual rule in civil RICO cases as similar; under both, plaintiff cannot use independent, new predicate act as bootstrap to recover for injuries caused by other earlier predicate acts that took place outside limitations period).

2020, the DOJ announced its settlement with ACS related to Copaxone patients who received financial assistance through CDF and TAF. Plaintiffs' allegation that Teva continued to refer Copaxone patients to ACS through 2022 is too vague to suggest that the unlawful conduct under RICO continued through that year—it merely suggests that ACS continued to fill some Copaxone prescriptions. Notably, plaintiffs omit the fact that the number of patients that Teva referred to ACS from 2006 to 2014 averaged some 3,000 patients per year, compared to some 220 patients per year from 2020 through 2022. *Expert Report Of Ian M. Dew* at 14, Exh. 6 to <u>Class Action Complaint</u> (Doc. #1). Absent additional allegations in the complaint about defendants' conduct after 2018, the fact that Teva continued to refer some Copaxone patients to ACS does not plausibly suggest that the alleged unlawful scheme continued.

Plaintiffs note that the complaint alleges that (1) from 2006 through "at least 2020," Teva consistently followed the practice of using data from the foundations (via ACS or AssistRx) to calculate its budgets for TAF or CDF and to pay them what they needed for Copaxone patients in the following year and (2) insurance companies made payments for Copaxone through 2022. <u>Class Action Complaint</u> (Doc. #1), ¶ 120. By themselves, these allegations are insufficient to plausibly allege that defendants' scheme continued. In particular, the complaint does not appear to allege that after 2018, TAF or AssistRx engaged in any unlawful conduct or that after the ACS settlement on August 13, 2020, any defendant engaged in wrongful conduct. The fact that insurance companies made payments for Copaxone through 2022 does not suggest any continued wrongful behavior.

Plaintiffs' allegations of wrongful conduct are simply too vague and conclusory to plausibly establish that defendants engaged in a continuing course of wrongful conduct beyond August 13, 2020—the date that the DOJ announced its settlement with ACS. <u>See</u> <u>Ute Indian Tribe</u>

of the Uintah & Ouray Indian Rsrv. v. United States Dep't of Interior, No. 2:21-cv-573, 2023 WL 6276594, at *16 (D. Utah Sept. 26, 2023) (naked assertions devoid of further factual enhancement cannot toll limitations period under continuing violation doctrine).  Plaintiffs have not met their burden to show that the continuing violation doctrine tolls the limitations period for their RICO claims.

4.    Equitable Tolling

Plaintiffs argue that their complaint is timely under the doctrine of equitable tolling. Plaintiffs argue that defendants designed their entire scheme to operate discretely and avoid detection by government agencies and Medicare payors.  To establish equitable tolling, plaintiffs must establish that (1) they diligently pursued their rights and (2) some extraordinary circumstances stood in their way.  Barnes v. United States, 776 F.3d 1134, 1150 (10th Cir. 2015). For substantially the reasons stated above, based on the publicly available information, plaintiffs have not alleged facts which plausibly show that they diligently pursued their rights or that any extraordinary circumstances prevented them from discovering their RICO cause of action.

Even if plaintiffs had properly responded to the merits of each defendant's motion, as noted, the Court would dismiss plaintiffs' RICO claims against all defendants for failure to state a claim on which relief can be granted because (1) the statute of limitations bars plaintiffs' RICO claims and (2) plaintiffs have not plausibly alleged facts which establish that defendants committed any RICO predicate act or that defendants' alleged violations of RICO proximately caused their damages.  Because plaintiffs have not stated a plausible claim under RICO, the Court likewise finds that plaintiffs have not stated a claim for RICO conspiracy.  See Tal v. Hogan, 453 F.3d 1244, 1270 (10th Cir. 2006) (if plaintiff has no viable claim under § 1962(a), (b) or (c), then subsection (d) conspiracy claim fails as matter of law).

## VIII.    State Law Claims

### A.    State Consumer Protection Statutes (Count 1)

Plaintiffs allege that defendants violated the consumer protection statutes of nine states—Connecticut, Florida, Illinois, Maine, Massachusetts, New York, Ohio, Washington and Wisconsin.  Defendants argue that the statute of limitations bars plaintiffs' consumer protection claims.

Because plaintiffs allege diversity and supplemental jurisdiction over their state law claims, the Court applies Kansas choice of law rules.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496–97 (1941); see Kipling v. State Farm Mut. Auto. Ins. Co., 774 F.3d 1306, 1310 (10th Cir. 2014) (diversity jurisdiction); Carson v. Nat'l Collegiate Student Loan Tr. 2004-2, No. 20-4055-JWB, 2021 WL 963276, at *4–5 (D. Kan. Mar. 15, 2021) (supplemental jurisdiction).  Kansas "applies its own statutes of limitations to actions before it."  Muzingo v. Vaught, 18 Kan. App. 2d 823, 828, 859 P.2d 977, 980 (1993).  If a non-Kansas statute creates a right of action "which has a limitations period that is so specifically directed at the statutory right that it may be said to qualify the right," that statutory time restriction controls.  Id.; see Garcia v. Int'l Elevator Co., 358 F.3d 777, 779 (10th Cir. 2004).

For consumer protection claims, Kansas has a three-year limitations period.  See Kan. Stat. Ann. § 60-512(2) (actions based on statutory liability); see also Florez v. Ginsberg, 57 Kan. App. 2d 207, 216, 449 P.3d 770, 777 (2019) (K.S.A. § 60-512(2) applies to actions under Kansas Consumer Protection Act).   As to plaintiffs' consumer protection claims in seven states (Connecticut, Florida, Illinois, Massachusetts, New York, Washington and Wisconsin), plaintiffs do not dispute that even if the non-Kansas statute has its own limitations period, that period is four years or less.  Plaintiffs' Response To TAF's Motion (Doc. #95) at 10–17.  Because plaintiffs'

consumer protection claims in these seven states are untimely under a four-year statute of limitations, the Court need not determine whether the Kansas three-year limitations period or the non-Kansas limitations period applies. Plaintiffs' RICO and consumer protection claims rely on the same factual allegations. As with plaintiffs' RICO claims, at the latest, plaintiffs and the insurance company assignors were on inquiry notice of their potential state consumer protection claims by August 13, 2020—the date on which the DOJ announced and published its settlement with ACS. Plaintiffs argue that under the law of each state, the statute of limitations either did not accrue under the injury discovery rule or that some tolling theory applies.[48] The Court rejected these same arguments as to plaintiffs' RICO claims and they are equally without merit here. The statute of limitations therefore bars plaintiffs' consumer protection claims under the laws of Connecticut, Florida, Illinois, Massachusetts, New York, Washington and Wisconsin.

For plaintiffs' consumer protection claim under the Maine Unfair Trade Practices Act ("MUTPA"), Me. Stat. tit. 5, § 205-A et seq., plaintiffs assert that Maine's six-year statute of limitations for civil actions applies. Defendants maintain that because the MUTPA does not include a limitations period and no Maine statute of limitations is specifically directed at such claims, the Court should apply the three-year statute of limitations period under Kansas law. See Defendant Chronic Disease Fund, Inc.'s Memorandum Of Points And Authorities In Support Of Its Motion To Dismiss (Doc. #85) at 6; The Assistance Fund's Motion To Dismiss And Accompanying Memorandum Of Law (Doc. #86) at 7. As explained above, if the Maine statute creates a right of action with a limitations period "so specifically directed at the statutory right that

---

[48]     Plaintiffs' Response To TAF's Motion (Doc. #95) at 10–17 (Connecticut – continuing violation, fraudulent concealment; Florida – fraudulent concealment; Illinois – injury discovery rule, fraudulent concealment, continuing violation; Massachusetts – injury discovery rule, fraudulent concealment; New York – continuing violation, equitable tolling; Washington – injury discovery rule, equitable tolling, continuing violation; Wisconsin – continuing violation).

it may be said to qualify the right," that statutory limit shall apply. <u>Muzingo</u>, 18 Kan. App. 2d at 828, 859 P.2d at 980. Plaintiffs argue that Maine's six-year statute of limitations is "established through statute," but cite a catch-all statute of limitations for civil actions. <u>Plaintiffs' Response To TAF's Motion</u> (Doc. #95) at 14; <u>see</u> Me. Stat. tit. 14, § 752 ("All civil actions shall be commenced within 6 years after the cause of action accrues and not afterwards, except actions on a judgment or decree of any court of record of the United States, or of any state, or of a justice of the peace in this State, and except as otherwise specially provided."). The MUTPA, which is codified under a different title and chapter than the catch-all statute of limitations, does not contain a statute of limitations. <u>See</u> Me. Stat. tit. 5 (Administrative Procedure And Services), chp. 10 (Unfair Trade Practices); Me. Stat. tit. 14 (Court Procedure), chp. 205 (Limitation Of Actions). Likewise, Maine has not adopted a statute of limitations which specifically applies to MUTPA claims. <u>Cf.</u> Me. Stat. tit. 14, § 752-A (limitations period for malpractice claim against architects or engineers). The Court therefore applies the Kansas three-year statute of limitations. As with plaintiffs' RICO and other consumer protection claims, plaintiffs and the insurance company assignors were on inquiry notice of their MUTPA claims by August 13, 2020 at the latest and plaintiffs have not shown that any tolling theory applies. The three-year statute of limitations therefore bars plaintiffs' consumer protection claim under Maine law.

For plaintiffs' consumer protection claim under the Ohio Deceptive Trade Practices Act ("ODTPA"), plaintiffs argue that the Court should apply the doctrine of laches rather than any statute of limitations. Plaintiffs concede that the ODTPA contains no specific statute of limitations. <u>Plaintiffs' Response To TAF's Motion</u> (Doc. #95) at 16–17. In these circumstances, under Kansas choice of law principles, the Court must apply the Kansas three-year statute of limitations for consumer protection claims. <u>See</u> <u>Muzingo</u>, 18 Kan. App. 2d at 828, 859 P.2d at

980 (exception applies only when non-Kansas statute has limitations period so specifically directed at statutory right that it qualifies such right). Plaintiffs argue that because the ODTPA contains no specific statute of limitations, this Court should apply the equitable doctrine of laches. Plaintiffs' Response To TAF's Motion (Doc. #95) at 16 (citing Barrio Bros., LLC v. Revolucion, LLC, No. 1:18-cv-2052, 2021 WL 2895509, at *13 (N.D. Ohio July 9, 2021) (because ODTPA has "no specific statutes of limitations," courts apply equitable doctrine of laches (quoting Prakash v. Altadis U.S.A. Inc., No. 5:10-cv-0033, 2012 WL 1109918, at *20 (N.D. Ohio Mar. 30, 2012))). Because Ohio was the forum state in Barrio and Prakash, neither case involved choice of law rules. Plaintiffs do not cite any Kansas authority or otherwise address choice of law principles. The fact that Ohio courts apply the doctrine of laches when a state statute does not contain a specific limitations period is not an exception to Kansas choice of law rules. See Muzingo, 18 Kan. App. 2d at 825, 859 P.2d at 979 (general rule on limitation of actions is that law of forum governs and "if any exceptions to this rule are to be recognized, such exceptions must be found in the law of the forum itself" (quoting Green v. Kensinger, 199 Kan. 220, 223, 429 P.2d 95, 98 (1967))). Because plaintiffs and the insurance company assignors were on inquiry notice of their ODTPA claims by August 13, 2020 at the latest and plaintiffs have not shown that any tolling theory applies, the statute of limitations bars their consumer protection claims under Ohio law.

B.     Unjust Enrichment (Count 2)

Plaintiffs allege unjust enrichment under the laws of 14 states (California, Connecticut, Florida, Illinois, Iowa, Maine, Massachusetts, Mississippi, Nebraska, New York, Ohio, Virginia, Washington and Wisconsin). As to such claims for eight states (Connecticut, Illinois, Maine, Massachusetts, New York, Ohio, Washington and Wisconsin), Teva argues that plaintiffs cannot

state an equitable claim for unjust enrichment where they have an adequate remedy at law.[49] Plaintiffs do not dispute that their unjust enrichment and consumer protection claims allege essentially the same wrongful conduct.  Likewise, plaintiffs do not dispute that they have an adequate remedy at law under each state's consumer protection statute for their alleged injuries in the form of higher prices, which resulted in "mountainous profits" to defendants at the expense of insurance companies who paid Copaxone claims.  Class Action Complaint (Doc. #1), ¶ 283. Because plaintiffs have an adequate remedy at law against all defendants, the Court dismisses plaintiffs' unjust enrichment claims under the laws of Connecticut, Illinois, Maine, Massachusetts, New York, Ohio, Washington and Wisconsin.

As to plaintiffs' unjust enrichment claims for seven states (California, Florida, Massachusetts, Mississippi, Nebraska, Virginia and Washington), plaintiffs do not dispute that the limitations period is four years or less.  Plaintiffs argue that they did not discover their claims and that various tolling doctrines apply.[50]  Again, for substantially the reasons stated above as to the timeliness of plaintiffs' RICO claims, plaintiffs have not shown that these tolling doctrines save

---

[49]     Teva Defendants' Memorandum Of Law In Support Of Their Motion To Dismiss (Doc. #81) at 23 (citing Town of Plainville v. Almost Home Animal Rescue & Shelter, Inc., 187 A.3d 1174, 1183 (Conn. Ct. App. 2018); Gociman v. Loyola Univ. of Chicago, 41 F.4th 873, 886 (7th Cir. 2022) (Illinois law); Wahlcometroflex, Inc. v. Baldwin, 991 A.2d 44, 49 (Me. 2010); Tomasella v. Nestle USA, Inc., 364 F. Supp. 3d 26, 37 (D. Mass. 2019), aff'd, 962 F.3d 60 (1st Cir. 2020); Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V., 400 F. App'x 611, 613 (2d Cir. 2010) (New York law); Coventry Cts., LLC v. Cuyahoga Cnty., 212 N.E.3d 373, 380–81 (Ohio Ct. App. 2023); Sorenson v. Pyeatt, 146 P.3d 1172, 1176 (Wash. 2006); Smith v. RecordQuest, LLC, 989 F.3d 513, 520 (7th Cir. 2021) (Wisconsin law)).

[50]     Plaintiffs' Response To TAF's Motion (Doc. #95) at 18–23 (California – injury discovery rule, continuing violation; Florida – continuing violation and fraudulent concealment; Massachusetts – injury discovery rule, fraudulent concealment; Mississippi – injury discovery rule, fraud concealment, equitable tolling, continuing violation; Nebraska – continuing violation and fraudulent concealment; Virginia – fraudulent concealment; Washington – injury discovery rule).

their unjust enrichment claims. The statute of limitations therefore bars plaintiffs' unjust enrichment claims under the laws of California, Florida, Massachusetts, Mississippi, Nebraska, Virginia and Washington.[51]

As to plaintiffs' unjust enrichment claim under Iowa law, plaintiffs argue that defendants did not address whether this claim is timely. Plaintiffs' Response To TAF's Motion (Doc. #95) at 18 n.13. In fact, each defendant argued that the Kansas statute of limitations barred plaintiffs' unjust enrichment claims in all states.[52] In any event, plaintiffs' claim is untimely. As with Maine's statute of limitations for consumer protection claims, Iowa's statute of limitations for unjust enrichment claims is based on a catch-all statute—not one that is "so specifically directed at the statutory right that it may be said to qualify the right." Muzingo, 18 Kan. App. 2d at 828, 859 P.2d at 980. The Court therefore applies the three-year Kansas statute of limitations to plaintiffs' claim for unjust enrichment under Iowa law.[53] Again, because plaintiffs and the

---

[51]     Defendants argue that the statute of limitations also bars plaintiffs' unjust enrichment claims under the laws of Connecticut, Illinois, Maine, New York, Ohio and Wisconsin. Because plaintiffs have not stated a claim for unjust enrichment under the laws of these states, the Court need not address whether plaintiffs' claims are also untimely.

[52]     See Teva Defendants' Memorandum Of Law In Support Of Their Motion To Dismiss (Doc. #81) at 9 (Kansas two-year statute of limitations applies); Brief In Support OF Defendant Advanced Care Script, Inc.'s Motion To Dismiss The Complaint (Doc. #83) at 10 (Kansas three-year statute of limitations applies); Defendant Chronic Disease Fund, Inc.'s Memorandum Of Points And Authorities In Support Of Its Motion To Dismiss (Doc. #85) at 6 (Kansas two-year or three-year statute of limitations applies); The Assistance Fund's Motion To Dismiss And Accompanying Memorandum Of Law (Doc. #86) at 11 n.11 (same); Memorandum In Support Of AssistRx, Inc.'s Motion To Dismiss (Doc. #90) at 23 (except Maine consumer protection statute and Florida RICO, all state law claims have statute of limitations of four years or less).

[53]     The Court need not address whether Kansas applies a two or three year statute of limitations to unjust enrichment claims. Compare Murray v. Miracorp, Inc., 318 Kan. 615, 623, 545 P.3d 1009, 1015 (2024) (group of claims including unjust enrichment subject to two-year

(continued. . .)

insurance company assignors were on notice of their unjust enrichment claim by August 13, 2020 at the latest, the statute of limitations bars plaintiffs' unjust enrichment claim under Iowa law.

     C.    <u>Florida RICO Claim (Count 5)</u>

Plaintiffs assert a claim under the Florida RICO Act. <u>See</u> Fla. Stat. § 772.101 <u>et</u> <u>seq.</u> A claim under the Florida RICO Act includes the same elements as a claim under RICO, <u>i.e.</u> plaintiffs must allege conduct or participation in an enterprise through a pattern of criminal activity. <u>Prou v. Giarla</u>, 62 F. Supp. 3d 1365, 1381 (S.D. Fla. 2014); <u>Asbury v. Slider</u>, No. 8:19-CV-874-T-36SPF, 2020 WL 871097, at *3 (M.D. Fla. Feb. 21, 2020). For predicate acts under the Florida RICO statute, plaintiffs must allege conduct that violates Florida law, rather than federal law. <u>Design Pallets, Inc. v. GrayRobinson, P.A.</u>, 515 F. Supp. 2d 1246, 1257 (M.D. Fla. 2007); <u>see</u> Fla. Stat. § 772.102 (criminal activity includes activity chargeable by indictment or information under Florida law, which includes offenses related to fraud).

Plaintiffs allege that defendants committed the predicate act of insurance fraud under Florida law. <u>Class Action Complaint</u> (Doc. #1), ¶¶ 359, 360, 364. A person commits insurance fraud if with "intent to injure, defraud or deceive any insurer, any person," he or she causes a false, incomplete or misleading statement to be presented with respect to a claim for payment. Fla. Stat. § 817.234(1)(a)(1). As with the mail and wire fraud predicate acts on plaintiffs' federal RICO claim, the complaint does not plausibly suggest that ACS expressly certified anything other than the accuracy of the PDE information or that the presentation of PDE date for purposes of payment constitutes insurance fraud. <u>See</u> <u>Humana</u>, 126 F.4th at 105 (insufficient to make conclusory

---

[53](. . . continued)

statute of limitations) <u>with</u> <u>Black v. Union Pac. R.R. Co.</u>, No. 23-CV-1218-EFM, 2024 WL 1604620, at *11 (D. Kan. Apr. 12, 2024) (under Kansas law, unjust enrichment characterized as implied contract claim subject to three-year statute of limitations).

assertion that defendant made fraudulent certification without identifying fraudulent statement itself or what exactly was certified; ACS submission of claims to insurance company insufficient to support "implied certification" of compliance with law).  Likewise, plaintiffs have not plausibly alleged how defendants' certifications to various government agencies comprise insurance fraud under Florida law.  Because plaintiffs have not plausibly alleged facts which establish that defendants committed any predicate act under the Florida RICO Act, the Court dismisses the claim against all defendants.

In addition, for substantially the reasons stated above on plaintiffs' federal RICO claim, plaintiffs have not plausibly alleged facts which establish that defendants' alleged violations of the Florida RICO Act proximately caused their damages.  See Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1263 (11th Cir. 2004) (applying federal RICO analysis to Florida's RICO statute); Caring Voice Coalition, 2022 WL 3155035, at *14–15 (plaintiffs' shortcomings on federal RICO claims also apply to Florida RICO); O'Malley v. St. Thomas Univ., Inc., 599 So. 2d 999, 1000 (Fla. Dist. Ct. App. 1992) (indirect injuries—injuries sustained not as direct result of predicate acts under Florida RICO—not recoverable).  The Court therefore dismisses plaintiffs' Florida RICO claim against all defendants for failure to state a claim on which relief can be granted.

D.      Tortious Interference With Contract Claim (Count 6)

Plaintiffs allege that defendants intentionally interfered with the Medicare health plans between insurance companies and patients.  Specifically, plaintiffs allege that defendants deliberately sought to subvert the patient cost sharing provisions in these health plans which increased the demand and price for Copaxone.  Class Action Complaint (Doc. #1), ¶ 374.  As to this claim, plaintiffs do not dispute that the Kansas two-year statute of limitations for tort claims applies.  Plaintiffs' Response To TAF's Motion (Doc. #95) at 23; K.S.A. § 60-513(a)(4).  Under

Kansas law, a tort action generally accrues at the later of (1) when the "act giving rise to the cause of action first causes substantial injury" or (2) when the "fact of injury becomes reasonably ascertainable to the injured party." K.S.A. § 60-513(b). Plaintiffs' claim is not "reasonably ascertainable" until plaintiffs had knowledge of their injury and that defendants were the likely cause. Michaelis v. Farrell, 48 Kan. App. 2d 624, 631, 296 P.3d 439, 445 (2013). Plaintiffs again argue that the complaint alleges that Teva continued to refer Copaxone patients to ACS through 2022. As explained above, this allegation is too vague to suggest that defendants' unlawful conduct continued through 2022—it merely suggests that ACS continued to fill some Copaxone prescriptions. The statute of limitations therefore bars plaintiffs' intentional interference claims against all defendants.

## IX.    Plaintiffs' Request To Amend Complaint

In Plaintiffs' Response To CDF's Motion (Doc. #94), plaintiffs state that if the Court finds any deficiencies in their complaint, they should be afforded leave to amend. Initially, the Court notes that plaintiffs only requested leave to amend in response to CDF's motion to dismiss. In any event, the Court disregards any motion or request to amend which does not comply with District of Kansas Rule 15.1(a). Under that rule, a party filing a motion to amend that may not be filed as a matter of right must (1) set forth a concise statement of the amendment or leave sought; (2) attach the proposed pleading or other document; and (3) attach a redlined version of the proposed amendment that shows all proposed changes to the pleading. D. Kan. Rule 15.1(a); see Requena v. Roberts, 893 F.3d 1195, 1204 n.3 (10th Cir. 2018) (insufficient to merely suggest that party should be allowed to amend if judge finds pleadings deficient; party must file written motion for leave to amend, giving adequate notice of basis of proposed amendment). Because plaintiffs have not satisfied any of these requirements, the Court overrules their request to amend the complaint.

## X.    Conclusion

For reasons explained above, the Court dismisses plaintiffs' claims against all defendants because plaintiffs conceded defendants' arguments to which they did not respond or the claims are subject to dismissal on the merits, or both.

**IT IS THEREFORE ORDERED** that plaintiffs have not shown good cause why the Court should not grant defendants' motions to dismiss as to arguments to which plaintiffs did not directly respond without incorporation by reference.

**IT IS FURTHER ORDERED** that the Teva Defendants' Motion To Dismiss (Doc. #80) filed November 18, 2024 is **SUSTAINED**.  Under Rule 12(b)(6), Fed. R. Civ. P., as to Teva Pharmaceuticals USA, Inc. and Teva Neuroscience, Inc., the Court dismisses plaintiffs' consumer protection claims (Count 1), plaintiffs' RICO claims (Counts 3 and 4), plaintiffs' Florida RICO Act claims (Count 5) and plaintiffs' tortious interference with contract claims (Count 6) as untimely and for failure to state a claim on which relief can be granted.  Under Rule 12(b)(6), as to Teva Pharmaceuticals USA, Inc. and Teva Neuroscience, Inc., the Court dismisses plaintiffs' unjust enrichment claims (Count 2) as untimely (all states) and for failure to state a claim on which relief can be granted (Connecticut, Florida, Illinois, Maine, Massachusetts, Nebraska, New York, Ohio, Washington and Wisconsin).

**IT IS FURTHER ORDERED** that the Defendant Advanced Care Scripts, Inc.'s Motion To Dismiss (Doc. #82) filed November 18, 2024 is **SUSTAINED**.  Under Rule 12(b)(6), Fed. R. Civ. P., as to Advanced Care Scripts, Inc., the Court dismisses plaintiffs' unjust enrichment claims (Count 2), plaintiffs' RICO claims (Counts 3 and 4), plaintiffs' Florida RICO Act claims (Count 5) and plaintiffs' tortious interference with contract claims (Count 6) as untimely and for failure to state a claim on which relief can be granted.  Under Rule 12(b)(6), as to Advanced Care Scripts,

Inc., the Court dismisses plaintiffs' consumer protection claims (Count 1) as untimely (all states) and for failure to state a claim (Connecticut, Florida, Illinois, Massachusetts, New York, Washington and Wisconsin).

**IT IS FURTHER ORDERED** that the Defendant Chronic Disease Fund, Inc.'s Motion To Dismiss (Doc. #84) filed November 18, 2024 is **SUSTAINED**. Under Rule 12(b)(6), Fed. R. Civ. P., as to Chronic Disease Fund, Inc., the Court dismisses plaintiffs' RICO claims (Counts 3 and 4) and Florida RICO Act claims (Count 5) as untimely and for failure to state a claim on which relief can be granted. Under Rule 12(b)(6), as to Chronic Disease Fund, Inc., the Court dismisses plaintiffs' consumer protection claims (Count 1) and plaintiffs' tortious interference with contract claims (Count 6) as untimely. Under Rule 12(b)(6), as to Chronic Disease Fund, Inc., the Court dismisses plaintiffs' unjust enrichment claims (Count 2) as untimely (all states) and for failure to state a claim (Connecticut, Illinois, Maine, Massachusetts, New York, Ohio, Washington and Wisconsin).

**IT IS FURTHER ORDERED** that The Assistance Fund's Motion To Dismiss And Accompanying Memorandum Of Law (Doc. #86) filed November 18, 2024 is **SUSTAINED**. Under Rule 12(b)(6), Fed. R. Civ. P., as to The Assistance Fund, the Court dismisses plaintiffs' consumer protection claims (Count 1), plaintiffs' RICO claims (Counts 3 and 4) and plaintiffs' tortious interference with contract claims (Count 6) as untimely and for failure to state a claim on which relief can be granted. Under Rule 12(b)(6), as to The Assistance Fund, the Court dismisses plaintiffs' unjust enrichment claims (Count 2) as untimely (California, Florida, Massachusetts, Mississippi, Nebraska, Virginia and Washington) and for failure to state a claim on which relief can be granted (all states). Under Rule 12(b)(6), as to The Assistance Fund, the Court dismisses plaintiff's Florida RICO Act claims (Count 5) for failure to state a claim on which relief can be

granted.

**IT IS FURTHER ORDERED** that AssistRx, Inc.'s Motion To Dismiss (Doc. #89) filed November 18, 2024 is **SUSTAINED**.  Under Rule 12(b)(6), Fed. R. Civ. P., as to AssistRx, Inc., the Court dismisses plaintiffs' RICO claims (Counts 3 and 4) and Florida RICO Act claims (Count 5) as untimely and for failure to state a claim on which relief can be granted.  Under Rule 12(b)(6), as to AssistRx, Inc., the Court dismisses plaintiffs' consumer protection claims (Count 1) and tortious interference with contract claims (Count 6) as untimely.  Under Rule 12(b)(6), as to AssistRx, Inc., the Court dismisses plaintiffs' unjust enrichment claims (Count 2) as untimely (all states) and for failure to state a claim on which relief can be granted (Connecticut, Illinois, Maine, Massachusetts, New York, Ohio and Washington).

**IT IS FURTHER ORDERED** that plaintiffs' request to amend the complaint in Plaintiffs' Response In Opposition To Defendant Chronic Disease Fund, Inc.'s Motion To Dismiss The Complaint (Doc. #94) filed December 18, 2024 is **OVERRULED**.

Dated this 30th day of April, 2025 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge